1              UNITED STATES DISTRICT COURT

2             DISTRICT OF MASSACHUSETTS (Boston)

3                         No. 1:19-cv-11835-WGY

4

5    JACK OWENS, on behalf of themselves and all
     others similarly situated,
6                   Plaintiffs

7    vs.

8

9    THE CITY OF MALDEN,
                   Defendant

10

11                       * * * * * * * * *

12

13              For Zoom Bench Trial Before:
                   Judge William G. Young

14

15

16              United States District Court
                District of Massachusetts (Boston)
17              One Courthouse Way
                Boston, Massachusetts 02210
18              Monday, May 10, 2021

19

20                       * * * * * * * *

21

22         REPORTER: RICHARD H. ROMANOW, RPR
                 Official Court Reporter
23               United States District Court
         One Courthouse Way, Room 5510, Boston, MA 02210
24                   bulldog@richromanow.com

25

```
1              A P P E A R A N C E S

2

3   JOSEPH A. PADOLSKY, ESQ.
        Louison, Costello, Condon & Pfaff, LLP
4       101 Summer Street, 4th Floor
        Boston, MA 02110
5       (617) 439-0305
        Email: Jpadolsky@lccplaw.com
6       For Plaintiffs

7

8   BARRY J. MILLER, ESQ.
    ALISON HICKEY SILVEIRA, ESQ.
9   TIMOTHY J. BUCKLEY, ESQ.
        Seyfarth Shaw, LLP
10      World Trade Center East
        Two Seaport Lane, Suite 300
11      Boston, MA 02210
        Email: Bmiller@seyfarth.com
12      For Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2

3   WITNESS                  DIRECT  CROSS  REDIRECT  RECROSS

4

5   CHIEF KEVIN MOLIS (Continued.)

6      By Mr. Padolsky:        9                 18

7      By Mr. Miller:                10

8

9   CAPTAIN JOHN AMIRAULT

10      By Mr. Padolsky:       20                    30

11      By Mr. Miller:               22

12

13   PLAINTIFF RESTS AND MOTIONS...................... 37

14

15   CHARLES RANAGHAN (Recalled.)

16      By Ms. Silveira:       79

17      By Mr. Padolsky:

18

19   MARGARET MARY SULLIVAN

20      By Mr. Buckley:        93

21      By Mr. Padolsky:

22

23

24

25

```
 1                    E X H I B I T S

 2

 3
          EXHIBIT 22.......................... 95
 4
          EXHIBIT 40..........................  8
 5
          EXHIBIT 41.......................... 26
 6
          EXHIBIT 42.......................... 32
 7
          EXHIBIT 43.......................... 37
 8
          EXHIBIT 44.......................... 38
 9
          EXHIBIT 45.......................... 81
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2          (Begins, 9:00 a.m.)

3          THE CLERK:  Now hearing Civil Matter 19-11835,

4     Owens versus the City of Malden.

5          THE COURT:  Good morning, counsel.  This is a

6     hearing, a continuation of the trial held on our zoom

7     platform.  Our host this morning is Courtroom Deputy

8     Clerk, Jennifer Gaudet.  I have on the line certain of

9     my law clerks.

10          We welcome to this hearing the Honorable Nomo

11    Sakamoto.  Judge Sakamoto is a judge in the Sapporo

12    District Court in Japan, she's studying here in

13    Cambridge.  Whenever I have an international jurist, I

14    invite them to sit with me and see things exactly as I

15    see them.  And this morning we welcome Judge Sakamoto.

16          This is a hearing open to the press and public.  I

17    do not know whether any members of the press or public

18    are present.  If they are, I must remind you to keep

19    your microphone muted and that the rules of court remain

20    in full force and effect, and that is there is no

21    retransmission, taping, streaming, or other broadcast of

22    these proceedings.

23          With that done, I'll ask the Clerk -- Chief Molis

24    was testifying.  I'll ask the Clerk to remind him that

25    he is still under oath.

1          THE CLERK:  I'd like to remind you, sir, that you

2     are still under oath.  Do you understand?

3          THE WITNESS:  Absolutely.  Thank you.

4          THE COURT:  Yes, and, sir, because of the nature

5     of this proceeding, I'll ask the question I asked you on

6     Friday.  As you are there in front of the camera, what

7     notes or other materials do you have immediately at

8     hand?

9          THE WITNESS:  None, sir.

10          THE COURT:  Thank you.

11          Mr. Padolsky, from our discussion I assumed you

12     were done with your examination of this witness, but you

13     tell me.

14          MR. PADOLSKY:  Yes, your Honor, I think so.  I --

15     I -- over the weekend, as we discussed on Friday, I went

16     back and looked to gather some examples and I forwarded

17     it -- well before we get started with the witness, I

18     forwarded it to my brother, um, 17 separate pay stubs

19     from 2018 to, um, 2021, which I asked that they agree to

20     stipulate to their admission.  It's to date, your

21     Honor --

22          THE COURT:  Let's take that up when we're done

23     with the examination, um, if we have to.

24          You have no further questions at this time?  All

25     right, um --

1          MR. PADOLSKY:  Well, no, your Honor, I have one

2    actually.

3          THE COURT:  And you may.  Go ahead.

4          MR. PADOLSKY:  I'm just trying to use the time

5    most efficiently.

6          I also went back, your Honor, um, before we get

7    started, and my associate who's been with us this entire

8    time, has been keeping the start and stop times for me

9    and I note that, um, she's indicated to me that I may

10   have a little bit more than 50 minutes remaining.

11         THE COURT:  No, the times are the times as I

12   announced them.  Go ahead.

13         MR. PADOLSKY:  Okay, your Honor, shall we address

14   the exhibits after Mr. --

15         THE COURT:  I think you would save time if you

16   did, unless you want them in to examine this witness.

17         MR. PADOLSKY:  Um, that -- I would like that, your

18   Honor.

19         THE COURT:  All right.

20         Any objection to these exhibits, Mr. Miller?

21         MR. MILLER:  Yeah, your Honor, we haven't had a

22   chance fully to digest them, but it's clear on the face

23   of it that some of them pertain to events outside the

24   statute of limitations period.

25         THE COURT:  Well I can take care of that.  They'll

```
1   be admitted.  And if they're outside the limitations
2   period, we won't give them any, um -- they don't count.
3          So how many are there?
4          MR. PADOLSKY:  17, your Honor.  I already
5   forwarded --
6          THE COURT:  All right, 17 of them would take us up
7   to --
8          MR. PADOLSKY:  Your Honor, for marking purposes I
9   have them marked as one exhibit with 17 subparts.
10         THE COURT:  I understand and that's fine.  So
11  they'll be Exhibit 40 in evidence.
12         (Exhibit 40, marked.)
13         MR. PADOLSKY:  And for the record it's a
14  collection of pay stubs, um, spanning June -- sorry,
15  from 2018 to 2020.
16         And then, your Honor, separately I'd move to
17  admit, and I've forwarded this to my brother and his
18  colleagues as well, um, three separate 1006, um, pieces
19  of evidence, which I also believe are admissible under
20  611 as pedagogical charts.  I can put them up on the
21  screen.
22         THE COURT:  Well you may use them.  I don't have
23  to rule on them right now.  In any event we'll use them
24  as chalks if they're not admitted.
25         But is there objection to these, Mr. Miller?
```

1          MR. MILLER:  Yes, your Honor, there's been no

2     foundation for how any of this is calculated.

3          THE COURT:  Well we'll get to that in due course.

4     But he may use them as charts if -- for no other reason.

5          Now, any questions, Mr. Padolsky, of this witness?

6          MR. PADOLSKY:  No, your Honor, I've forwarded

7     those to the Court, they're AQ, AR, and AS for the

8     record.

9          THE COURT:  Thank you.

10         MR. PADOLSKY:  One question for the witness, your

11    Honor.

12         THE COURT:  All right.

13         (Chief Kevin Molis, continued.)

14

15    DIRECT EXAMINATION BY MR. PADOLSKY:  (Continued.)

16    Q.    Chief, good morning.

17    A.    Good morning, sir.

18    Q.    Are you aware of the current detail rate that the

19    City pays for firefighters?

20         MR. MILLER:  Objection, relevance.

21         THE COURT:  Yes, why is that relevant?

22         MR. PADOLSKY:  It goes to disproving the defense

23    that the City has made regarding the, um, rate being

24    higher than it's supposed to be.

25         THE COURT:  No, I don't see it.  Sustained.

1          So that's it with this witness for you,

2     Mr. Padolsky?

3          MR. PADOLSKY:  Yes, your Honor.

4          THE COURT:  All right.  Mr. Miller, do you wish to

5     inquire now or reserve, sir.

6          MR. MILLER:  Briefly now, your Honor, and reserve

7     as may be necessary to --

8          THE COURT:  And you may do both.  You may inquire.

9

10    CROSS-EXAMINATION BY MR. MILLER:

11    Q.    Good morning, Chief Molis.

12    A.    Good morning, sir.

13    Q.    I'll jump right into this.  Do you know all of the

14    officers who work for the Malden Police Department by

15    name?

16    A.    Yes.  Yes.

17    Q.    Do you know an officer named Heidi McCormick?

18    A.    No.

19    Q.    To your knowledge has anyone named Heidi McCormick

20    ever been a police officer in the City of Malden?

21    A.    I believe so, no.

22    Q.    And can you state with certainty that no one named

23    Heidi McCormick has been a police officer for the City

24    of Malden in the past three years?

25    A.    I'm extremely certain.

Q.    Okay.  Do you know Captain Glenn Cronin?

A.    Yes.

Q.    Do you know if he worked details?

A.    Um, yes.

Q.    Do you know if he's worked any paid details in the last three years?

A.    I would believe so, yes.

Q.    Moving on to the general concept of details.  Do you recall some testimony that you gave in response to Mr. Padolsky's questions about circumstances in which the City or the police department might determine that a police detail was necessary in light of ongoing activity.  Do you recall that testimony?

A.    Yes, sir.

Q.    Does the department only provide details when the department has decided that details are necessary?

A.    No.

Q.    So a vendor can request one that's not the subject of any City requirement?

A.    That's possible, yes.

Q.    You spoke to Mr. Padolsky about a strike involving National Grid.  Do you recall that testimony?

A.    Yes, sir.

Q.    And are you aware of any ordinance or other legal requirement that obligates a private employer to pull a

1    detail in the event of a labor strike?

2    A.    I have a general belief that there is something

3    that triggers the requirement.  I don't know whether

4    it's an ordinance or a law, but I believe there is

5    something that mandates it.

6    Q.    Okay.  But you're unable to identify any such

7    legal requirement?

8    A.    No.

9    Q.    Okay.  Are you familiar with the conceptual

10   distinction between city and private details?

11        MR. PADOLSKY:  Objection.

12        THE COURT:  Overruled.

13   A.    I believe, yes.

14   Q.    And, um, in terms of city details, can you give us

15   a sense of what percentage or fraction that those make

16   up of the total details worked?

17   A.    Um, a small amount.  I don't know a percentage,

18   but it's small compared to the third-party ones.

19        MR. PADOLSKY:  Objection, your Honor, 602.  We

20   have the actual records in the record.

21        THE COURT:  I'll let it stand, for what it's

22   worth.  Thank you.

23   Q.    Would it be fair to say, Chief Molis, that the

24   overwhelming number of details pulled are in fact

25   private details, the overwhelming majority of them?

1      MR. PADOLSKY:  The same objection, your Honor.

2      THE COURT:  Overruled.

3  A.   Yes.

4  Q.   Does the police department ever hire details?

5  A.   Um, no, I can't imagine how that would be a

6  necessity.  No.

7  Q.   And what do you do if you need to cover say a

8  patrolled territory for the given posting and don't have

9  enough officers scheduled to cover that?

10 A.   That would be an overtime situation.

11 Q.   So if the City needs additional police work for

12 the police force, it just becomes overtime, that's not a

13 detail --

14     MR. PADOLSKY:  Objection, your Honor, outside the

15 scope.

16     THE COURT:  No, overruled.  He may have it.

17 A.   Yeah, if it's something related to police

18 operations, it needed to be, um, provided -- say

19 investigatory work by detectives or patrol officers to

20 cover the City, then that would be police overtime.

21 Q.   Do you recall Mr. Padolsky talking to you about

22 your designation as a representative of the City for

23 certain purposes at your deposition?

24 A.   Yes.

25 Q.   I'm showing you the same document he showed you,

1    which is Exhibit F, and specifically I'm showing you the

2    Schedule A to the 30(b)(6) notice of deposition.

3         Do you see that?

4    A.    Yes.

5    Q.    Of these topics do you see any mention of the

6    detail rate?

7    A.    I'll read it to be sure.  Hold on.  (Reads.)   No.

8    Q.    Do you see any mention of any calculations of any

9    kind from the Schedule A?

10        MR. PADOLSKY:  Objection.

11        THE COURT:  It speaks for itself and there are

12   none.

13        MR. MILLER:  Thank you, your Honor.

14   Q.    Chief Molis, have you ever been asked by the City

15   to calculate the detail rate?

16   A.    No, never.

17   Q.    And do you know with any certainty which elements

18   of pay have in fact been included in the detail rate at

19   any given time over the years?

20   A.    Not with any specificity, no.

21   Q.    Have you ever been asked to approve a detail rate

22   that was calculated by someone else?

23   A.    No.

24   Q.    Are you aware of the existence of the Detail

25   Board?

1    A.    Yes, sir.

2    Q.    Do you ever attend their meetings?

3    A.    No.

4    Q.    Have you ever been invited to their meetings?

5    A.    No.

6    Q.    Do you receive any report of what happens at their

7    meetings?

8    A.    Um, no.  (Pause.)  I just want to be clear.  With

9    regard to that like minutes or a regular expectation?

10   No.  I might become aware of something that emerges from

11   a meeting, but there's no mandatory reporting or

12   exchange of that in a scheduled format.

13   Q.    I see.  I'm shifting gears on you a little bit,

14   Chief.

15        Is there an established schedule that patrol

16   officers and superior officers work?

17   A.    Yes.

18   Q.    Tell us about that if you would.

19        THE COURT:  I'm sorry, I couldn't hear?

20   Q.    Can you tell us the schedule that patrol officers

21   and senior officers work, Chief?

22   A.    Yes.  With regard to patrol officers, which is the

23   majority of the department, we have five platoons that

24   cover the city on a 24-hour 7-day-a-week basis.  We have

25   three platoons that work 8:00 in the morning -- well

1    it's been changed, from 7:00 in the morning until

2    11:00 p.m., that's an 18-hour tour.  And then we also

3    have platoons, two of them, that work from 11:00 p.m. at

4    night until 7:00 a.m.  That's the majority of the

5    department.

6         But then we also have detectives who generally

7    work four shifts that are like 8:00 to 4:00, 8:00 a.m.

8    to 4:00 p.m., and then one night shift, 4:00 to

9    midnight.  And then we have a small number of people who

10   are in what you would call "administrative schedules,"

11   which also tend to be Monday through Friday, 8:00 till

12   4:00, and then with one night, um, component too.  So

13   that's pretty much it.  But the majority of it is that

14   patrol schedule.

15   Q.   Okay, so let's focus on that.

16        The first schedule you told me about where

17   officers are working longer days, how many shifts do

18   they work in a week when they are on that schedule?

19   A.   I think it might depend on like how the week

20   falls, but you do -- you work the, um, 7:00 to 11:00 and

21   then you're off, and then you would do another 7:00 to

22   11:00 and then you would be off, I believe, um, for two

23   or three days, and then you would come back in to work

24   another cycle.  It remains in a cycle.  So when your

25   platoon is working, there are a couple of platoons that

1  are off.  So it's a cycle.  And I think your days off

2  tend to rotate because of that cycle because it's not in

3  a traditional Monday through Friday schedule, um, as the

4  rest of the world works.

5  Q.    Understood.  And with respect to the overnight

6  shift that you described, those are 8-hour shifts?

7  A.    Yes, 11:00 to 7:00.  Yes.

8  Q.    And is there a rotation in place with respect to

9  those as well?

10  A.    Yes, there are only two platoons that work those

11  hours and I believe those officers work three shift, 8

12  hours each, and then they go off for I believe three

13  shifts and then return.

14  Q.    So that means that they're working either three or

15  four 8-hour shifts in a 7-day week, is that right?

16  A.    I believe -- yeah, potentially, yes, I think

17  that's how it would play out in a 7-day analysis.  Yes.

18        MR. PADOLSKY:  Objection, your Honor, move to

19  strike under 602.

20        THE COURT:  The motion to strike is denied.

21        MR. PADOLSKY:  May I be heard on this, your Honor?

22        THE COURT:  No, it's not necessary.

23  Q.    So those officers working the night shift that

24  work either 3 or 4 shifts per week, their regular

25  schedule is going to have them working either 24 or 32

1    hours a week, is that right?

2    A.    I believe that would be the number, yes.

3    Q.    Okay.

4         MR. MILLER:  That's all I have for Chief Molis at

5    this time, Judge Young.  We do reserve the right to

6    recall him.

7         THE COURT:  Of course you do.

8         All right, you have no questions, Mr. Padolsky?

9         MR. PADOLSKY:  Two, your Honor.

10        THE COURT:  Very well.  Go ahead.

11

12   REDIRECT-EXAMINATION BY MR. PADOLSKY:

13   Q.    Chief, all details are for public safety, correct?

14        MR. MILLER:  Objection.

15        THE COURT:  Overruled.

16   A.    Yes, I believe there is a public safety function,

17   yes.

18   Q.    And, um, counsel asked you the question, that

19   you're not aware of any specific augments that are

20   included, I think he said the phrase "with certainty"?

21   Do you recall that question?

22   A.    I'm honestly having a hard time with some audio

23   here, so could you please say that again?

24   Q.    Sorry, Chief.  Counsel asked you specifically,

25   that you're not aware of which particular augments are

1    included in the paid detail rate with certainty?  Do you

2    recall that question?

3    A.    I know there's a lot that goes into it, so I don't

4    want to miss something by saying that I know it

5    intricately, so.

6    Q.    Sure.

7    A.    So that's what I meant by that.

8    Q.    But you agree though that you testified that you

9    are certain that Quinn and longevity are included in the

10   rate?

11   A.    I believe that's been the calculation by others,

12   yeah.

13   Q.    Thank you.

14         MR. PADOLSKY:  Nothing else, your Honor.

15         THE COURT:  Thank you.

16         All right.  Nothing further, Mr. Miller, from this

17   witness?

18         MR. MILLER:  No, your Honor.

19         THE COURT:  Thank you.

20         Now, Mr. Padolsky, subject to my rulings on the

21   exhibits, you rest, correct?

22         MR. PADOLSKY:  No, your Honor, I have one other

23   witness to call.

24         THE COURT:  You may.

25         MR. PADOLSKY:  Captain John Amirault.

1          THE COURT:  He may be called.

2          MR. PADOLSKY:  The plaintiffs call John Amirault.

3          THE WITNESS:  I'm here.  Can I be heard?

4          MR. PADOLSKY:  Yes.

5          THE WITNESS:  Okay.

6          (CAPTAIN JOHN AMIRAULT, sworn.)

7          THE COURT:  And, Mr. Amirault, consistent with our

8     procedure throughout this trial, may I ask you to state

9     your full name.

10          THE WITNESS:  John Amirault.

11          THE COURT:  And, Mr. Amirault, you're from

12     wherever you're testifying there.  What do you have in

13     the way of notes or papers and the like right to hand

14     while you're testifying?

15          THE WITNESS:  Nothing at all, your Honor.

16          THE COURT:  Thank you.

17          Proceed, Mr. Padolsky.

18

19          * * * * * * * * * * * * * * * * * * * *

20          CAPTAIN JOHN AMIRAULT

21          * * * * * * * * * * * * * * * * * * * *

22

23     DIRECT EXAMINATION BY MR. PADOLSKY:

24     Q.    So, Captain Amirault, you're a Captain at the

25     Malden Police Department, is that correct?

1    A.    Yes.

2    Q.    And you've been with the department for over 40

3    years?

4    A.    41.   Over 41.

5    Q.    And how long have you been a Captain for?

6    A.    Approximately 16 years.

7    Q.    And is part of your duties as a Captain involving

8    scheduling and the work week?

9    A.    No.

10   Q.    Do you have an understanding of when the work week

11   begins and ends for all members of the Malden Police

12   Department?

13   A.    Yes, I do.

14   Q.    And could you give us your understanding of that?

15   A.    The payroll work week runs from Sunday to

16   Saturday, um, for the entire Malden Police Department.

17   Q.    Thank you.  And then your -- two other quick

18   questions.

19         In your time with the department, um, the paid

20   detail rate that pays a detail based upon the maximum

21   rate of pay of the highest-paid patrolmen, has that

22   always included whichever wage augment gets you to that

23   highest-paid patrolman's rate?

24         MR. MILLER:  Objection, there's no foundation for

25   this.

1          THE COURT:  Well more to the point, you're leading

2     and I have problems with that, um, with this witness.

3     Sustained.

4          MR. PADOLSKY:  No other questions, your Honor.

5          THE COURT:  Very well.

6          Nothing for this witness at this time, Mr. Miller?

7          MR. MILLER:  Actually, your Honor, I do have some

8     cross for Captain Amirault that might be helpful to get

9     in right now.

10          THE COURT:  Yes, go ahead.

11

12     CROSS-EXAMINATION BY MR. MILLER:

13     Q.    Captain Amirault, what's your highest level of

14     education?

15     A.    I have a Master's Degree in Criminal Justice from

16     the University of Massachusetts.

17     Q.    Does that put you at the highest step level with

18     the Quinn Bill benefit?

19     A.    Yes.

20     Q.    And are you a member of the union, sir?

21     A.    I'm a member of the Superior Officers Union, yes,

22     that's correct.

23     Q.    And you've been in the Superior Officers Union

24     since December of 1992?

25     A.    Correct.

1    Q.    Have you ever been a member of the bargaining team

2    for the Superior Officers Union?

3    A.    I have.

4    Q.    Have you ever been a member of the Detail Board?

5    A.    I have.

6    Q.    Were you on the Detail Board for between 5 and 8

7    years?

8    A.    Yes.

9    Q.    Does the Detail Board, in your view, have the

10   authority to change the rate of pay that the City

11   invoices to vendors for details?

12   A.    No.

13   Q.    Does the Detail Board, in your view, have the

14   authority to change the rate of pay paid to officers for

15   working details?

16   A.    No, that's done by the collective bargaining

17   agreement.

18   Q.    Is that true of both city and private details?

19   A.    Yes.

20   Q.    Okay.  So the Detail Board, in your view as a

21   former member of the Detail Board and a member of the

22   City's bargaining team, has no power to change the rate

23   that is to be charged for details either to vendors or

24   paid to officers, is that right?

25   A.    I can't answer the question in the way you phrased

1    it.  I mean it's a more-than-a-one-time process that

2    occurred.  There's something that occurs prior to us,

3    um, indicating that the rate should go up.

4    Q.    That wasn't my question.  My question is, does the

5    board have the authority to change the rate from what's

6    specified in the CBA?

7    A.    No, the collective bargaining agreement sets the

8    rate.

9    Q.    Okay.  And we agree that the collective bargaining

10   agreement sets the rate to be paid to officers, correct?

11   A.    Yes.

12   Q.    (Pause.)  I'm showing you an exhibit which has

13   been labeled for identification as BD.  (On screen.)

14   Can you see that, Captain Amirault?

15   A.    I can.

16   Q.    You'll see in the middle of this document it's an

17   e-mail that you sent on October 21, 2015, is that right?

18   A.    Yes.

19   Q.    And you sent this to the e-mail address that reads

20   "Maldenpolice@maldenpd.com," is that right?

21   A.    Correct.

22   Q.    Do you know who gets that e-mail, who it's

23   broadcast to?

24   A.    Um, everybody in the -- everybody who's in that

25   mailing list.

1    Q.    Do you know who's in the mailing list?

2    A.    I think it's the entire Malden Police Department.

3    Q.    Okay.  But certainly all the officers who are

4    working details?

5    A.    Yes.

6    Q.    Okay.  And your e-mail reads "To all members."  Is

7    that members of the department?

8    A.    That's correct.

9    Q.    And you go on to say that "The Detail Board met

10    October 6th, 2015 and voted on the following issues," is

11    that right?

12    A.    Yes.

13    Q.    And you report to the membership of the department

14    that the Detail Board met in October of 2015 and voted

15    that effective November 2015 -- November 15th, 2015, the

16    detail rate will be raised to $55.91 per hour, is that

17    right?

18    A.    That's what that says.

19    Q.    And you go on to report that "From that 55.91 an

20    hour the City will deduct its 10 percent."  Is that

21    right?

22    A.    That's correct.

23    Q.    And this is all under the heading of something

24    that the Detail Board voted on?

25          MR. PADOLSKY:  Your Honor, I think completeness

1     requires reading the remaining paragraph.

2          THE COURT:  Well, I, um -- the remaining paragraph

3     is before him and I can read it.

4          Are you going to offer this document, Mr. Miller?

5          MR. MILLER:  Yes, your Honor.

6          THE COURT:  And no objection, is there?

7          MR. PADOLSKY:  No, your Honor.

8          THE COURT:  All right, DB is admitted in evidence,

9     Exhibit 41.  So now the whole thing is before me.

10          (Exhibit 41, marked.)

11    Q.    Captain Amirault, you reported to the entire

12    police department that the Detail Board voted not only

13    to raise the rate to $55.91 an hour, but that the City

14    would deduct its 10 percent, leaving the detail officer

15    with the rate of $50.32 before taxes, is that right?

16    A.    That's what that says, yes.

17    Q.    Okay.  That was an accurate report on your part,

18    right?

19    A.    Not for --

20          MR. PADOLSKY:  Objection, calls for an opinion.

21          THE COURT:  No, overruled.  He can tell us if he

22    thought it was accurate.

23    A.    When I wrote it I thought it was accurate.  I

24    don't believe it's accurate now.

25    Q.    But at the time you reported this to the entire

1   membership of the department, you believed it to be

2   accurate?

3   A.    Then I thought it was accurate, yes.

4   Q.    Okay.  The calculation that's set forth in

5   Paragraph 1, who performed that calculation?

6   A.    Um, I'm not 100 percent certain.  I don't -- I

7   don't recall.

8   Q.    Do you recall being asked that question at your

9   deposition?

10  A.    Um, I may have been.

11  Q.    Do you recall testifying at your deposition that

12  this was your calculation?

13  A.    I could have very well, yes.

14  Q.    Would you like to see the testimony?

15  A.    No, I take your word for it.  It could have been

16  my calculation.

17  Q.    Okay.  You don't dispute now that this was in fact

18  your calculation set forth in the e-mail that we're

19  looking at, is that right?

20  A.    It was -- um, I didn't sit down and do the math.

21  Any time that I have a payroll question, I would ask

22  Terry Ippelyito, the Chief's administrative assistant.

23  Q.    Is it your testimony now that this is not your

24  calculation?

25  A.    Well it's my calculation in the sense that I'm

1    trying to get this information out to the officers, yes.

2    Did I sit down and do the math?  I would seriously doubt

3    it.

4    Q.    Okay.  Do you recognize that you testified at the

5    deposition about the -- with the words, "This was my

6    calculation"?

7    A.    Well it's a mischaracterization that I sat down

8    and actually did the math.

9    Q.    Okay.  But you understand you said those words at

10   deposition?

11   A.    I may have.  I take your word for it.  But like I

12   said, I didn't do the math.

13   Q.    (On screen.)  Can you see your deposition

14   transcript on the screen there, Captain Amirault?

15   A.    I see it.

16   Q.    And you were asked a question.  "You made a very

17   specific calculation in this e-mail.  Did you calculate

18   with somebody how to do this calculation or did you just

19   come up with it yourself?"  Your answer was "This was my

20   calculation," is that right?

21   A.    Yes.

22   Q.    And you went on with your testimony to be asked,

23   "Did you talk to anyone else when you made this

24   calculation?"  And you testified that you did not, is

25   that right?

1    A.    Yes, I see that.

2    Q.    (Pause.)  Do you know how you undertook the

3    calculation, do you know what math you did?

4    A.    Again I've answered that.  I don't believe that I

5    did the math.  I mean I'm currently in charge of a

6    number of things, to include grants, and when it comes

7    to requesting payroll data, I go to the Chief's

8    secretary, Terry Ippelyito, for those numbers, and I

9    believe that that's what I did in this matter.

10   Q.    Okay.  Notwithstanding your deposition testimony

11   that it was your calculation?

12   A.    Yes.

13   Q.    And you didn't consult with anybody else about it?

14   A.    That's correct.

15   Q.    Okay.  Do you know what elements are included in

16   the calculation you reported to the membership of the

17   unions?

18   A.    It's always been my opinion that, um, everything

19   that's in an officer's pay is calculated into that

20   figure.

21   Q.    And that's what you report, you report a rate that

22   includes all augments that any officer could receive,

23   right?

24   A.    Yes.

25   Q.    And then you report that the rate paid to the

1    officer will be reduced by 10 percent from that amount,

2    is that right?

3    A.    Because at the time I wrote that document, I

4    believed that to be, um, what was supposed to have

5    happened.

6    Q.    Is that a "Yes"?

7    A.    Yes.

8         (Pause.)

9         MR. MILLER:  That's all I have for Mr. Amirault

10   right now, your Honor.  We may reserve the right to

11   recall him as well.

12        THE COURT:  And you may.

13        Mr. Padolsky, anything?

14        MR. PADOLSKY:  Your Honor, I just need a moment.

15        (Pause.)

16        MR. MILLER:  Your Honor, I'm not sure if I moved

17   this yet?  This was taken into evidence, is that

18   correct?

19        THE COURT:  It is, Exhibit 41.

20        (Indicates.)

21        (Pause.)

22        MR. PADOLSKY:  Okay.

23

24   REDIRECT-EXAMINATION BY MR. PADOLSKY:

25   Q.    Okay.  Captain Amirault, I'm going to show you a

1    few documents, the first is an e-mail, a 5-Page e-mail

2    from Terry Ippelyito to yourself dated August 28th,

3    2019, which says in it, "Here you go, the first call is

4    regular pay hourly rates and the second is overtime

5    rates," do you see that?

6    A.    I do see it.

7          MR. MILLER:  Objection, it's beyond the scope of

8    direct.

9          MR. PADOLSKY:  It's not you specifically asked --

10         THE COURT:  Wait.  Wait.  Just a moment.

11         Why isn't it?

12         MR. PADOLSKY:  He specifically asked him where

13   within, um -- where he gets those specific rates from,

14   um, and he responded "Terry Ippelyito," um, that he

15   doesn't calculate the rates himself --

16         THE COURT:  Yes, but this is years after the

17   e-mail we were looking at.

18         MR. PADOLSKY:  It's exactly the type of -- the way

19   in which --

20         THE COURT:  It may be.  Sustained.  Which is not

21   to say you can't get it in evidence.  But sustained.

22   Q.    Captain Amirault, do you recognize this e-mail?

23   A.    I do.

24   Q.    And, um, what is it?

25   A.    This is an e-mail sent by Terry Ippelyito, the

```
 1    Chief's administrative assistant, at my request, um,

 2    for, um, information I needed to complete a grant.

 3    Q.    What type of information?

 4          MR. MILLER:  Objection, beyond the scope.  There's

 5    been --

 6          THE COURT:  It is, sustained.

 7          Do you want this in evidence?

 8          MR. PADOLSKY:  Yes, your Honor.

 9          THE COURT:  No objection, is there?

10          MR. MILLER:  Not as to its authenticity, but as to

11    its relevance there is.

12          THE COURT:  Oh, I think it's relevant generally.

13    Overruled.  It's Exhibit 42 in evidence.

14          (Exhibit 42, marked.)

15          THE COURT:  Anything further for this witness?

16    Q.    One additional e-mail that I'd like to show you,

17    sir.

18    A.    (On screen.)

19    Q.    Captain Amirault, take a look at this e-mail dated

20    May 6th, 2021 -- sorry, October 1st, 2020 from Terry

21    Ippelyito to yourself.  Do you recognize this e-mail?

22    A.    Yes.

23    Q.    And what is this e-mail?

24          MR. MILLER:  Objection, beyond the scope.

25          THE COURT:  Yes, it is.  It definitely is.
```

1    Sustained.

2    Q.     Sir, do you see that this also contains, um, rates

3    --

4           MR. MILLER:  Objection, these are overtime --

5    A.     -- pay rates and OG pay rates.

6           THE COURT:  Yeah, sustained.  I'm not admitting

7    this in evidence.  It's sustained.

8           MR. PADOLSKY:  No other questions, your Honor.

9           THE COURT:  Thank you.

10          Nothing further for this witness, Mr. Miller?

11          MR. MILLER:  No, your Honor.

12          THE COURT:  All right.  He may step down.

13          Now, but for the documents you've proffered under

14   1006 and how we've discussed the various payroll

15   records, Mr. Padolsky, you rest, correct?

16          MR. PADOLSKY:  (Pause.)  I do, your Honor.

17   Although it's a bit earlier than I expected to ask for a

18   break.  Do you think if we could take a break now?  I

19   would like the opportunity just to go over all the --

20          THE COURT:  I'll -- I'll allow that.  Let me

21   explain the day here.

22          We're going to run till noon and then I have a

23   criminal matter which I must take care of which will

24   occupy me between 12:00 and 1:00, then I'll give you the

25   time between 1:00 and 2:00 for this trial.  Then at

1   2:30, um, assuming that you're going to rest, they're

2   going to make a motion under 52(c) and I will hear

3   argument on that motion this afternoon.

4       Unless, Mr. Miller, you want to put that off?

5       MR. MILLER:  Actually I have another idea, your

6   Honor, if I can just offer it?

7       THE COURT:  Yes.

8       MR. MILLER:  It seems to me that the Court has

9   nearly all the proof it needs to adjudicate everything

10   that's it's going to be able to adjudicate in this case.

11       THE COURT:  Well that's your choice.

12       MR. MILLER:  Exactly right, your Honor.  And that

13   being the case, we would be prepared to cede some of our

14   trial time to go ahead and argue the motion at the close

15   of Mr. Padolsky's case, because I'm sensitive to the

16   fact that there's a lot tax dollars burning here and I

17   don't think we need to put in most of the evidence that

18   we would otherwise --

19       THE COURT:  Yeah, I'm all for efficiency, but I

20   have to follow the rules of evidence.  So when he rests,

21   with the caveat that we have already discussed, if

22   you're not going to put on any evidence, because that's

23   your assessment, we'll suspend, and I could give you

24   time tomorrow morning or we could schedule a time for

25   closing arguments.  I'm not pressing on that.  But if

1    you're going to put on evidence, I'm going to use my

2    trial time to receive that evidence.

3          Is that okay with you, making that decision?

4          MR. MILLER:  Well we do have to reserve the right

5    to put on evidence if your Honor disagrees with us about

6    the motions, so if your Honor doesn't want to take us up

7    on that proposal -- it was just a case-management idea.

8          THE COURT:  No, no, let's -- we'll have arguments

9    in the afternoon.  Let's use -- unless you want to --

10    you think you're not going to take that much time?

11          MR. MILLER:  I'm not, your Honor.  I'm happy to

12    cede our trial time to do this.  We don't need the rest

13    of our trial time.

14          THE COURT:  So -- I don't want to blindside

15    anyone.  What we'll do is we'll wait for him to rest.

16    We'll take another -- we're going to take a 15-minute

17    recess now.  We'll wait for him to rest.  We'll, um --

18    then we'll take another 15-minute recess and I will hear

19    your 52(c) motion and hopefully be in a position to

20    determine it.  Once I've determined it, then, um, the

21    trial either will go on or it won't or I will be so much

22    up in the air that I'm going to take everything under

23    advisement.

24          Is that okay with you?

25          MR. MILLER:  That's my proposal, your Honor.  I

```
 1   think that's the best way to --
 2          THE COURT:  I do understand that.
 3          Is that okay with you, Mr. Padolsky?
 4          MR. PADOLSKY:  Your Honor, did you say you're
 5   going to take everything under advisement?
 6          THE COURT:  I didn't say that.
 7          MR. PADOLSKY:  No, I understand that.  If you make
 8   that choice, um, if I'm hearing my brother right, we're
 9   essentially done.  You don't plan on going on until
10   tomorrow?
11          THE COURT:  If I'm taking -- that's correct, I
12   don't plan on going on until tomorrow if I need to take
13   stuff under advisement, correct?
14          MR. MILLER:  And just to be clear, your Honor, we
15   are reserving the right to put on a case in our
16   remaining trial time if need be.
17          THE COURT:  Right, which you can accomplish
18   tomorrow.
19          MR. MILLER:  Yes, we can.
20          THE COURT:  Understood.
21          That's okay, Mr. Padolsky, isn't it?
22          MR. PADOLSKY:  I think I understand, your Honor.
23          THE COURT:  All right.  So a 15-minute recess and
24   then we'll be back to you, Mr. Padolsky.  We'll recess
25   for 15 minutes until 5 minutes to 10:00.  We'll recess.
```

1          (Short recess, 9:40 p.m.)

2          (Resumed, 9:55 a.m.)

3          THE COURT:  Are you prepared to rest,

4     Mr. Padolsky?

5          MR. PADOLSKY:  I believe, your Honor, but I don't

6     believe I formally moved to admit Richard Barthelmes's

7     pay stub that I was showing to Mr. Ranaghan in his

8     examination.  It's the April 3rd, 2020 pay stub.

9          THE COURT:  Was it marked for identification?

10         MR. PADOLSKY:  It was not, it was one of the

11    50,000 pages of payroll records that I had pulled out.

12         THE COURT:  It may be admitted, Exhibit 43.

13         (Exhibit 43, marked.)

14         THE COURT:  And subject to the discussion that we

15    had on Friday after the trial day regarding reserving

16    the right to keep the record open to submit the 50,000

17    pages of payroll along with a motion to impound those

18    documents so that, um, personal identifiers are not

19    included in the court record, yes, we rest.

20         THE COURT:  Very well.

21         Now, do we want to take then another recess --

22    well you have your motion, Mr. Miller, correct?

23         MR. MILLER:  We do, your Honor.

24         Also there's an unadmitted exhibit that was

25    conditionally addressed, it's Exhibit AO, it's the 1006

1  chart that Ms. Silveira used with Mr. Ranaghan, the

2  Court was going to reserve on the admission of that.

3         THE COURT:  I was and I'm going to treat that the

4  same -- well actually that one I understand what the

5  basis is.  I don't understand what the basis is of his,

6  um, Mr. Padolsky's, um, what he proffers under 1006.

7  But AO I will admit and it will be Exhibit 44.

8         (Exhibit 44, marked.)

9         MR. MILLER:  Thank you, your Honor.

10        THE COURT:  All right.

11        What else?

12        MR. MILLER:  We do have some objections to the

13  1006 documents that we --

14        THE COURT:  And we'll hear those, but they are in

15  play, if you will.

16        But you're ready to, um, have argument on your

17  52(c) motion?

18        MR. MILLER:  Yes, your Honor.

19        THE COURT:  Take another 15-minute recess or go

20  right ahead, what's your pleasure?

21        MR. MILLER:  I don't need the 15-minute recess.

22        THE COURT:  Mr. Padolsky, how do you feel?

23        MR. PADOLSKY:  Um, I -- I did not anticipate the

24  City would be resting this quickly so I --

25        THE COURT:  Well they're not resting.

1          MR. PADOLSKY:  I understand.  That they would be

2   doing this procedure.  So I could use the time given the

3   change in procedure.

4          THE COURT:  All right.  Is 10 minutes enough or do

5   you want 15?

6          MR. PADOLSKY:  15, your Honor, please.

7          THE COURT:  So we'll recess for 15 minutes until

8   11:15.  Arguments will not exceed one half hour, um --

9   well let's see.  Yeah, that will work.  Arguments will

10  not exceed one half hour.  It is the defense's motion so

11  the defense will argue first.

12         One thing I will say to save time.  On the state

13  of the record as it now stands, I don't see how, um --

14  if this Heidi McCormick is an individual plaintiff, I

15  don't see how she can recover.  But we'll recess for

16  15 --

17         MR. PADOLSKY:  Your Honor?

18         THE COURT:  Yes.

19         MR. PADOLSKY:  Arguing the motion does not count

20  towards my trial time, correct?

21         THE COURT:  It does not.

22         MR. PADOLSKY:  Thank you, your Honor.

23         THE COURT:  No, it does not.  And you're right to

24  be alert to it.  Arguing the motion does not count

25  towards anyone's trial time -- well I take that back, it

1    counts towards the defense's trial time, they're ceding

2    their time.  You get a half an hour to argue and it

3    doesn't count towards the trial time.  The final

4    argument, which will come tomorrow, if we're not done

5    today, um, will count.  So at the present time, by my

6    count you've got 35 minutes remaining, so you've got

7    ample time to make your final argument.

8         All right, we'll take a 15-minute recess until

9    10:15.  We'll recess.

10        MR. MILLER:  Thank you, your Honor.

11        (Recess, 10:55 a.m.)

12        (Resumed, 11:15 a.m.)

13        THE COURT:  All right, we're prepared to continue

14   and Mr. Miller I will hear you.

15        MR. MILLER:  Thank you, your Honor.

16        Defendant hereby moves, pursuant to Federal Rule

17   of Procedure 52(c), for a judgment on partial findings

18   as to several aspects of this case that we submit are

19   completely susceptible to adjudication on the evidence

20   now presented.  And I want to start with the Wage Act

21   claim because I think it's far and away the most

22   significant piece of this litigation.

23        The plaintiff's Wage Act claim is premised on the

24   notion that the rate of pay for details was less than

25   the rate to which they were entitled, that's the

1    fundamental basis of their claim.  We all agree that the

2    sole source of that detail rate, the sole authority on

3    it that prescribed the calculation is one sentence in

4    the parties's collective bargaining agreement found at

5    Article 23, Section 3.

6        We also now know, as summarized in the last

7    exhibit that your Honor admitted, previously designated

8    as AO for identification, exactly what these officers

9    were in fact paid for working details throughout the

10   period in question and I would submit that's everything

11   the Court needs to resolve the Wage Act claim, because

12   it's all going to turn on whether that one sentence in

13   the collective bargaining agreement is ambiguous or

14   unambiguous, and either way the claim fails.

15       If the sentence in the collective bargaining

16   agreement is unambiguous, it leads syllogistically to

17   the simple conclusion that these officers were in fact

18   overpaid, not underpaid.  The reason for that is that

19   the collective bargaining agreement specifies the base

20   rate of pay for the maximum patrol officer plus night

21   shift differential, one augment among a panoply of

22   augments that officers receive that is recited in that

23   sentence we specifically included.  And we know that the

24   law is that when a given item is enumerated, and there's

25   no suggestion that it's a without-limitation recitation

1    of ingredients, that the recitation of that one element

2    excludes other elements that could be included in the

3    calculation.  That proposition is so well-established

4    that it's expressed in Latin, "expressio unius est

5    exclusio alterius."  It's not pronounced in Latin very

6    easily, but that's the phrase.

7         And so if that's the case, then this Wage Act

8    claim just fails on its own terms as a result of the

9    document marked as Exhibit AO, because that document

10   conclusively establishes that officers are paid between

11   $4 and $12 an hour -- that's what they have been paid,

12   between $4 and $12 an hour more than the contract

13   specifies, and obviously for them to pay more than the

14   contract specifies, the Wage Act claim fails.

15        Let's back up to the question about whether the

16   Court can even begin to question whether the agreement

17   is ambiguous.  We heard some testimony about what

18   various people think that sentence in the contract

19   means, all of which is germane to nothing.  The First

20   Circuit and the Massachusetts Appeals Court has

21   repeatedly said, and this is black-letter law, that

22   whether a contract is ambiguous is a question of pure

23   law for the Court to be measured by the content of the

24   four corners of the document and nothing else.  The law

25   it very clear that anybody's opinion, including the

 1    parties's opinion on the meaning of the contract doesn't

 2    matter if the Court finds it to be unambiguous.  We

 3    submit this one is unambiguous, your Honor has already

 4    stated that he's given that some thought, and if it is,

 5    the Wage Act claim simply fails.

 6         Let's think about the other alternative.

 7    Mr. Padolsky seems to contend, though he said at certain

 8    points that the contract is ambiguous, that it's somehow

 9    susceptible to another interpretation than the one that

10    we've advanced, and that's just a way of him asserting

11    that it is ambiguous.  And what he appears to assert is

12    that this longstanding practice as to how the detail

13    rate was in fact calculated, which included all of the

14    other elements that any officer could possibly receive

15    for working as an officer for the City of Malden,

16    Mr. Padolsky contends that that somehow became the rate

17    prescribed by the contract as a result of past practice.

18    He says "This contract is ambiguous, we have to see what

19    people were doing in order to fill out exactly what this

20    term means."

21         The problem with that argument is that it's self-

22    defeating because if Mr. Padolsky is right, then past

23    practice, the very practices that have in fact

24    empirically been in place for 40 years, as we've heard

25    multiple people testify about, displace the language of

1    the contract or maybe amend it somehow.  So what that
2    means is that the past practice becomes what these
3    officers are entitled to.  That fundamentally seems to
4    be Mr. Padolsky's position.  And if that's the case,
5    they have, as a tautological matter, received exactly
6    what they're entitled to and the Wage Act claim fails.
7    Mr. Padolsky's position seems to be a "heads I win,
8    tails you lose" sort of proposition.
9            THE COURT:  Wait.  Wait.  I see it a little
10   differently.  If the language is ambiguous, um, one
11   construct of the language that is possible is that the
12   word "based" in the sentence that we're all trying to
13   construe excludes those situations such as strike pay,
14   holiday pay, and the others, and then, um, a possibility
15   is, as Chief Molis said, that you take the highest-paid
16   patrolman who has the -- whatever that highest-paid
17   patrolman has, plus night differential, because he might
18   not have that, and you go one and a half times that, and
19   that is the detail rate for the officer.  That's what he
20   contends, I think, um, and that is at least plausible on
21   this record.
22           I'll hear you.
23           MR. MILLER:  I don't think it is, your Honor, for
24   the reasons that are brought forth by the other aspects
25   of the contract.  Were that what the parties wanted to

1  do, they did it expressly.

2      For example, with court time, where they wanted to

3  include a Quinn Bill benefit, it's exactly the same

4  sentence that specifies the hourly rate for details, it

5  says "maximum patrolman's rate of pay plus night

6  differential," or others, including night differential,

7  but everyone knew, and the contract makes clear, that

8  that does not in fact include all augments and it

9  specifically does not include the Quinn Bill incentive

10  because if it did there would be no rational reason to

11  have all separate paragraphs of this contract that says,

12  "Wait a minute, when we're talking about court time, if

13  certain attendance requirements are met, then the Quinn

14  Bill incentive is also included in this rate."  There's

15  no similar language with respect to the detail rate.

16      And so I think the reading that Mr. Padolsky

17  offers is incoherent, I think it renders -- I don't

18  think that's an ambiguous interpretation of the

19  contract, I think he's offering something that almost

20  begins to be ungrammatical at that point and completely

21  at odds with the language of the contract itself.  And

22  if that's the case, the Wage Act claim fails.

23      And if we could put in evidence as to where the

24  rate came from, how it was calculated, the Court's

25  already heard some of that, but I don't think it changes

1   this fundamental outcome, and I don't think that any

2   evidence in this case could authorize the outcome that

3   Mr. Padolsky urges, which is that this "ambiguous," as

4   he contends it to be, past practice, includes all of

5   these augments that have been included over the years,

6   but somehow excludes the 10 percent administrative fee

7   that has also been part of the bargain the whole time.

8   Essentially he's saying "Heads I win, tails you lose."

9   If the contract is interpreted to be susceptible to

10  certain increases in the rate, then I get to take

11  advantage of that.  But even if those increases in the

12  rate include terms that also work to the detriment of

13  plaintiffs, here the 10 percent, we exclude those.  We

14  just want to take advantage of the parts that help us.

15  And contract law simply doesn't allow for that

16  interpretation.  And we've just filed a brief on this

17  point, your Honor.

18      But one thing that's very clear, is that in this

19  context specifically, in the collective bargaining

20  context, "past practice is a double-edged sword," and

21  that's actually the language in this case, and what it

22  says -- I think it actually says "It cuts both ways," so

23  strike that.  But the notion is that if a contract is

24  ambiguous and susceptible to reinterpretation or

25  amendment based on the practice of the parties, you have

1   to take the good with the bad.

2        And so if Mr. Padolsky could establish that this

3   agreement is ambiguous -- and I again submit that most

4   of this is wasted energy because he can't, the contract

5   is clear on its face, but if it's not, the result is the

6   same.

7        With respect to -- if your Honor has no questions

8   about the Wage Act claim beyond that, I would be happy

9   to move on to the Fair Labor Standards Act claim.

10       THE COURT:  Go ahead.

11       MR. MILLER:  With respect to the Fair Labor

12  Standards Act Claim, Mr. Padolsky hasn't proven a single

13  violation.  He has given us two instances that were

14  outside the statute of limitations period and properly

15  excluded as such, he attempted to show us two instances

16  within the statute of limitations period and he hasn't

17  done that.  He -- he got very clear instructions from

18  the Court on Friday as to what he needs to do to

19  substantiate this Fair Labor Standards Act claim.  He

20  has to prove at least one violation as to at least one

21  named plaintiff during the statute of limitations period

22  and he hadn't even attempted to do that before this

23  morning.  The exhibits that he'd offered this morning

24  also don't do it.

25       We've had a preliminary chance to look through the

 1    exhibits that Mr. Padolsky offers, he offered two

 2    different ones.  One is based on a Sunday-to-Saturday

 3    work week, which frankly we think is not applicable

 4    because the contract is very clear as to what the work

 5    week is, but that too changes nothing, because on his

 6    exhibit, that's based on a Sunday-to-Saturday work week.

 7    There are no ostensible asserted violations of any named

 8    plaintiff at all.  And a number of the things that he

 9    includes on that are untimely, they're outside the

10    statute-of-limitations period.

11         With respect to the other documents that he

12    submitted, um, that is based on a Saturday-to-Saturday

13    work week, which we submit is in fact the proper work

14    week.  He's got a bunch of untimely examples, for

15    example as to Mr. Amirault, roughly a third of what's on

16    that document is untimely.  The only person that's even

17    listed as a named plaintiff is Patrick Manolian.  And

18    just in our review this morning, we've already figured

19    out that the evidence he cited from that chart is not in

20    the record, the pay stub that he contends to be in the

21    record has not been offered.  And so that document

22    frankly is inadmissible because it's flawed.  But even

23    if it were admissible, it doesn't prove what the Court

24    has told him he needs to prove.

25         Further to the point, even if it did, there's been

```
 1    a massive failure of proof as to this claim for the
 2    group of 100-plus people that we brought forth in front
 3    of this court, none whatsoever.  Nor is there any basis
 4    to segregate those who may have a claim from those who
 5    don't have a claim.  All we know is that some people
 6    might to some extent and we know that those claims are
 7    de minimis in nature.  The ostensible violation in
 8    Mr. Padolsky's exhibits as to Patrick Manolian show
 9    damages of 72 cents, again based on evidence.
10         THE COURT:  Wait.  Wait.  One thing.  In a FLSA
11    case, if some win and some don't, that doesn't defeat
12    the lawsuit as to those who win.
13         MR. MILLER:  Good question, your Honor.  But it
14    does have ramifications.  And the FLSA case law on this
15    subject is clear.
16         We know that the Fair Labor Standards Act is not
17    susceptible to Rule 23 treatment because Congress has so
18    stated in Section 216(b).  What the courts have done is
19    construct a mechanism for litigating Fair Labor
20    Standards Act claims through judicial law.  But that
21    judicial law incorporates a lot of the same due
22    process-based concepts as Rule 23.  And that judicial
23    law requires that when the group of people as a whole is
24    not susceptible to common proof, at least as to
25    liability, which is plainly the case here, there are --
```

 1    half of the officers in play are at a rate below where

 2    the FLSA violation has occurred.

 3         But more to the point, there's been no attempt to

 4    show violations as to the overwhelming majority of the

 5    people in view here.  More than 100 of the people at

 6    issue, there's no evidence at all in the record about

 7    the rate, their details, or anything.  And when there is

 8    no mechanism for the Court to address liability on a

 9    group-wide basis, the proper course is to decertify the

10    collective.  It doesn't mean that those who may have

11    violations are unable to pursue them, but it does mean,

12    first of all, that everyone who doesn't has to go and

13    anyone who believes that they might have similar

14    violations of -- that they will be of small magnitude.

15    But whoever believes that they have violations must

16    pursue that on their own.  That's what the case law in

17    the Fair Labor Standards Act requires.

18         So we filed a motion to decertify on that basis.

19    The reason we do that now is that we think it gives the

20    Court a path forward in terms of what to do with the

21    Fair Labor Standards Act case if the Court finds that

22    the submission Mr. Padolsky has made is, um, sufficient

23    to establish a Fair Labor Standards Act violation, and

24    we submit not, he hasn't done that.  But to the extent

25    the Court finds some violation anywhere, it's

1    inappropriate to keep 110 people together, the vast

2    majority of whom have made no showing on that subject.

3         THE COURT:  But suppose you're right as to that

4    and suppose there's a minority that have shown

5    something, isn't it this Court's duty then to deny

6    recovery to those who haven't and to proceed as to those

7    who have?

8         MR. MILLER:  It's not under the case law, your

9    Honor.  Under the case law, those people have to proceed

10   individually, it's a due process problem to have them

11   all amalgamated together with no --

12        THE COURT:  But they would be proceeding, I could,

13   um -- I handled a number of tobacco cases in Florida,

14   they weren't FLSA cases, but that's exactly what

15   happened, they, um -- and this is under the laws of

16   Florida, they found for a large plaintiff class, but

17   then it turned out that they -- that the claims in terms

18   of actually being reduced to judgment, um, the

19   individual position of the claimants was individual and

20   they were treated as an aggregate group or individually

21   it was treated as aggregate litigation.  Shouldn't I do

22   that here?  Let me give you an example.

23        Suppose 30 show some sort of damage under the

24   FLSA.  Shouldn't I then, um, adjudicate the, um -- you

25   say 110, the 80, 80 lose, they're out, and the 30 I just

1    treat as an aggregate group of 30 and proceed to a

2    damages calculation.  Shouldn't I do that?

3         MR. MILLER:  I think that's only appropriate, your

4    Honor, if you have some way to say that these 30 have

5    claims and the other 70 do not.  Nothing before the

6    Court allows us to do that.  Mr. Padolsky has made just

7    ad hoc attempted showings and most of them fail.

8         THE COURT:  I -- I had -- that makes sense to me,

9    but I have said he's entitled to put before the Court

10   this mass of, um, records that was produced shortly

11   before the trial.  So, um, I -- so someone has got to

12   review those and I've invited him to start doing that.

13   If there's no way to tell, then your argument -- I agree

14   with your argument.

15        Let me ask the question because you, um, I'm not

16   in any way prejudging it, but as part of your argument

17   on the FLSA claim, not all details are the same because

18   of course the statute itself excludes certain details.

19   How do you parse the array of details that are before

20   the Court?

21        MR. MILLER:  It's a problem, your Honor, and it is

22   part of the problem I was just talking about.  The

23   exercise of finding a violation in this case requires

24   multiple ingredients and this is one of them.  The first

25   question is did someone work a city detail?  Because if

1    not, that time is not chargeable to the City.  And

2    there's going to be some dispute about which entities

3    are City entities, we suspect, based on the materials

4    that Mr. Padolsky has provided.  But that's just the

5    first step in the process.

6        After that's identified, we have to go back and

7    look at each work week for each person who worked a city

8    detail.  It's an unavoidably manual bit-by-bit process

9    that is not susceptible to class-wide resolution.  And

10   that's the reason that decertification is warranted.

11       Also there's been no showing of liability, period,

12   at all.  Mr. Padolsky dumping a very large volume of

13   records on the Court, I would submit does not meet the

14   -- putting a mass volume of broad data in front of the

15   Court and saying "Broadly I contend there was a

16   violation of unknown shape and size," I don't think that

17   carries his burden.  It certainly couldn't carry his

18   burden as to the more than four or five people mentioned

19   in his 1006, and doesn't provide a methodology for

20   moving forward in anything other than this extremely

21   manual approach.

22       But I have another idea that minimizes the

23   significance of the Fair Labor Standards Act, and as

24   I've said really from the beginning, the Fair Labor

25   Standards Act claim in this case, as evidenced by the

1      1006 that Mr. Padolsky presented and his struggles to

2      find violations, we know that there obviously aren't too

3      many of these or Mr. Padolsky would be much more able to

4      find them, and that's the one he's found as to the named

5      plaintiffs.  Like Mr. Manolian, 72 cents total is at

6      issue.  And so a point that your Honor made earlier in

7      the trial about finding a way to bring this to a close

8      begins to come to the fore.

9           And another thing that we need to do to bring this

10     to the close is decide the issue of willfulness, which I

11     think the Court is also in a position to do right now

12     based on plaintiffs' presentation.  Willfulness, as a

13     matter of law, is plaintiffs' burden to prove.

14          If he wants to recover for three years of the

15     statutory period rather than 2, he must show a willful

16     violation.  There's been no effort seriously to do that.

17     Mr. Padolsky has provided us two things that he seems to

18     insist are indicative of a willful violation, but they

19     both fail dramatically.

20          The first thing to realize is that what he has to

21     do is show evidence of knowledge, willfulness, in the

22     third year, that is the period that would be rendered

23     timely if the Court were to find willfulness.  That

24     proposition is well-established in the law and it's

25     discussed in our briefs that we just filed.

1          The only examples that he's proffered on that

2     subject consist of a cease-and-desist letter that he

3     sent to the City after he had filed this litigation and

4     the record reflects that the first time that

5     Mr. Padolsky ever raised this issue, as both Mayors and

6     Mr. Ranaghan testified, was in a meeting that he called

7     two days before he filed the lawsuit in order to tender

8     a settlement demand.  So the only thing he's shown is

9     that the City was aware of this issue moments before he

10    filed his litigation, which does nothing in terms of

11    willfulness, it's totally irrelevant, it doesn't begin

12    to prove this issue.

13         The other thing that he points to, the only other

14    thing that he points to is the Massachusetts Appeals

15    Court case that terminated in 2017, he points to that in

16    there's been prior litigation about details.  There has

17    been prior litigation about details, but every one he's

18    talked about testified that had nothing to do with the

19    rate that the details were paid at.  It was contained to

20    one issue which is when do officers get paid for working

21    details.

22         Now if this were such a glaring issue, if this

23    were willful -- and let's think about what "willful"

24    means.  "Willful" is not negligence.  Mr. Padolsky

25    continues to push this in the direction that suggests

1    negligence.  That the City -- if it were paying

2    attention and not negligent, it should have done

3    something more about that.  That's not willful.

4    Willfulness under the law shows -- requires a showing of

5    either actual knowledge, the City was aware of a

6    violation of the law and just chose not to do anything

7    about it during the third year, or a reckless disregard.

8    Negligence, the courts have been clear, doesn't begin to

9    get him there.  And his position seems to be that as a

10   result of this other case that concerns another issue,

11   the City was reckless to not recalculate the rate, but

12   that doesn't really wash with the total course of

13   conduct here.

14        I mean let's think about the fact that this piece

15   of litigation that he refers to went on for a few years

16   and went up to the Appeals Court and throughout that

17   time plaintiffs never raised a single issue about the

18   rate, which is a pretty good indication that plaintiffs

19   were also oblivious to this issue that they now raise

20   and raise for the first time with the City only a few

21   days before they filed suit.  So Mr. Padolsky hasn't

22   come anywhere close to showing that this is a willful

23   violation, that seems almost a frivolous assertion at

24   this point.  And that point is significant because it's

25   going to be one of the key ingredients.

1        And whether the class is decertified or not, to

2    figure out who may have a claim here, there's so much

3    work to be done after that, but we can resolve that

4    issue now based on the evidence presented --

5    Mr. Padolsky's case is closed, there is no evidence of

6    willfulness, and limit that claim to the two years

7    before each individual either joined this case as a

8    named plaintiff or opted into the litigation.  And I

9    think those points frankly are enough to dispose of the

10   case.  I think the Wage Act claim fails for the reasons

11   I described, the Fair Labor Standards Act claim is

12   unproven, the willfulness claim has been shown to be

13   without foundation, and a ruling on those points I think

14   terminates this case.  I don't think we need a single

15   thing more to bring this to a close.

16       To the extent that the Court disagrees and

17   believes that there's evidence to be put in about the

18   source of the detail rate for purposes of the Wage Act

19   or some further evidence as to the scope of the Fair

20   Labor Standards Act issue, we can take that into account

21   and present it in our case in chief as needs may be.

22   But I submit, your Honor, the Court can enter judgment

23   on both counts at this time.

24       THE COURT:  Thank you.

25       Mr. Padolsky.

1          MR. PADOLSKY:  Thank you, your Honor.

2          Is there one particular issue that you would like

3     me to start with?

4          THE COURT:  Well one thing that, um -- actually,

5     No, but one thing that I need to focus on is the, um,

6     argument under FLSA law the, um, willfulness has to

7     encompass the third year.  That I was not aware of

8     candidly and I'll need to reflect on that.

9          MR. PADOLSKY:  I will get to that, your Honor.  I

10    promise.  Let me go in the same order as my brother.

11         THE COURT:  And that's fine.

12         MR. PADOLSKY:  His pitch is certainly eloquent but

13    it's detached entirely from the record that's before

14    you, your Honor, and, um, when I get to the FLSA part of

15    this, one thing that I found to be strikingly odd about

16    the, um, the City's FLSA 52(c) motion is that, um, they

17    appear to admit that they violated the FLSA, but they're

18    asking you to disregard the claim because of their

19    mocking of the amount of the violation.

20         THE COURT:  No, now I don't take it as to

21    disregard, they're saying procedurally that I must

22    decertify the class.  I'll tell you that that argument

23    has some traction with the Court.  But at the same time,

24    um, they're saying that means I should just enter

25    judgment and then there would be separate proceedings.

1      I'm not so sure that's in the interest of justice and on

2      this record I'm not so sure that that's the way to go.

3              But again, they have not presented their case, so

4      I'm not making any findings here at all unless I'm going

5      to make findings against you, and this is their right.

6      And so then when I -- I don't know as I suggested it,

7      but it's certainly in my mind, Mr. Miller practically

8      and skillfully says "Well knock out willfulness and it

9      will make the whole thing a lot simpler because there's

10     no evidence of willfulness in that third year."  Well

11     there's something to that.

12             Go ahead.

13             MR. PADOLSKY:  Thank you, your Honor.  I'm looking

14     at the time, I want to make sure that I stay within

15     that.

16             So the Wage Act claim, the City doesn't properly

17     state what is required in terms of the elements.  The

18     goal is not, um, "the contract is unambiguous because we

19     say it's unambiguous," the goal is to determine the

20     unambiguous intent of the parties.  And in order for the

21     City to win their 52(c), you have to read out large

22     parts of the contract and read into the operative

23     Article 23, Section 3, specific words that are not

24     contained within that Section.

25             So if we look to that Section, and I'll put it up

1    on the screen, your Honor.  (On screen.)  The -- what

2    the City is doing in order to ask you to dismiss the

3    case right now on 52(c) for a lack of proof, is to say

4    "This is unambiguous, very clearly it's only meant to

5    include the base salary."  Well nowhere there within

6    Article 23, Section 3 does it say that.  It doesn't say

7    "The base rate for paid details shall be 1 1/2 times the

8    base salary."  It doesn't.  It doesn't say "base rate,"

9    it doesn't, um -- as it relates to the rate that's being

10   multiplied.  It doesn't say any of what the City is

11   suggesting makes this unambiguous when they make their

12   argument that Article 23, Section 3 is unambiguous.

13        The only time it says "base rate" is when it

14   specifically refers to the fact that this is the base

15   rate for paid details.  And we saw with Chief Molis, who

16   we've anticipated this but he was designated not on

17   calculations as the City has tried to frame this, he was

18   designated specifically on interpretations of the

19   contract, and that was very clear.

20        THE COURT:  How do you deal with Mr. Miller's

21   argument that if we take the contract as a whole, and I

22   must and will, where other rates are described, um, the,

23   um, elements are set forth with more precision?

24        MR. PADOLSKY:  That's not a problem at all, your

25   Honor, they're actually not set forth with more

1    precision.  Mr. Miller does a phenomenal job of making

2    it seem that way, but that's not the case.

3         When you look to the court time article, it's not

4    clear in any sense.  When you look to the contract

5    overtime article, it's not clear in any sense.  And as

6    it relates to the ways in which my brother uses the, um,

7    the incorporation of Quinn and court time, but not paid

8    details, that section he refers to doesn't actually

9    specifically do that, it speaks to incorporating Quinn

10   and court time and it speaks to incorporating Quinn in

11   the 1 1/2 overtime rate.  It does not specifically say

12   anything about whether Quinn is or is not included in

13   the operative language of Article 23 because Article 23

14   relates to a completely different subject that, um, in

15   terms of our records, this subject was in existence for

16   over 40 years, this particular language.

17        And so when we look to the language in terms of

18   looking for the unambiguous intent of the parties when

19   they formed this particular language, there's been no

20   evidence that that -- that those other provisions relate

21   to Article 23 at all, period, outside of my brother's

22   suggestion that they do and his -- his analogies to the

23   way in which he wishes the Court to read this particular

24   contract.

25        But we saw this with the Chief, we broke it down,

1    the base rate for paid details, that the Chief spoke to

2    the fact that there are additional, um, rates for paid

3    details.  The contract, Article 23, itself speaks to

4    additional categories which exceed the base rate, that

5    is Section 12, the second sentence, "No new categories

6    for which now pay in excess of 1.5 times the maximum

7    patrolman's rate of pay will be approved or voted by

8    members of this union without approval of the Mayor."

9    We heard from the witnesses, that language predated the

10    current Mayor, that language predated Mayor Howard, that

11    language predated Chuck Ranaghan.  The, um -- but no one

12    denied the existence of the, um, what I'll call the

13    "multiplier" rates or the other categories and we talked

14    about these things.

15        So a night -- a night, um, multiplier, a holiday

16    multiplier, a, um, an hours-in-excess-of-8 multiplier, a

17    supervisor's multiplier, and a strike multiplier, all of

18    those categories, the record is clear, pay in excess of

19    1.5 times the maximum patrolman's rate of pay, and

20    they've all existed along with the language of this

21    particular contract.  My brother doesn't mention them

22    because it doesn't fit his unambiguous argument, it

23    doesn't fit at all, but those exist.  And I'd like to

24    show your Honor a particular, um, document that was

25    marked for identification this morning.  (On screen.)

1    And break it down.

2        So these, your Honor, are examples in the record

3    where the City paid a rate in excess of 1 1/2 --

4        MR. MILLER:  Your Honor, I would object to

5    Mr. Padolsky attempting an evidentiary presentation that

6    --

7        THE COURT:  No, no, this is one of his supposed

8    documents under 1006, he may reference it and argue from

9    it.

10        MR. PADOLSKY:  The base detail rate.  So what were

11    we talking about, just to go back up to Section 3?  The

12    base rate for paid details.

13        Where did the City pay, recognize and pay, um, a

14    rate that was a multiplier of that, a category under

15    Section 12?  And, your Honor, in the record, Exhibits 25

16    through 28, which for ease here, your Honor, 25 through

17    28 are the detail hours, the spreadsheets which indicate

18    who ordered the detail, the date and time, the number of

19    hours, and the amount paid by the City, I don't think

20    there's any dispute there.  These specific details are

21    pulled from Exhibits 25 through 28, they are on city

22    details, this is -- I don't think -- the City tries to

23    suggest and they brought this up in their particular

24    argument saying "Well there's an array of details and,

25    you know, who knows what a City detail is?"  Well that's

1   not in accord with the evidence.

2        Mr. Ranaghan testified that there are certain

3   things that are clearly city details, the Water

4   Department, the DPW, the City of Malden Waterworks and

5   Engineering, the Water Department for the City of

6   Malden, the Board of Health of Malden, the Mayor's

7   office, if the Mayor hires.  These examples that I'm

8   showing your Honor come specifically from these

9   particular Exhibits, 25 through 28, showing paid details

10  on city details and they show that the City paid a

11  multiplier.  And let me show your Honor, and here on the

12  right side is a more specific pinpoint citation to the

13  actual exhibit in the record.

14       So, for example, Stephen Bellavia, who is a

15  patrolman, was paid $89.87 on 3-26-2021 by the City of

16  Malden on a Water Department detail.  If we go to

17  Exhibit 28 at Page 133  (On screen.)  we can see Stephen

18  Bellavia worked a Water Department detail for the City

19  of Malden and he was paid -- and you can see that the

20  detail was -- it started as an 8-hour detail and on the

21  same day it continued for an additional 9th hour and

22  here we have a multiplier rate, $89.87.  And so the City

23  is paying the detail rate that was being invoiced, that

24  they invoiced, and the City is paying the multiplier

25  rate.

1          So my brother's argument that this language in

2     Section 3, Article 23, um, is clear on its face in terms

3     of determining the unambiguous intent of the parties is

4     not, um -- at least according to the way in which he

5     presents it, because it refers here to the base rate for

6     paid details and it refers to -- and Section 12 refers

7     to categories which pay in excess of the base rate for

8     paid details.  And you can see through Exhibit 28,

9     through Exhibit 25, through the -- the "chalk," if you

10    will, that we've offered for purposes of understanding

11    this voluminous record, that that multiplier exists,

12    it's paid, it's recognized, it's part of the contract,

13    and my brother doesn't refer to it at all because it

14    doesn't serve his argument.

15         We can look to the others if it would be helpful,

16    your Honor, but we can see a couple of others.  Michael

17    Giordano on 6-21-2018 worked, um, a midnight to

18    7:00 a.m. detail for the Water Department and was paid

19    $84.14, which was -- which is 1.5 times the then detail

20    rate of 56 and change.  These exhibit sources are all

21    exhibits in the record, this chalk is really a reference

22    point more than it is a self-identifying exhibit.

23         To show you, your Honor, where in the record the

24    City is paying both the amount of the detail they now

25    claim for the first time is wrong in the multiplier

1    rates, which they make no mention of in their argument

2    under 52(c).

3            (On screen.)

4            Then we go to the next phrase, which my brother

5    doesn't get into, "the maximum patrolman's rate of pay."

6    It doesn't say here what he says, he says eloquently,

7    I'll give him that, um, but he says, um, "That 1 1/2

8    times" -- he says "1 1/2 times the base salary."

9            Now the base salary article of this contract does

10   not contain rate of pay, the record of it then shows

11   that it has -- it's not a rate of pay item.

12   Mr. Ranaghan agreed to that.  The document speaks for

13   itself, if you will, on that.  And the hours worked in

14   order to get to that specific, um, salary are different

15   for every officer -- I don't think the City disputes

16   that.  And so when calculating "rate of pay," if you

17   will, according to the City's interpretation of this,

18   they suggest that it's artificially high and should be

19   down to $44, but in order to do that they artificially

20   read in a 40 hour divider for everyone.

21           Where if you actually take the City's argument for

22   what it is and then you look to the record evidence and

23   you see, some officers work a 24-hour work week

24   depending upon their platoon.  They're not using 24 as

25   the divider because if they did, then they would again

1    be underpaying details.  They're not because it doesn't

2    fit their particular argument.  What they're doing is

3    they're artificially using 40 hours for everyone,

4    they're reading language into Article 23, Section 3 that

5    doesn't exist, and they're excluding the testimony of

6    their own witness on the interpretation of the

7    collective bargaining agreement.  Not the calculation of

8    the rate, the interpretation of the collective

9    bargaining agreement.  Who testified, without any doubt,

10   that longevity is included, Quinn is included.  And to

11   make it more personal, if you recall, your Honor, the

12   Chief said, "I don't get Quinn.  I don't have a degree.

13   When I worked a detail, I got Quinn."  I don't think

14   there's any doubt as to what the Chief's testimony was

15   despite the City's intent to make that so through my

16   brother's "eloquent pitch," if you will.

17        Your Honor, the City also requires ignoring the

18   timely language of Section 12, "The detail rate will be

19   increased as of the date the pay increases hereunder are

20   funded by the City."  They ignore it entirely.  If we

21   look to Article 23, Section 12 -- or Section 3  (On

22   screen.)  The initial confusion, I think, based upon the

23   openings, your Honor, was the fact that my brother was

24   suggesting that this was unambiguous and I also

25   suggested it was unambiguous, but when I said it I was

1    suggesting "This is unambiguous, this shows the
2    unambiguous intent of the parties."  And when I said
3    that, it was because I had deposed the City, the City
4    being the Chief on contract interpretations, and the
5    City was saying every -- when I said it was "maximum
6    patrolman's rate of pay," the City was saying
7    "everything that gets you to that maximum patrolman's
8    rate of pay, and that doesn't always include night
9    differential and therefore you include night
10    differential as well," and that's not unexpected given
11    the fact that the more senior an officer gets, the less
12    likely they are to be working overnight shifts.  Now
13    that's why I said it was unambiguous.
14         But if you find it ambiguous, and certainly you
15    could on this record based upon all that you've seen,
16    it's not a game of "got-you," it's a game of what is the
17    phrase intended, but what is the intent of that phrase,
18    "maximum patrolman's rate of pay including night
19    differential"?  And we've heard from -- every single
20    witness we've heard from in terms of intent of that
21    particular language says it includes everything,
22    including the City through the Chief, who now attempts
23    to discredit it.  Everyone says that includes whatever
24    gets you to the highest rate of pay for a patrolman.
25    And then because a patrolman doesn't -- more senior

```
1    patrolmen don't always work nights, you include night

2    differential.  And that's consistent with the way it's

3    always been, that's consistent with the way the City has

4    paid it themselves.  And there's no evidence to support

5    my brother's eloquent argument to the contrary except

6    for Mr. Ranaghan's 11th-hour change in testimony as to

7    how he interprets the specific language, which is

8    essentially counsel arguing through a witness "Walk this

9    way as I show you, this is how you should be reading

10   it," and that's not -- that's not how you determine the

11   intent of the parties.

12          If there are no other points on the Wage Act, your

13   Honor, I'll move on.  The evidence we have is in the

14   record, the evidence that you need is in the record.  If

15   the specific amounts in the operative period, 23 through

16   28, contained every, um, amount paid for paid details

17   over the operative period, and so in terms of

18   determining whether or not, um, we have sufficient

19   evidence, we have the contract, we have the testimony of

20   the witnesses regarding, um, the contract language, the

21   intent of the parties, um, we have the contract on

22   timing, um, we have the pay stubs which, for the highest

23   paid patrolman, which I don't think there's any

24   disagreement there, Edward Fitzpatrick, Trent Headley,

25   Jack Owens in the record, we have the timing pay stubs
```

1    which show when the City funded pay increases, and then

2    we have the, um, in Exhibits 23 through 28, the actual

3    amounts paid over that same period.  And so it's

4    actually, it's not easy in the sense that it's a lot of

5    work, we have 70,000 pages of payroll records, but it is

6    easy in the sense of once we have the numbers, getting

7    to a final amount on the violation, is, um, easy, it's

8    --

9         THE COURT:  10 more minutes, Mr. Padolsky, and I

10   would like you to address the FLSA claim in really three

11   particulars.  First, the procedural argument that under

12   the decided and perhaps controlling cases, um, I really

13   should decertify the class and in essence wash my hands

14   of that claim.  Two, um, I've already raised this matter

15   of willfulness, um, it has to be willful in the third

16   year you're trying to add.  And then three, there cannot

17   be any double recovery here however this Court rules on

18   liability, isn't that correct?  If you'd address those

19   points and whatever else you want in the remaining 10

20   minutes.

21        MR. PADOLSKY:  Thank you, your Honor.

22        So on the decertification issue, and I'll kind of

23   weave the whole matter of the FLSA claim into that.

24   That there are very clearly, um, common issues that have

25   led to the actual FLSA violation, um, that apply to

1    whomever, um, the -- had suffered that violation over
2    the operative period, whether you determine it's 2 or 3
3    years.  That comes from Mr. Ranaghan's testimony, um,
4    specifically.  He's admitted the City has no payroll
5    mechanism in place to catch when an officer exceeds 40
6    hours and works a city detail, to pay that officer their
7    time and a half rate when that time and a half rate is
8    higher than the pay detail rate.
9        THE COURT:  Well what case supports that being
10   enough for willful?
11       MR. PADOLSKY:  I'm talking about the combination,
12   but I'll get to willfulness, your Honor.
13       THE COURT:  All right.
14       MR. PADOLSKY:  So that's the common issue common
15   to the entire class of eligible plaintiffs.  So then we
16   get to a couple points here.
17       My brother is right that I've struggled with the
18   record, but not for the reasons he suggests, I struggled
19   because they just dumped 70,000 pages on me and I've
20   done my best to try to show your Honor examples.  Let me
21   walk you through what I provided this morning, your
22   Honor.
23       So we'll do two things.  The first is the Saturday
24   through Saturday work week that my brother says is
25   correct.  First, he's not right on this, he points to

1  one part of the CBA and that part of the CBA that says

2  Saturday to Saturday speaks to a new clause that was

3  added about the maximum number of hours that an

4  officer's allowed to work in a particular week, he

5  solicited no testimony on that, but the language speaks

6  for itself.  It says that over the period of Saturday to

7  Saturday, no one should work more than 112 hours.  It

8  doesn't say anything about that being the work week.

9  Whether it is or it isn't though is not a problem in

10 terms of determining that the City has violated the FLSA

11 on this -- as a result of this admitted practice or

12 process failure.

13      So if we look to the Saturday to Saturday work

14 week, we see it.  Stephen Bellavia, May 28th, 2019,

15 that's within the operative two-year period.  So my

16 brother said very eloquently, but incorrectly, that we

17 didn't show anything within the time period in the

18 record.  That's within it, May 28th, 2019, is the date

19 that Stephen Bellavia, a patrolman, worked for the City

20 of Malden.  Where do we find that?  Exhibit 26 at Page

21 447.

22      We then look to Stephen Bellavia's pay stub, which

23 was admitted this morning and his pay stub shows all of

24 these forms of regular compensation.  Whether or not

25 those are regular compensation is not even arguable from

1    the City, the First Circuit has declared that those

2    items are included very actually and specifically by the

3    total of those items, but also because they're items of

4    regular compensation.  We get a rate based on the fact

5    that he worked 40 hours for the City and that rate is

6    $60.72, which is above the amount he was actually paid,

7    $56.09.

8         And then for the last item, your Honor, we look at

9    the -- we try to get to the actual hours he worked for

10   the City, and that's also in the record, 39.6 is, um,

11   the exhibit on this particular one.  And we look to

12   Mr. Bellavia for a specific time.  (On screen.)  And

13   we're looking at -- which was the date here?  I'm sorry.

14   (On screen.)  Saturday to Saturday, Bellavia, we're

15   looking at 5-28, so we go to 5-28.  (On screen.)  And,

16   your Honor, my, um, the City says it's Saturday through

17   Saturday, but 5-28 is a Tuesday.  We look at Saturday

18   through Saturday, he worked a swap, but he worked -- it

19   says here Officer Bellavia worked a swap.  So 8, 16, 24,

20   32, 40.  40 hours.  And so we can see Officer Bellavia

21   worked 40 hours for the City.  And then we look at the

22   specific exhibit that references where he worked the

23   City detail for that same time frame and you can see

24   where that, um, his record is sourced in the record.

25         And so -- and that's one example.  Your Honor,

 1    this is not everything, this is everything that I was

 2    able to get through this weekend.  And I would ask that,

 3    um, based upon this, um, that your Honor infer against

 4    the City the fact that the volume of records that's

 5    forthcoming includes more examples.

 6         THE COURT:  You have 5 more minutes, Mr. Padolsky.

 7    go ahead.

 8         MR. PADOLSKY:  Thank you.

 9         So that's Saturday to Saturday.  Your Honor, I

10    showed you the -- over the course of the trial, if we

11    used the work week that's defined within the timecards,

12    that says "Work Week 1, 2, 3" and so on, there's

13    examples there.  If we use a Sunday through Saturday

14    work week, um, as you heard from John -- Captain

15    Amirault today, that the work week is Sunday through

16    Saturday, here are the examples within the specific

17    exhibits in the record.

18         And so my brother's eloquent argument that says we

19    haven't shown a FLSA violation is just plain wrong.

20    It's in the record.  We've shown it.

21         As to willfulness, your Honor, again an eloquent

22    argument detached from the record.  Exhibit 9, which is

23    admitted, is an e-mail from the gentleman we heard from

24    today, and it's an e-mail on November 9th to the Chief

25    saying specifically, "I performed a traffic assignment

1    for the Malden Department of Public Works.  I'm

2    requesting to be paid my overtime rate instead of the

3    detail rate."  There's Item Number 1, that's November

4    2015.

5        Then we look specifically at the 2017 case, the

6    Appeals Court saying "To the extent the City hires its

7    own officers or employees to perform detail services,

8    those are wages governed by the Wage Act."  That says a

9    bunch of things to an employer.  Specifically, "You have

10   to pay it within a certain amount of time, but their

11   wages," meaning the FLSA applies.  Right?

12       Then we have a meeting with the City before the

13   filing of this suit.  There's no evidence in the record

14   to support what my brother suggested, that it was a

15   settlement demand.  The evidence in the record, from the

16   witnesses, the Chief, the Controller, was that we were

17   providing notice to the City of the issues --

18   specifically the question that was asked and answered

19   was the issues that gave rise to this case.  It was not

20   a settlement meeting and there's no evidence to suggest

21   that.

22       And then we have the letters.  And the letters

23   show the -- specifically that the City was put on notice

24   of that again.  And then the testimony that says, "We're

25   just going to let the litigation play out," not "We're

1    going to honor our obligations as fiduciaries."

2          THE COURT:  But that doesn't go to the third year,

3    the testimony that "We're going to let the litigation

4    play out," that's this litigation, that was the

5    reference that the --

6          MR. PADOLSKY:  That goes to intent, your Honor, it

7    goes to the willfulness component.  I do think it goes

8    to the third year.  The timing of when that comes into

9    play is certainly something the City can argue, but it

10   still goes to the intent of the decision-makers in this

11   case and the City in particular.

12         THE COURT:  All right.  All right.  I've heard the

13   argument.

14         (Pause.)

15         THE COURT:  Here's the ruling of the Court.  The

16   motion under Rule 52(c) is allowed in part and denied in

17   part.  It's allowed in that to the extent one Heidi

18   McCormick is a claimant here, judgment will enter for

19   the City.  The Court can also make determinations as it

20   is persuaded on specific points.  The work week is

21   Saturday to Saturday.  In all other respects, the motion

22   under 56 -- 52(c) is denied.  The denial does not

23   express an opinion of the Court that the plaintiff has

24   prevailed, it simply denies the motion at this stage.

25         As is my practice, and I've said this before, I'll

1    make some additional comments.  These do not reflect the

2    Court's opinion, but only its reaction to the strength

3    of the evidence.  And both really go more to the law

4    than any factual findings.

5         First -- and they both deal with the FLSA case.

6    It does appear to the Court that, um, the governing law

7    suggests but it does not require that the FLSA class

8    ought be decertified.  The Court is not -- well the

9    Court, as I've posited, um, presently as I sit here,

10   thinks that I could handle the case as an aggregate case

11   of these various plaintiffs.

12        Also, without deciding, without expressing any

13   opinion, if the -- it is in fact clear that willfulness

14   must be demonstrated in the first, that is the third

15   year back from the filing of the case, the plaintiffs'

16   case appears to me to be thin.  But beyond that, I will

17   say nothing more.

18        Very well, Mr. Miller, you have the opportunity to

19   put on evidence.  We could suspend so you can digest

20   those matters and resume tomorrow or you can start right

21   in.  It's your call.

22        MR. MILLER:  We have, your Honor -- we have some

23   evidence that we can present today and we may need a

24   little bit of tomorrow.

25        THE COURT:  And that's fine.  Do you want to go in

1    the hour 1:00 till 2:00, because I can go till 12:00

2    now?

3         MR. MILLER:  Whatever the Court prefers is fine

4    with us.

5         THE COURT:  Well if you're going to be done

6    tomorrow, I prefer the hour between 1:00 and 2:00 so I

7    can have lunch.  But I want you done tomorrow including

8    final argument.

9         Is that okay?

10        MR. MILLER:  Yes, that should be no problem, your

11   Honor.

12        THE COURT:  Very well.  Then you go ahead and

13   proceed.

14        MR. MILLER:  Okay.  We will call Mr. Ranaghan.

15        THE COURT:  He may be recalled.

16        And to the Clerk, since she wasn't with us, he has

17   earlier testified, and would you simply remind him that

18   he's under oath.

19        THE CLERK:  Yes, Judge.

20        I would like to remind you, sir, that you are

21   still under oath.  Do you understand?

22        THE WITNESS:  I do.

23        THE COURT:  And, Mr. Ranaghan, now that you're

24   back with us, my question.

25        As you sit here now today, what documents do you

1    have at hand to refer to and use?

2         THE WITNESS:  Nothing at all.

3         THE COURT:  Thank you.

4         Go ahead, Mr. Miller.

5         MS. SILVEIRA:  Actually, your Honor, I'm going to

6    be questioning Mr. Ranaghan.

7         THE COURT:  Oh, I'm sorry.  Go ahead,

8    Ms. Silveira.

9         MS. SILVEIRA:  No problem.

10         (CHARLES RANAGHAN, recalled.)

11

12    DIRECT EXAMINATION BY MS. SILVEIRA:

13    Q.    Would you tell us, for the record, what a "city

14    detail" is in terms of how you would identify a "city

15    detail"?

16    A.    A "city detail" would be a detail performed by a

17    Malden police officer for a department within the City

18    of Malden.

19    Q.    Where would I look to find a listing of the City's

20    departments?

21    A.    The City's annual budget, which would be on the

22    City's website, lists each individual department.

23    Q.    And who is responsible for preparing the City

24    budget?

25    A.    I am.

1    Q.    Mr. Ranaghan, I want to show you an exhibit that

2    we premarked as Exhibit AT for identification.  This

3    exhibit list was provided to the Court just a few hours

4    ago.  (On screen.)  Hold on one second.  Yes, here it

5    is.  (On screen.)

6         Mr. Ranaghan, can you see Exhibit 18 on your

7    screen?

8    A.    I do.

9    Q.    Do you recognize this document?

10   A.    I do.

11   Q.    And what is it?

12   A.    It's an extract from the City of Malden budget,

13   it's a high-level summary of, um, listing each

14   department contained within the city budget.

15   Q.    Is this list a complete list of the City of Malden

16   departments with their own budgets including police

17   details?

18   A.    It does.

19   Q.    Is it fair to say that a detail that is billed to

20   any entity listed on Exhibit AT is a city detail?

21        MR. PADOLSKY:  Your Honor, objection, leading.

22        THE COURT:  Sustained.  You're leading the

23   witness.

24   Q.    How would you use Exhibit AT to determine whether

25   an item is a city detail or a private detail?

1          MR. PADOLSKY:  Objection, your Honor.

2          THE COURT:  No, "How would you use?"  It's not

3     leading.

4          MR. PADOLSKY:  That part's not but --

5          THE COURT:  All right, maybe there's no

6     foundation.

7          Would you use it?

8          THE WITNESS:  Would?

9          THE COURT:  Yeah, would.  Do you use this at all

10     to figure out whether it's a city detail?

11          THE WITNESS:  Yeah, I would match up the -- the

12     entity that was billed on the police detail invoice to

13     this exhibit here to determine if it was a city detail.

14     Q.    Sir, at this point I'd like to move Exhibit AT

15     into evidence under Rule 1006 as a summary of

16     information available as it indicates on the top on the

17     City of Malden's website.

18          THE COURT:  No objection to that, Mr. Padolsky?

19          MR. PADOLSKY:  I still object on the inadequate

20     foundation, he says he would, but there no time frame on

21     that at all.

22          THE COURT:  That goes to the weight.  Overruled.

23     Admitted Exhibit 45 in evidence.

24          (Exhibit 45, marked.)

25          MS. SILVEIRA:  Thank you, your Honor.

1    Q.    Mr. Ranaghan, you testified yesterday, or the day

2    before, that you're a member of the City's bargaining

3    team with respect to the patrol officer contract, is

4    that right?

5    A.    Correct.

6    Q.    Is there a separate union that represents superior

7    officers?

8    A.    There is.

9    Q.    What is it.

10   A.    "Mass Cop Local 479," I believe.

11   Q.    And who's on the City's bargaining team for the

12   purpose of bargaining with Mass Cop Local 479?

13   A.    Um, myself, Maria Louise, the Chief of Staff, um,

14   the Human Resources Director, Anthony Ciccarelli, and

15   the Police chief.

16   Q.    And is the City represented by counsel during its

17   negotiations with that union?

18   A.    We are.

19   Q.    Has that been true since 2012?

20   A.    Yes.

21         MR. PADOLSKY:  Objection, relevance.

22   Q.    Who was the City's counsel then?

23         MR. PADOLSKY:  Objection, relevance.

24         THE COURT:  No, overruled.  She may have a few

25   questions.

1    A.    Um, it's been two separate firms.  One was -- the

2    first one up until a few years ago was Albert Mason, and

3    then more recently it's been Clifford & Kenny.

4    Q.    Is there a fully-integrated selective bargaining

5    agreement that governs the terms and conditions of

6    employment for those superior officers who are members

7    of that union?

8    A.    There is.

9    Q.    Are you familiar with that agreement?

10   A.    I am.

11   Q.    Well I want to show you what has been marked as

12   Exhibit 13 in this case.  (On screen.)  I'm showing you

13   what's been marked as Exhibit 13, which is a Memorandum

14   Of Agreement between Mass Cop Local 479 and the City of

15   Malden.

16          Is this the fully-integrated collective bargaining

17   agreement between the City and the Superiors union?

18   A.    No.

19   Q.    What is this Memorandum Of Agreement?

20   A.    This memorandum, it was a, um -- the contract

21   expired and we, um, negotiated a three-year interim

22   agreement to that fully-integrated collective bargaining

23   agreement.

24   Q.    And is that three-year integrated agreement what

25   this Memorandum Of Agreement represents?

A.    Yes.

Q.    If we scroll down and look at Paragraph 6 here, which you've looked at before, this is entitled "Article 5 Paid Details and Poll Duty."  Do you see that?

A.    I do.

Q.    What is this a reference to?

A.    Um, it's a reference to the paid detail language within the Superior Officers' collective bargaining agreement.

Q.    Is Article 5, "Paid Details and Poll Duty in the Superior Officers' agreement," is that identical to Article 23 of the Patrol Officers' contract?

MR. PADOLSKY:  Objection, your Honor, this is leading.

THE COURT:  It's both leading, but I have both documents in evidence and they speak for themselves.  So it's not -- go ahead.

A.    Um, no, they're not --

THE COURT:  No, I can read.

Go ahead, Ms. Silveira.

Q.    Mr. Ranaghan, you testified -- oh, and I'll take this down, um, regarding the 10 percent administrative fee returned by the City for private details.  Why does the City charge that fee?

A.    To compensate the City for the administrative, um,

1    tasks involved with running the, um, detail program.

2    Q.    And why is it that neither that the Patrol

3    Officers' contract nor the Memorandum Of Agreement that

4    we just looked at reference the 10 percent fee?

5    A.    Because it's an agreement between the City and the

6    contractors, it's not a -- an agreement between the City

7    and the officers.

8    Q.    Are private vendors or contractors informed of

9    this fee before hiring a detail?

10   A.    They are.

11   Q.    Who informs them of the fee?

12   A.    The Police Detail Clerk.

13   Q.    How does the Detail Board or the Clerk inform

14   vendors of the fee?

15   A.    She sends out a memo every time the rates change

16   to all the vendors informing them of the fee.

17   Q.    And is that done before or after the vendor hires

18   the detail?

19   A.    Before.

20        MR. PADOLSKY:  Objection, leading.

21        THE COURT:  Well I'll let that stand.

22   Q.    Mr. Ranaghan, do you know a patrol officer named

23   Brian Tilley?

24   A.    I do.

25   Q.    Is Officer Tilley a plaintiff in this case?

1     A.     Yes.

2     Q.     Is Officer Tilley eligible for Quinn benefits

3     under the Patrol CBA?

4     A.     No, he's not.

5     Q.     Why not?

6     A.     The Quinn Bill benefits, um, adds compensation

7     when certainly educational degrees are received and

8     Officer Tilley does not have a degree.

9     Q.     I'm going to show you what's been marked as

10     Exhibit 33 in this case.  This is a pay stub of Officer

11     Tilley.  Do you see that?

12     A.     I do.

13     Q.     Can you tell, by looking at this pay stub, what

14     Officer Tilley's overtime rate was as of July 28th,

15     2017?

16     A.     I believe it says $45.68.

17     Q.     All right, I'm going to make that a little bit

18     bigger.  Is that better?

19     A.     $45.68.  Yes.

20     Q.     It appears from its face that the overtime rate

21     says "Quinn claim," do you see that?

22     A.     I do.

23     Q.     Do you know why that is?

24     A.     (Pause.)  No.

25     Q.     How do you know Officer Tilley is not eligible for

1  Quinn?

2  A.    If he was eligible for Quinn there'd be a separate

3  pay code listed here that talked about the Quinn Bill

4  benefits and there's not one listed.

5  Q.    So for Officer Tilley, because he's not eligible

6  for Quinn, his overtime calculation is just regular base

7  wages plus shift differential, is that right?

8          MR. PADOLSKY:  Leading, your Honor.

9          THE COURT:  It is, sustained.

10  Q.    Can you tell me, by looking at this pay stub, how

11  Officer Tilley's pay overtime rate is calculated,

12  Mr. Ranaghan?

13  A.    It would be the base rate of pay plus shift

14  differential times 1 1/2.

15  Q.    Is that the base rate of pay plus shift

16  differential divided by 40 times 1 1/2?

17  A.    Correct.

18          MR. PADOLSKY:  Leading, your Honor.

19          THE COURT:  Yes, I mean you are leading the

20  witness, Ms. Silveira.

21          MR. PADOLSKY:  I'm concerned about this, your

22  Honor, because it's happening on almost every exchange

23  of --

24          THE COURT:  All right, you're concerned, and I'm

25  ruling.  Sustained.

1    Q.    Um, Mr. Ranaghan, I want to look at the line here

2    that says "Police Details."  What does that indicate in

3    this pay stub?

4    A.    That on July 28th, 2017, Officer Tilley received

5    $1,107.80 in police detail pay.

6    Q.    Okay.  And I want to go and take the Court to

7    those detail spreadsheets that we've looked at several

8    times.  This is paid July 28th, 2017.  (On screen.)

9    And putting up what's been marked as Exhibit 24 in this

10   case, which is the 2017 pay details, I want to go to

11   Page 254 of this document.  This page shows the details

12   that are paid in the July 28th, 2017 pay stub as we've

13   discussed.  And for Officer Tilley.  (Scrolls.)

14         Can you tell, by looking at this spreadsheet, what

15   the base rate of pay for paid details Officer Tilley

16   received in that July pay stub was?

17   A.    $56.09.

18   Q.    How much more per hour did Officer Tilley earn for

19   paid details as opposed to his overtime rate?  Can you

20   do that math for us.

21   A.    (Calculates.)  I don't recall what the overtime

22   rate on the pay stub was.  Can I view that pay stub?

23   Q.    Yes.  (On screen.)

24   A.    $10.41.

25         THE COURT:  And just so I'm following, he got

1    $10.41 more per hour for the detail than his overtime

2    pay, is that what you're telling me?

3            THE WITNESS:  Correct.

4            THE COURT:  Thank you.

5    Q.    Has the detail rate paid to officers increased at

6    all since July 2020?

7    A.    July 2020?  No, I don't believe so.  No.

8    Q.    I want to pull up the exhibit that just went into

9    evidence this morning, which is the summary chart that

10   was formerly Exhibit AO, that is now marked as, um,

11   Exhibit 44.

12           THE COURT:  It is.  44.

13           MS. SILVEIRA:  Yes, 44.

14           (On screen.)

15   Q.    Mr. Ranaghan, could you tell me, looking at this

16   chart, what the detail rate paid to officers as of July

17   2020 was?

18   A.    $59.92, I believe.  Yes, $59.92.

19   Q.    Okay.  I want to show you one more document.  If

20   you could write down the $59.92, we're going to do one

21   more math problem.  I'm going to show you one more

22   document.  (On screen.)  I'm showing you now what's been

23   marked as Exhibit 36 in this case by agreement of the

24   parties.

25           What is Exhibit 36, Mr. Ranaghan?

1    A.    It is a pay stub for Officer Brian Tilley dated

2    April 9th, 2021.

3    Q.    And based on this pay stub, what is Officer

4    Tilley's current overtime rate, can you tell?

5    A.    $52.25.

6    Q.    And what is the difference then between the rate

7    that Officer Tilley is paid for details and his current

8    overtime rate?

9    A.    $7.67.

10   Q.    Does this change whether Officer Tilley worked a

11   city or private detail?

12   A.    No.

13   Q.    Why not?

14   A.    The rate paid to officers for city details and

15   private details is the same.

16   Q.    Thank you, Mr. Ranaghan.

17        MS. SILVEIRA:  I have no further questions.

18        THE COURT:  Anything for this witness,

19   Mr. Padolsky?

20        MR. PADOLSKY:  Nothing, your Honor.

21        THE COURT:  Very well.

22        MR. PADOLSKY:  On the time, your Honor, I had that

23   I used 6 minutes this morning?

24        THE COURT:  I'll decide the time.  You've got 5

25   minutes left.

```
 1          MR. PADOLSKY:  I started the day with 50 though,
 2     didn't I?
 3          THE COURT:  What?
 4          MR. PADOLSKY:  I started the day with 50, didn't
 5     I?
 6          THE COURT:  Yeah, and you used some up.
 7          MR. PADOLSKY:  I thought I only used 6?
 8          THE COURT:  No, you did not, you used 15 minutes
 9     today.
10          MR. PADOLSKY:  Does -- does the preliminary time
11     count against me?
12          THE COURT:  We start on time, all this time
13     counts.
14          Now, um -- I'm applying the time fairly.
15          Any other evidence that you want to put on today,
16     Ms. Silveira or Mr. Miller?
17          MS. SILVEIRA:  Yes, your Honor, and I'm going to
18     turn it back to Mr. Miller.
19          THE COURT:  Fine.
20          MR. MILLER:  Thank you, your Honor, and sorry for
21     the game of relay here, but we're going to call the
22     Detail Clerk Mardi Sullivan and my colleague,
23     Mr. Buckley, will be handling the questioning.
24          THE COURT:  Thank you.
25          (Pause.)
```

```
1           THE CLERK:  Is Ms. Sullivan on the zoom?
2           THE WITNESS:  Yes, I'm trying.  Sorry.  All right,
3     can you hold on, please?
4           (Pause.)
5           THE WITNESS:  Can you hear me now?
6           THE CLERK:  Yes, we can.
7           THE WITNESS:  All right.  Thank you.  Sorry for
8     that, I'm not used to this.
9           (MARGARET MARY SULLIVAN, sworn.)
10          THE COURT:  And, Ms. Sullivan, in these proceeding
11    I open the questioning because it's a zoom proceeding.
12          Would you please state your full name.
13          THE WITNESS:  Margaret Mary Sullivan.
14          THE COURT:  And, Ms. Sullivan, as you sit there by
15    the camera, what documents do you have at hand to use in
16    any way?
17          THE WITNESS:  Um, I just have my daily work here
18    but nothing pertaining to this proceeding.
19          THE COURT:  In other words you're in your work
20    space and you haven't pulled together anything having to
21    do with this case, is that the truth?
22          THE WITNESS:  It's the truth.
23          THE COURT:  Very well.
24          And, Mr. Buckley.
25          MR. BUCKLEY:  Thank you, your Honor.
```

1          Good morning, Ms. Sullivan, how are you?

2          THE WITNESS:  I'm fine, thank you.  And yourself?

3          MR. BUCKLEY:  Doing well.  Thank you.

4

5          * * * * * * * * * * * * * * * * * * * * * *

6          MARGARET MARY SULLIVAN

7          * * * * * * * * * * * * * * * * * * * * * *

8

9     DIRECT EXAMINATION BY MR. BUCKLEY:

10    Q.    Ms. Sullivan, could you, um -- what do you do for

11    a living?

12    A.    I work at the Malden police as a Detail Clerk.

13    Q.    And how long have you been doing that?

14    A.    Um, 11 years.

15    Q.    So by my math does that put you as starting at

16    about 2010 or so?

17    A.    I would say, yes.

18    Q.    Ms. Sullivan, when you were hired, who did you

19    understand hired you to be the Detail Clerk?

20    A.    My understanding is I was hired by the Detail

21    Board.

22    Q.    Okay.  Ms. Sullivan, I would like to show you an

23    exhibit that has been premarked as Exhibit SS.  And let

24    me share my screen for a moment.  (On screen.)

25          Can you see my screen here, Ms. Sullivan?

```
 1    A.     I can.

 2    Q.     And do you see that's a letter dated January 29th,

 3    2010?

 4    A.     Yes.

 5    Q.     And how would you describe or what do you

 6    recognize this letter to be?

 7    A.     I believe that's my offer letter.

 8           MR. PADOLSKY:  Can we see the full exhibit?  I

 9    only see part of it.

10           MR. BUCKLEY:  Okay.

11           (Moves on screen.)

12    Q.     And, Ms. Sullivan, could you just do me a favor

13    and read the first line after "Dear, Ms. Sullivan."

14    A.     "On behalf of the Malden Police Detail Board, it

15    is my pleasure to follow up from our phone conversation

16    this week to officially offer you the job as Detail

17    Clerk beginning Friday, February 5th, 2010."

18    Q.     Excellent.  Thank you.

19           MR. BUCKLEY:  And, your Honor, I'd like to move

20    this into evidence.  I know that it was premarked as SS,

21    but I believe it's agreed to as Exhibit Number 22.

22           THE COURT:  No objection, then it's Exhibit 22 in

23    evidence.

24           MR. PADOLSKY:  No objection, your Honor.  Though

25    for completeness -- well I guess it's in the record, the
```

1    specific text is in the letter.

2         THE COURT:  Yes.

3         (Exhibit 22, marked.)

4    Q.    Okay.  Ms. Sullivan, could you describe for me

5    what you consider your primary responsibilities as the

6    Detail Clerk?

7    A.    Um, fill in the details, um -- you know fill in

8    the details when I am here, fill in the details, and

9    then export and bill the details for payroll.  And

10   complying -- and compiling a spreadsheet that the

11   officers would get paid in that time period.

12   Q.    I see.  And am I right to assume that there are

13   multiple steps in that process?

14   A.    Correct.

15   Q.    I'd like to walk through a couple of those steps,

16   if that's all right.

17        Now, Ms. Sullivan, if I were a private vendor

18   wanting to request a detail, how would I go about doing

19   that?

20   A.    You would call the business line, which is the

21   781-397-7170.  If I am -- if I am at my desk I will pick

22   up the phone, ask my company who's calling, a call-back

23   number, the date of, you know, what time in the day is

24   the detail, and where the officers should report.

25   Q.    So am I right that if I were a private vendor,

1    that they would provide the location, the date, and the

2    start and end time?

3            MR. PADOLSKY:  Leading, your Honor.

4            THE COURT:  Sustained, on that ground.

5    Q.    Ms. Sullivan, could you just specify what

6    information a vendor would typically provide when they

7    call or request a detail?

8    A.    I would identify myself when I picked up the

9    phone.  He, the vendor, would say the name of the

10   company.  I then would ask who I was speaking with, take

11   their phone number, a call-back number, and ask them

12   where they would like the police detail for and for what

13   time.

14   Q.    And would that be both the beginning and the end

15   time?

16   A.    No, not all the time with the end time.  No.

17   Q.    Okay.

18           THE COURT:  If you people will pause for a second,

19   I need to take this call.

20           MR. BUCKLEY:  Yes, your Honor.

21           THE COURT:  Go ahead.

22           (Pause.)

23           THE COURT:  And you'll forgive me, we're

24   accommodating two sessions of the Superior Court in this

25   courthouse, and that was a Justice of the Superior Court

```
 1    in the -- I've given up my courtroom for this service,
 2    and that was the Justice of the Superior Court.  Forgive
 3    me.  I -- that's the only type of call that I would
 4    take.  And I apologize to you, Ms. Sullivan.
 5             THE WITNESS:  No problem.
 6             THE COURT:  Go ahead, Mr. Buckley.
 7             MR. BUCKLEY:  Thank you, your Honor.
 8    Q.    Ms. Sullivan, after you have the necessary
 9    information from the vendor, then what would you do?
10    A.     We -- I have a cohort in crime, you know, Kathy
11    Hannon.  We have a detail list that was provided the day
12    before, so the next officer up for this detail, I would
13    then call and ask them if they would like that detail.
14    Q.    And if that officer were to decline the detail,
15    then what would you do?
16    A.    A refusal for that day is added onto a spreadsheet
17    to determine how many hours of detail work they have.
18    Q.    And would you make an additional phone call to --
19             MR. PADOLSKY:  Objection, your Honor, leading.
20             THE COURT:  Yeah, sustained on that ground.
21             What would you do then?
22             THE WITNESS:  I would move on to the next officer
23    on the list.
24    Q.    And at that point in time?
25    A.    Yes.
```

1   Q.    Thank you.  And at that point in time --

2         MR. PADOLSKY:  Well I guess I'll move to strike.

3         THE COURT:  The motion to strike is denied.

4   Q.    So, Ms. Sullivan, after you called officers and

5   after an officer accepted the detail, what would your

6   next step in the process be for that particular detail?

7   A.    If the officer accepts the detail, I would then

8   write his name corresponding in the red book where I had

9   just previously taken the detail information and put the

10  officer's name there.

11  Q.    And does the officer turn anything in after

12  concluding the detail?

13  A.    Yes.

14  Q.    What would the officer turn in?

15  A.    We have an in-house detail slip or he could also

16  turn in a slip that has been provided from the company

17  that he worked for.

18  Q.    And what information, just generally, would be

19  contained on that detail slip?

20  A.    The in-house one would be his name, both, you

21  know, the name of the company and possibly the location

22  and the hours.  On the ones that are provided by the

23  company themselves, you know it has more details.  It

24  has the company's name and address, a space for the

25  officer's name, where the detail occurred, the hours

1    worked, the officer's signature, and then a good amount

2    of the time a signature from the company.

3    Q.    Would you do anything in particular with the

4    detail slip after you received it?

5    A.    Once I take it out of the detail box, it's marked

6    against the red book and we make a check next to the

7    officer's name that we have received a detail slip from

8    him.  I also note down the hours, whether it's a 4-hour

9    detail or an 8-hour detail or more, I do that for

10   purposes of my own quality control.

11   Q.    And then how do you go about -- or how does a --

12   strike that.  How do you go about seeking payments for

13   the details?

14   A.    I use those slips and I produce an invoice.

15   Q.    And that's an invoice that's to be sent to the

16   vendor that requested the detail?

17   A.    That's correct.

18   Q.    And what information about the rates charged to

19   vendors and rates paid to officers is included in those

20   invoices?

21         MR. PADOLSKY:  Leading, your Honor.

22         THE COURT:  No, "What information," that's not

23   leading.

24         MR. PADOLSKY:  It mildly suggests --

25         THE COURT:  You may.  You may.  I have to make the

1    ruling.  Overruled.

2    A.    It would be the rate of the detail pay, the hours

3    worked, and the total amount of the invoice due.

4    Q.    And how does -- you said -- I'm sorry.  You said

5    the rate of the detail to be paid, is that right?

6    A.    Yes.

7    Q.    And is that the rates that the vendor will be

8    paying for the detail?

9    A.    That's correct.

10    Q.    Does it include any other rates of pay that you

11    recall on the slip?

12    A.    No.

13         THE COURT:  An administrative fee, um, with a

14    third-party vendor, how is that factored in?

15         THE WITNESS:  It's worded on the top of the

16    invoice and it says a 10 percent admin fee as

17    included -- I don't know the exact verbiage, but there

18    is a notation saying that an admin fee has been

19    included.

20         THE COURT:  So the rate that you use to bill the

21    third-party for the officer's work includes 10 percent?

22         THE WITNESS:  Correct.

23         THE COURT:  Thank you.

24    Q.    And, Ms. Sullivan, how does the vendor make

25    payment?

1    A.    Checks being sent to the police department.

2    Q.    And what do you do when you receive a check from a

3    third-party vendor?

4    A.    Well once I receive a check, the check has the

5    invoice number that, you know, that is going to be paid

6    for that, I pull that out of the file, and when I go to

7    make my -- and then I put it in a folder until I go to

8    make my deposit to City Hall.

9    Q.    Do you do any comparisons between -- no, strike

10   that.

11         What comparisons do you do between the amount of

12   the check and the amount of the invoice?

13         MR. PADOLSKY:  Leading again, your Honor.

14         THE COURT:  Well it assumes that you do

15   comparisons, so sustained.

16         MR. BUCKLEY:  Your Honor, I can rephrase it if

17   you'd like.

18         THE COURT:  Go right ahead.

19   Q.    What comparison, if any, Ms. Sullivan, do you do

20   to compare the amount of the invoice and the amount of

21   the check received?

22         MR. PADOLSKY:  Your Honor, it's the same question.

23         THE COURT:  No, no, he added "if any," but that

24   doesn't really save it.

25         What do you do when you get the check, what

1    review, if any, do you give to the check?

2         THE WITNESS:  What I do is, if I have the check in

3    front of me and the invoice, I compare the invoice

4    number to the invoice number that's on the check and I

5    make sure that the check amount is the same amount that

6    is due on the invoice.

7         THE COURT:  All right.

8         Go ahead.

9    Q.    And, Ms. Sullivan, does this process vary at all

10   if it's a -- strike that.

11        If there is a detail that is performed by -- or by

12   a City department, do they pay by check?

13   A.    They do not.

14   Q.    And how would a City department pay for a detail?

15   A.    It would be -- I refer to it as a "transfer."  So

16   I would send my invoice to -- to the departments that

17   requested the detail and I get notification then that,

18   you know, I -- that an in-house transfer has been done.

19   Q.    An by an "in-house transfer," is it fair to

20   characterize that as a transfer from one City department

21   to another?

22   A.    Yes.

23        MR. PADOLSKY:  Leading.

24        (Pause.)

25        THE COURT:  It's about 5 minutes to 12:00, I need

1    a few minutes to get ready for my next hearing.  Could

2    we stop now and resume at 9:00 tomorrow morning?

3         MR. BUCKLEY:  That's fine by me, your Honor.  Yes.

4         THE COURT:  And, Mr. Miller, I'm counting on you

5    now to conclude by tomorrow morning, is that correct?

6         MR. MILLER:  Yes, that is our intention, your

7    Honor.  We'll have at most one or two more witnesses

8    tomorrow.  But we should conclude tomorrow.

9         THE COURT:  And they'll be short?

10         MR. MILLER:  I believe so, your Honor.

11         THE COURT:  Very well.

12         We'll recess in this case until 9:00 a.m. tomorrow

13    morning.  We'll recess.

14         (Adjourned, 11:54 a.m.)

15

16

17

18

19

20

21

22

23

24

25

```
1            C E R T I F I C A T E

2

3

4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5   do hereby certify that the foregoing record is a true

6   and accurate transcription of my stenographic notes

7   before Judge William G. Young, on Monday, May 10, 2021,

8   to the best of my skill and ability.

9

10

11

12  /s/ Richard H. Romanow 08-23-21
    _____
13  RICHARD H. ROMANOW   Date

14

15

16

17

18

19

20

21

22

23

24

25
```