1                UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS (Boston)

3                          No. 1:19-cv-11835-WGY

4

5    JACK OWENS, on behalf of themselves and all
     others similarly situated,
6                    Plaintiffs

7    vs.

8

9    THE CITY OF MALDEN,
                     Defendant

10

11                     * * * * * * * *

12

13              For Zoom Bench Trial Before:
                    Judge William G. Young

14

15

16              United States District Court
                District of Massachusetts (Boston)
17              One Courthouse Way
                Boston, Massachusetts 02210
18              Tuesday, May 11, 2021

19

20                     * * * * * * *

21

22        REPORTER: RICHARD H. ROMANOW, RPR
                 Official Court Reporter
                 United States District Court
23     One Courthouse Way, Room 5510, Boston, MA 02210
                    bulldog@richromanow.com

24

25

```
1                    A P P E A R A N C E S

2

3    JOSEPH A. PADOLSKY, ESQ.
         Louison, Costello, Condon & Pfaff, LLP
4        101 Summer Street, 4th Floor
         Boston, MA 02110
5        (617) 439-0305
         Email: Jpadolsky@lccplaw.com
6        For Plaintiffs

7

8    BARRY J. MILLER, ESQ.
     ALISON HICKEY SILVEIRA, ESQ.
9    TIMOTHY J. BUCKLEY, ESQ.
         Seyfarth Shaw, LLP
10       World Trade Center East
         Two Seaport Lane, Suite 300
11       Boston, MA 02210
         Email: Bmiller@seyfarth.com
12       For Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2

 3   WITNESS                  DIRECT  CROSS  REDIRECT  RECROSS

 4

 5   MARGARET MARY SULLIVAN (Continued.)

 6      By Mr. Buckley:          7

 7      By Mr. Padolsky:                42

 8

 9   OFFICER JACK OWENS

10      By Mr. Miller:        48

11      By Mr. Padolsky:

12

13   CLOSING ARGUMENT BY MR. MILLER................... 54

14   CLOSING ARGUMENT BY MR. PADOLSKY................. 77

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    E X H I B I T S
 2
 3
       EXHIBIT 46.......................... 18
 4
       EXHIBIT 47.......................... 20
 5
       EXHIBIT 48.......................... 25
 6
       EXHIBIT 49.......................... 25
 7
       EXHIBIT 50.......................... 27
 8
       EXHIBIT 51.......................... 27
 9
       EXHIBIT 52.......................... 27
10
       EXHIBIT 53.......................... 46
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1              P R O C E E D I N G S
2         (Begins, 9:00 a.m.)
3         THE CLERK:  Civil Matter 19-11835, Owens versus
4    the City of Malden.
5         THE COURT:  Good morning counsel.  I think this is
6    the fifth and final day of this jury-waived trial held
7    on our zoom platform.  Our host is Courtroom Deputy
8    Clerk, Jennifer Gaudet.  The proceedings are taken down
9    by our Official Court Reporter, Rich Romanow.  The
10   proceedings are open to the public and they are welcome.
11        I must say therefore that if you are observing
12   these proceedings, you must keep your microphone muted
13   and that the rules of court remain in full force and
14   effect, there is no rebroadcast, taping, streaming, or
15   other transcription of this proceeding.
16        And I'll ask the Clerk to remind the witness that
17   she remains under oath.
18        THE CLERK:  Ma'am, I'd like to remind you that you
19   are still under oath.  Do you understand?
20        THE WITNESS:  Yes, I do.
21        THE COURT:  And, Ms. Sullivan, consistent with my
22   procedure in a zoom proceeding, could you tell me -- I
23   understand you're in your work space, but other than
24   your normal work materials that are at hand, have you
25   pulled together anything, notes, or any records, that
```

1    are with you as you testify?

2           THE WITNESS:  I have not.

3           THE COURT:  All right.

4           And, Mr. Buckley, you may continue.

5           MR. MILLER:  Yes, Judge Young, can I just raise a

6    very quick procedural point?

7           THE COURT:  Yes.

8           MR. MILLER:  There's been an exchange of 1006 in

9    this case and we had not seen the 1006 that Mr. Padolsky

10   offered yesterday until a few minutes before trial.  We

11   just filed a written objection to that.  We think this

12   is most expedient rather than to try and belabor the

13   record with the problems.

14          THE COURT:  I will entertain it.  I have not

15   looked at it, but I will before making any ruling.

16          MR. MILLER:  Thank you, your Honor, I'll get it

17   over to you.

18          MR. PADOLSKY:  May I just remind the Court,

19   although I'm sure you don't need any reminder, that your

20   Honor did not admit AR as a 1006, that it was allowed as

21   a chalk or a 611(a) summary of voluminous evidence.  And

22   so the objection that my brother made is not exactly

23   accurate nor is it referencing the specific exhibits

24   that are already in the record.

25          THE COURT:  I will make my rulings at an

1  appropriate time.  Thank you.

2       Mr. Buckley, you may continue.

3       MR. BUCKLEY:  Good morning, your Honor.  Thank

4  you.

5       (Margaret Mary Sullivan is resumed.)

6

7  DIRECT EXAMINATION BY MR. BUCKLEY.  (Continued.)

8  Q.    Good morning, Ms. Sullivan, how are you today?

9  A.    Fine.  Thank you.  And yourself?

10 Q.    Doing well.  Thank you.

11      So, Ms. Sullivan, so yesterday we discussed, um,

12 the process for receiving requests for details and what

13 I would consider that aspect of the detail process, but

14 this morning I want to turn to what you do to facilitate

15 how officers get paid for details.

16      So with that, how are officers paid for details?

17 A.    I don't understand the question.  How are they

18 paid for details or how do I set them up for being paid

19 for details?

20 Q.    We can take the latter question that you just

21 asked.  How do you set them up to be paid for details?

22 A.    I export a table which I then put into an EXCEL

23 spreadsheet and that lists all invoices that have been

24 invoiced for that period of time.  (Pause.)  Shall I

25 continue or?

1    Q.    Please.

2    A.    I then sort the EXCEL spreadsheet by date and the

3    officer's name.  I check that EXCEL spreadsheet -- I do

4    this in my own record against the, um, red book for

5    quality control and I make sure that the officer that

6    did a detail on May 5th matches what is, you know, in

7    the red book, so I know that I have a clean spreadsheet.

8    Q.    Uh-huh.

9    A.    I then tally up the invoices and then I do another

10   spreadsheet that I send -- and I send both of those to

11   Terry.

12        THE COURT:  When you say you're making reference

13   to the "red book," to what are you referring?

14        THE WITNESS:  There is a red book located in the

15   police department that has every detail that has been

16   performed and that book is replaced every January 1st.

17        THE COURT:  Thank you.

18   Q.    And, Ms. Sullivan, you describe two spreadsheets

19   that you send to Ms. Ippelyito?

20   A.    That's correct.

21   Q.    For one of the spreadsheets, how many columns does

22   it contain?

23   A.    If I'm going to refer to the spreadsheet that

24   groups them all together, it is the officer's name,

25   the -- what company they performed the detail for, the

1    date of the said detail, the hourly rate, how many hours
2    they worked, and the total amount.  That's just from
3    memory.  There could be another -- well I believe that's
4    it.
5    Q.    Ms. Sullivan, I'm going to share my screen with
6    you and show you an exhibit.  Well I am going to attempt
7    to share my screen with you.  I'm sorry.  Hold on a
8    second.
9         MR. BUCKLEY:  Ms. Gaudet, is it possible for me to
10   have the ability to share the screen with her?
11        (Pause.)
12        THE CLERK:  I've just done it.
13        MR. BUCKLEY:  Wonderful.
14        THE CLERK:  Hold on one second.  Let me -- nope.
15        (Pause.)
16        THE CLERK:  Okay, you should have the ability now.
17        MR. BUCKLEY:  Yes, it looks like it works.  Thank
18   you very much.
19        (On screen.)
20   Q.    So, Ms. Sullivan, can you see my screen?
21   A.    Yes, I can.
22   Q.    And do you see at the top of the screen that
23   there's a date listed here?
24   A.    That is correct.
25   Q.    And is what's showing on the screen and what's

1    been premarked as Exhibit MM, is this a depiction of the

2    spreadsheet that you just described?

3    A.    Yes.

4    Q.    And, um -- I'll put that down now.  And you had

5    mentioned a second spreadsheet, is that right?

6    A.    Yes.

7    Q.    And could you describe what's contained on the

8    second spreadsheet?

9          MR. PADOLSKY:  Your Honor, I object, and may I be

10   heard on this?

11         THE COURT:  Yes.

12         MR. PADOLSKY:  The City did not produce any sort

13   of "second spreadsheet" in discovery or in response to

14   --

15         THE COURT:  They aren't offering any.  If they

16   did, um, that objection would be meritorious.

17         Go ahead.

18         He's just asking you.  So describe the second

19   spreadsheet, ma'am?

20         THE WITNESS:  The second spreadsheet, to the best

21   of my knowledge, is the name, I believe the employee

22   number or PSN number, and the amount of all of the

23   details that the officers did during that 14 days.  So

24   it's a total amount.

25         THE COURT:  And the 14 days is the pay period?

```
 1          THE WITNESS:  That's correct.
 2          THE COURT:  What does "PSN" mean?
 3          THE WITNESS:  I don't know the answer to that
 4     question.
 5          THE COURT:  Well just generically what does it
 6     show?
 7          THE WITNESS:  I would say a PSN is the officer's
 8     identification number.  I don't know what the "PSN"
 9     stands for.
10          THE COURT:  Thank you.
11     Q.   And, Ms. Sullivan, I'm actually just going to put
12     back up Exhibit MM just because it might be helpful for
13     a moment.  (On screen.)
14          Ms. Sullivan, for the second spreadsheet that you
15     just described, if we were to take an example of Stephen
16     Bellavia here, there are 6 entries that are contained on
17     this spreadsheet for Stephen Bellavia, do you agree with
18     me there?
19     A.   Yes.
20     Q.   And for the second spreadsheet that you just
21     described, would there be just be one entry for
22     Mr. Bellavia?
23          MR. PADOLSKY:  Objection, your Honor, leading.
24     And I also object to --
25          THE COURT:  It is leading.
```

```
1          And where are we going with this, Mr. Buckley?
2     Mr. Padolsky's objection seems to be meritorious here.
3     Unless you've produced this, um, we're not getting into
4     anything at this stage given my order.  I ordered that
5     production be made.  So I don't know where you're going
6     with this.  Sustained.  And you're leading her.
7          MR. BUCKLEY:  Understood, your Honor.
8     Q.   Ms. Sullivan, what -- for a particular work week,
9     what amount would show in the row for Stephen Bellavia
10    on the second spreadsheet that we've discussed?
11         MR. PADOLSKY:  The same objection, your Honor.
12         THE COURT:  Yeah, I'm sustaining it.
13         What difference does it make?
14         MR. BUCKLEY:  Understood, your Honor.
15         (Pause.)
16    Q.   And, Ms. Sullivan, what is your understanding as
17    to how the second spreadsheet that we described is used
18    for purposes of payroll?
19         MR. PADOLSKY:  The same objection, your Honor.
20         THE COURT:  No, no, I'll get her explanation.
21    A.   My understanding is -- I complete that
22    spreadsheet.  I send it to Terry Ippelyito with the
23    spreadsheet that has all of the details grouped together
24    and I send that to Terry.  My understanding is that the
25    second spreadsheet is sent to payroll.  I am not 100
```

1    percent sure on that.

2         MR. PADOLSKY:  I make the same objection and,

3    um --

4         THE COURT:  Well we'll let it stand for what's

5    it's worth.

6         MR. BUCKLEY:  Thank you, your Honor.

7    Q.    Ms. Sullivan, yesterday we briefly discussed the

8    administrative fee charged to entities requesting a

9    detail.  How much is the administrative fee?

10         MR. PADOLSKY:  Leading, your Honor.

11         THE COURT:  No, "How much?"

12         MR. PADOLSKY:  No, the first part of the question.

13         THE COURT:  No, he may have it.  He may have it.

14    A.    I believe it states that it's 10 percent.

15    Q.    And what in the request details are subject to the

16    administrative fee?

17    A.    Um, are you asking me are all details subject to

18    that?

19    Q.    I could ask it that way, sure.

20    A.    No.

21         THE COURT:  What are not?

22         THE WITNESS:  There are -- there are a few right

23    now that are going on.  Um, Arletter is one that's not

24    charged for an admin fee.  Newport Construction is not

25    charged an admin fee.  And another detail, GLX, is not

```
1    charged an admin fee.
2           THE COURT:  Why not?
3           THE WITNESS:  Um, I requested backup for why the
4    admin would not be charged and those companies sent me
5    correspondence statements that they are state jobs and
6    -- and basically it's the MBA, Judge, and they're not
7    charged an admin fee.  So I have backup for all of
8    those.
9           THE COURT:  Uh-huh.  And on the others, um, when
10   you say an "admin fee," you explain that city jobs,
11   there's an internal transfer among departments, is that
12   right?
13          THE WITNESS:  That's correct.
14          THE COURT:  Is that equivalent in amount to the
15   admin fee?
16          THE WITNESS:  I bill it with an admin fee.  The
17   transfer, when I get notification that that has been
18   paid, it's minus the admin fee.
19          THE COURT:  Thank you.
20          Mr. Buckley.
21          MR. BUCKLEY:  Thank you, your Honor.
22   Q.   Ms. Sullivan, is the rate paid to officers the
23   same for city -- what is your understanding of the rate
24   paid to officers for city details as opposed to private
25   details?
```

1    A.    My understanding is that it's the same as of --
2    (Pause.)  That has been changed due to the fact that a
3    couple of weeks ago the Superior Officers got an
4    increase.  But prior to that it has been the same.  I
5    just wanted to clarify that.
6    Q.    All right.  And does the -- and putting the aside
7    the -- putting aside the Superior Officers' recent
8    change, did the detail rate ever change?
9    A.    Has the detail rate ever changed?
10   Q.    Yes.
11   A.    Yes.
12   Q.    And how are those rate changes announced to
13   vendors who might hire a private detail?
14   A.    Excuse me, I didn't understand that?
15         THE COURT:  How is the rate change announced to
16   vendors that might hire a private detail?
17         THE WITNESS:  A detail increase memo is sent out.
18   Q.    Ms. Sullivan, I'll share my screen again.  (On
19   screen.)  Ms. Sullivan, are you able to see my screen?
20   A.    I am.
21   Q.    And, um, can you just read the date that's at the
22   top of this, the top of the document on my screen?
23   A.    May 15th, 2012.
24   Q.    And I'm just going to scroll down and show you the
25   second page.  Do you see the second page?

1    A.    I do.

2    Q.    Ms. Sullivan, this exhibit has been identified --

3    has been marked as Exhibit E.  What do you recognize

4    this document to be?

5    A.    The memo that I just stated that would go out to

6    the vendors to notify them of an increase.

7    Q.    And who drafted this memo?  If you know.

8    A.    I do not know.  I made changes to it, I'm sure,

9    but I don't know who drafted the actual memo.

10   Q.    And where did the memo come from?

11   A.    (Pause.)  I -- I don't know.

12   Q.    What changes, if any, did you make to this form?

13   A.    I would have changed the date on the top and I

14   would have changed the hourly rates.

15         And can you go to the second page, please?

16   Q.    Of course.  (On screen.)

17   A.    And I believe those would be the only changes I

18   would have made.

19         THE COURT:  Let me see if I follow, ma'am.  This

20   memo that you've been shown, EE for identification,

21   that's back in 2012.  Now do I understand that this is

22   the format of, um, the memo announcing detail rate

23   changes?

24         THE WITNESS:  That is correct.

25         THE COURT:  And so when there was a rate change,

1    you would take that format, as you've just testified,

2    and you would put in the new rate or rates?

3         THE WITNESS:  Yes.  If there is a rate change, um,

4    let's say tomorrow, then I would go in and I would copy

5    and paste, save it as a new detail memo with the dates

6    of the new increase, and then make the necessary

7    changes.

8         THE COURT:  Thank you.

9    Q.    And, Ms. Sullivan, do you see that there's an

10   asterisk next to the hourly rate of $47?

11   A.    I do.

12   Q.    And the asterisk denotes -- it includes a 10

13   percent to the City of Malden administrative fee, did I

14   read that correctly?

15   A.    Yes.

16        MR. PADOLSKY:  Objection.

17        THE COURT:  Well the objection is sustained, the

18   document speaks for itself.  But let's admit it in

19   evidence.

20        MR. PADOLSKY:  Your Honor, I don't think there's

21   been an adequate foundation for all parts of these

22   statements within this particular document.

23        THE COURT:  Like what?

24        MR. PADOLSKY:  Specifically including the

25   statement that counsel just read, there's no foundation

1   as to where it came from, who wrote it.

2        THE COURT:  No, there isn't, but she testified

3   that this is the format.  Overruled.

4        ED for identification is admitted, it will be

5   Exhibit --

6        THE CLERK:  46, Judge.

7        THE COURT:  46.  Thank you.

8        MR. PADOLSKY:  Your Honor, this exhibit contains

9   hearsay as well, which is inadmissible, and part of that

10  it includes the statement that I just read, as well as

11  other statements here and where there's no adequate

12  foundation.

13       THE COURT:  Admitted, it will have such weight as

14  it is due.  Admitted.

15       (Exhibit 46, marked.)

16  Q.   Ms. Sullivan, I'd just like to note, um, or ask,

17  who is the -- who or what entity is contained in the

18  signature line of this memo?

19       MR. PADOLSKY:  Objection, your Honor, this is part

20  of the hearsay concern, an issue of --

21       THE COURT:  I understand, but overruled.

22  A.   Can you repeat the question, please?

23  Q.   Sure.  Who or what entity is included in the

24  signature line of the memo?

25  A.   The Malden Police Detail Board.

1    Q.    Ms. Sullivan, I would like to show you another

2    document.  (On screen.)  And, Ms. Sullivan, can you see

3    my screen again?

4    A.    I do.

5    Q.    And, Ms. Sullivan, could you read, um, who is the

6    "From" line on this?

7    A.    It's from myself.

8    Q.    And can you see the date that's noted there?

9    A.    I can't.

10   Q.    Okay.  And, Ms. Sullivan, what relationship would

11   this -- and, I'm sorry, strike that.

12         And can you see the "To" line recipients to this

13   e-mail?

14   A.    I do.

15   Q.    And who do the individuals listed in the "To" line

16   represent?

17   A.    (reads.)  To the best of my knowledge that would

18   be the Detail Board that was in effect on that date.

19   Q.    Okay.  And why did you send this e-mail to the

20   Detail Board?

21   A.    I'm assuming I was notified of an increase in the

22   detail rate and I would have wanted them to review the

23   detail memo that was going to be sent out to vendors

24   before it was sent out.

25         THE COURT:  From whom do you get notification of

```
1   changes in the detail rate?
2        THE WITNESS:  I don't know the answer to that
3   question because it -- sometimes they appear on my desk
4   but the e-mail was just erased.  It usually happens
5   sometimes when the Officers' contract is up.
6   Q.   And, Ms. Sullivan, is it your understanding that
7   the document that was attached, um -- that the document
8   that was attached to this e-mail was the document that
9   we just reviewed and was admitted into evidence?
10  A.   That's my understanding, yes.
11  Q.   Okay.
12       MR. BUCKLEY:  Your Honor, I would like to move to
13  admit what's been premarked as Exhibit CZ.
14       THE COURT:  Any objection?
15       MR. PADOLSKY:  No, your Honor, not to this one.
16       THE COURT:  All right, CZ is admitted, Exhibit 47.
17       MR. BUCKLEY:  Thank you, your Honor.
18       (Exhibit 47, marked.)
19  Q.   Ms. Sullivan, I'd like to show you a couple
20  additional documents.  (On screen.)
21       Ms. Sullivan, can you see my screen again?
22  A.   I can.
23  Q.   Okay.  Now, Ms. Sullivan, I've opened two
24  additional tabs here, one I'm showing you is what's
25  considered the second of the two, it's what's been
```

1    premarked as Exhibit DD, and I'm going to flip over to

2    the other tab and it's what's been marked as Exhibit CC

3    -- premarked as Exhibit CC.  Excuse me.

4         Ms. Sullivan, do you recognize these two

5    documents?  And I'm happy to flip through them if you'd

6    like.  (Scrolls.)

7    A.    They appear to be, um, the memo for a detail

8    increase, you know, in the detail rates.

9    Q.    And that would be the same for what's been

10   premarked as Exhibit DD and what's been premarked as

11   Exhibit CC?

12   A.    (Pause.)  Yes.

13   Q.    Ms. Sullivan, how do you recognize these

14   documents?

15   A.    They just look similar to the ones that were

16   presented before.

17        THE COURT:  Could you refresh my memory, ma'am,

18   when did you become the Detail Clerk?

19        THE WITNESS:  I -- I believe it was February 2010.

20        THE COURT:  Thank you.

21   Q.    Ms. Sullivan, where are these documents, um,

22   located in the regular course?

23   A.    I -- I do not know where that document was kept.

24   I did have a copy of that document in my desk, that was

25   from the files that I inherited.

1    Q.    When you took over in February of 2010?

2    A.    Correct.

3    Q.    Okay.  And, Ms. Sullivan, I note that these

4    documents are both one page each.

5          Do you happen to know if -- whether or not there

6    is a second page for these documents that exist?

7    A.    I do not.

8    Q.    Do you believe this to be a complete copy of the

9    document?

10   A.    I don't know.

11   Q.    To the extent a second page would exist, what

12   information, if any, do you think would have been

13   contained on it?

14         MR. PADOLSKY:  Your Honor, this is --

15         THE COURT:  Sustained.  There's no foundation for

16   that.

17         MR. BUCKLEY:  Your Honor, I would like to submit

18   these into, um -- both Exhibits DD and CC in evidence.

19         THE COURT:  Any objection?

20         MR. PADOLSKY:  Well subject to the same objections

21   I was making, your Honor.

22         THE COURT:  Well those objections may have merit

23   as to these documents.

24         Why aren't these all hearsay, Mr. Buckley?

25         MR. BUCKLEY:  Your Honor, I don't believe that

1    these are hearsay at all.

2          THE COURT:  Why not?

3          MR. BUCKLEY:  Your Honor, we would submit these to

4    be business records of the City and admissible under

5    803, Section 6.

6          THE COURT:  I see.  Do you think you've made a

7    foundation?

8          MR. BUCKLEY:  I would think so, yes.

9          THE COURT:  Well I don't.

10         MR. BUCKLEY:  Well, your Honor, if I could ask

11   Ms. Sullivan a few additional questions in order to do

12   so?

13         THE COURT:  Go ahead.

14         MR. BUCKLEY:  Thank you.

15   Q.   Ms. Sullivan, where in these documents are

16   located -- strike that.

17         Where were copies of these documents located,

18   um -- strike that.

19         Where did you find copies of these documents?

20   A.   In a folder in the desk draw that I occupied when

21   I became the Detail Clerk.

22   Q.   Were they there around the time that you began in

23   February of 2010?

24   A.   I'm sure they were in my desk at that time.  I

25   don't know if I actually reviewed them at that time.  I

1    would say no.
2          THE COURT:  Where are the originals now?
3          THE WITNESS:  In a binder -- the ones that I
4    found, Judge?
5          THE COURT:  Yeah.
6          THE WITNESS:  In a binder in my office.
7          THE COURT:  Okay.
8    Q.    Ms. Sullivan, in the ordinary course of your
9    operations as the Detail Clerk, do you keep, um, do you
10   keep copies of the detail memos that have been issued --
11   the detail rate-increase memos?  Excuse me.
12   A.    In the computer, yes.
13   Q.    And were there other documents, um, pertaining to
14   the detail rate and detail operations that were -- that
15   existed with these two documents that we're looking at
16   today when you found these documents?
17   A.    Yes.
18   Q.    Is there any reason in your mind, Ms. Sullivan, to
19   doubt that these two documents were created around the
20   time that the documents are dated?
21         MR. PADOLSKY:  Objection, your Honor, calls for
22   speculation.
23         THE COURT:  Sustained.  I mean it does.  She
24   wasn't even there.
25   Q.    Were you --

1      MR. BUCKLEY:  Your Honor, I think -- I would again

2   move to admit them pursuant to the business records.

3      THE COURT:  Yes, I think you have.  They'll be

4   admitted.  DD will be 48 and CC will be 49.

5      MR. BUCKLEY:  Thank you, your Honor.

6      MR. PADOLSKY:  Your Honor, if I could briefly

7   state my objection for the record?

8      THE COURT:  You may.

9      MR. PADOLSKY:  It relates to the admissibility of

10  46.  I understand your Honor has already admitted 46

11  over my objection.  But the objection to 48 and 49 was

12  purely the same as that as it was for 46.  Once you made

13  the ruling on 46, um, in all candor I actually don't

14  have an objection to 48 and 49 and that's because of

15  your admission to 46 over my objection.

16     THE COURT:  Yeah, and your rights are saved.

17     (Exhibits 48 and 49, marked.)

18  Q.   Okay, Ms. Sullivan, I've got another exhibit to

19  show you.

20     MR. PADOLSKY:  I'm sorry to interrupt.  Could you

21  just identify those numbers to the last two -- not the

22  numbers, the --

23     THE COURT:  EE is 48.  CC is 49.

24     MR. PADOLSKY:  Thank you, your Honor.

25  Q.   Ms. Sullivan, if you would give me a moment, I'm

1    going to open and share with you two additional

2    documents.  (On screen.)

3         Ms. Sullivan, can you see my screen in what's been

4    premarked as Exhibit FF?

5    A.    I do.

6    Q.    And in fact I'm going to flip over to the next

7    tab.  And this is what's been premarked as Exhibit GG.

8    And I'll just flip over to look at what's been premarked

9    as Exhibit A.

10        Are you able to see all three of those documents?

11   A.    I am.

12   Q.    And I'd like to give you an opportunity to take a

13   look, um, take a look at them.  I'll just scroll through

14   each quickly and you can tell me if you'd like me to

15   slow down at all.  (Scrolls.)  That's the end of Exhibit

16   AN.  (Scrolls.)  That's the end of Exhibit GG.

17   (Scrolls.)  And this is the end of Exhibit FF.

18        Ms. Sullivan, do you recognize the three documents

19   that appear on the screen?

20   A.    I do.

21   Q.    And what do you recognize these documents to be?

22   A.    The memos that are sent out when there is a detail

23   increase.

24   Q.    And in what years were these?

25        THE COURT:  Well they speak for themselves and

```
 1   I've made note of it.
 2        Are you offering them?
 3        MR. BUCKLEY:  I am, your Honor.
 4        THE COURT:  There's no objection to these, is
 5   there, Mr. Buckley?
 6        MR. PADOLSKY:  I make the same objection that I
 7   made before, your Honor.
 8        THE COURT:  And your rights are saved, but I'm
 9   admitting them.
10        FF is 50.  GG is 51.  And AN is 52.
11        (Exhibits 50, 51, and 52, marked.)
12        THE COURT:  Much more for this witness,
13   Mr. Buckley?
14        MR. BUCKLEY:  A few more questions, your Honor.
15        THE COURT:  Very well.
16   Q.   Ms. Sullivan, did you send out these e-mails --
17   excuse me.  Did you send out these memos to private
18   vendors?
19   A.   I would say, yes.
20   Q.   And, Ms. Sullivan, I just note that Exhibit, um --
21   strike that.
22        Ms. Sullivan, is it accurate to say that you
23   updated the rates, um, in each of these three memos?
24        MR. PADOLSKY:  The same objection, it's leading,
25   your Honor.
```

1          THE COURT:  It is leading, sustained.

2     Q.    Ms. Sullivan, what updates did you make to these

3     three memos before you issued them to the private

4     vendors?

5     A.    The date, the hourly rate, and, um -- can you go

6     to the next page, please.

7     Q.    Of course.  (Scrolls.)  Exhibit FF is up there,

8     it's just the one page, but I just found the second page

9     on Exhibit GG.  (On screen.)

10    A.    (Looks.)  I believe that would be it.

11    Q.    Okay.  And after you updated -- after you updated

12    the memos, what verifications from the Chief or any

13    other City executive, if any, did you receive before

14    publishing them to vendors?

15         MR. PADOLSKY:  Leading, your Honor.

16         THE COURT:  Sustained, it is.  Because it assumes

17    there was some verification step afterwards.

18    Q.    What verifications, if any, after you updated the

19    memo from the Chief or other City executive did you

20    receive?

21         MR. PADOLSKY:  It's the same question, your Honor.

22         THE COURT:  Yeah.  Looking at these -- yeah, I'll

23    sustain it.

24         Looking at these recent memos, ma'am, the ones of

25    the more recent years, do you have any recollection

```
 1   where the authority to make those changes came from?
 2        THE WITNESS:  Again I don't know where they came
 3   from, like who -- if you're asking me who told me to
 4   make the changes?  I don't know who told me to make the
 5   changes.
 6        THE COURT:  Yeah.
 7        THE WITNESS:  I just know -- no, I do not know who
 8   told me to make the changes.
 9        THE COURT:  All right.  And someone did tell you
10   to make the changes and you did.  And then what did you
11   do before sending it out, if anything?
12        THE WITNESS:  I would have made the necessary
13   changes and I'm assuming, because I just know how I am,
14   that I would have either sent it to the Detail Board via
15   e-mail or I would have ran it by someone in the Detail
16   Board, some members, just to say, you know, "Does this
17   look okay to go out?  Do you see any" -- you know
18   basically spell checks or, um, "Is this good to go?"
19        THE COURT:  Thank you.
20   Q.   Ms. Sullivan, I've stopped sharing my screen, but
21   I have a couple more exhibits to show you.  (On screen.)
22        Ms. Sullivan, can you see my screen again?
23   A.   I can.
24   Q.   And this is, um -- do you see that we have what's
25   been premarked as Exhibit MM?
```

1    A.    I do.

2          THE COURT:  I believe we've looked at that before.

3          MR. BUCKLEY:  Correct, your Honor, but I'm going

4    to use it for a different purpose, if that's all right?

5          THE COURT:  It is.

6          MR. BUCKLEY:  Thank you.

7          (On screen.)

8    Q.    Ms. Sullivan, what's the date at the top of this

9    document represent?

10   A.    That date would represent when the officer would

11   receive his paycheck.  So I'm assuming that would be a

12   Friday.

13   Q.    I see.  And I'd like to take a look, um, at the

14   entries for Stephen Bellavia quickly and ask a different

15   question of you.

16         If we were to look at the first entry, can you

17   read what the -- what appears in what I'll call the

18   second-to-last column, the number?

19   A.    $50.32.

20   Q.    And what does the $50.32 represent?

21   A.    The detail rate.

22   Q.    And what amount would Stephen Bellavia be paid for

23   this particular detail, if you can tell from this

24   document?

25   A.    (Looks.)  For the detail that was performed on the

1    10th, he would have received 8 hours of pay in the total

2    of $402.56.

3    Q.    And -- I see.  Now if you look at the second

4    entry, um, do you see an hourly rate?

5    A.    I do.

6    Q.    What hourly rate was Stephen Bellavia paid for the

7    second entry, the Walgreens Malden entry?

8    A.    $75.48.

9    Q.    Looking at this entry, um, can, um -- can you

10   explain why Officer Bellavia would receive $75.48 for

11   this detail?

12   A.    That Walgreens detail starts at 12:00 a.m. and

13   goes to 6:00 a.m., so he would have received the

14   overtime rate for 6 hours.

15   Q.    Okay.  And if we go down to look at the last entry

16   for Officer Bellavia.  (On screen.)  What was the

17   hourly -- what was the hourly rate paid for the last

18   entry for Stephen Bellavia?

19   A.    $75.48.

20   Q.    And based upon this entry, can you explain why

21   Officer Bellavia would receive, um, $75.48 for this

22   detail -- for this entry?  Excuse me.

23   A.    Yes, it appears that on February 16th he did a

24   detail for Devereau in excess of 8 hours, he did a

25   detail for 10 hours.  So he would have received regular

```
 1   pay for 8 and 2 hours at an overtime rate.
 2        THE COURT:  When you say "regular pay," you mean
 3   regular detail pay for 8 hours?
 4        THE WITNESS:  Yes, correct.  Sorry, Judge, regular
 5   detail pay and then the 2 hours for overtime for detail
 6   pay.
 7        THE COURT:  Thank you.
 8   Q.   All right, Ms. Sullivan, I'm going to show you
 9   another document.  (On screen.)   And can you see my
10   screen again?
11   A.   I can.
12   Q.   Okay.  And you can see that this has been
13   premarked as Exhibit NN, am I right?
14   A.   I can.
15   Q.   And what do you recognize this document to be?
16   A.   A strike detail payroll -- a detail payroll.
17        THE COURT:  How do you know it's a strike detail
18   payroll?
19        THE WITNESS:  Um, a couple of things.  I noticed
20   that it's billed to National Grid Security and that's
21   where I was advised to bill all strike details, instead
22   of National Grid Gas or National Grid Electric.  And
23   also the dates and also the rates.
24        THE COURT:  Thank you.
25   Q.   And, Ms. Sullivan, I scroll down to the bottom
```

1    obviously.   (On screen.)

2         Ms. Sullivan, in this document is it your

3    understanding -- strike that.

4         What additional details, if any, other than strike

5    details, were paid in this document?

6    A.    In the one that's in front of me, it does not

7    appear that there were any strike details paid.   That

8    document is in the, um -- where they worked.   But the

9    $56.09 is a regular detail rate.   The next one is -- the

10   $126.21, that looks like that -- that is a holiday

11   detail rate paid for Walgreens, the last one, um,

12   Reynolds.

13   Q.    I see.   And I would just scroll back up and have a

14   few questions for you.   (Scrolls up.)   And I am going to

15   scroll to, um, Officer Giordano.

16        Do you happen to know offhand, Ms. Sullivan,

17   what's the correct title for Mr. Giordano?

18   A.    Mike Giordano is a Sergeant now.

19   Q.    Okay, so Sergeant Giordano.   And pardon me for one

20   moment.   (Pause.)

21        So, Ms. Sullivan, can you see the -- I'll just

22   zoom in a bit.

23        Are you able to see the third entry for Sergeant

24   Giordano, um, where I have the cursor now?

25   A.    The one for 8-14?   Yes, I can.

1   Q.    Okay.  And what was the rate paid to Officer
2   Giordano for this entry?
3   A.    $112.18.
4   Q.    And why was Officer Giordano paid $112.18 for this
5   detail, do you know?
6   A.    It would have been double the strike rate.
7   (Pause.)  Not double the strike rate, double the detail
8   rate because it was a strike.  Sorry.
9   Q.    I see.  And if we were to look at the entry just
10  above it, do you -- can you tell me -- well let's look
11  at the -- actually we're going to look at the two
12  entries just above it, but we'll start with the second
13  one.
14        Can you tell me what rate Sergeant Giordano was
15  paid for the second entry?
16  A.    $168.28.
17  Q.    And can you tell from this document why, um --
18  excuse me, Sergeant Giordano was paid $168.28 for this
19  entry?
20  A.    It appears to me that he was paid as a supervisor.
21  Q.    But --
22  A.    During the nighttime hours.
23  Q.    And is there another reason that he would have
24  been -- strike that.
25        Um, what type of detail is that entry that we're

1    looking at?

2    A.    It's a National Grid strike that took place on

3    August 13th.  And looking at it now, I couldn't you the

4    exact time, but I know that it was during the -- you

5    know after midnight.

6    Q.    I see.

7    A.    It looks like he was a supervisor for 5 hours and

8    then it looks like he was paid for a supervisor for 1

9    hour after -- after 12:00 a.m.

10   Q.    What you just referenced there, are you referring

11   to the line above, is that correct?

12   A.    That's correct.

13   Q.    And what is the rate, um, for the first line that

14   we see here?

15   A.    $252.42.

16   Q.    And could you just explain your understanding as

17   to why he -- why Sergeant Giordano would have received

18   $252.42 for this particular entry?

19   A.    If I'm remembering accurately -- I don't remember

20   the actual hours, but he was a supervisor and he worked

21   during the night.  So after midnight there is an

22   increase.

23   Q.    Okay.  Ms. Sullivan, if you'll bear with me I have

24   one additional document to show you on these lines.

25        And, Ms. Sullivan, can you see --

```
1        THE COURT:  Mr. Buckley, don't take this as
2   crowding you, um, but I guess it is.  Mr. Miller says
3   there may be two more witnesses after this.  You've used
4   the better part of an hour here.  The parties are
5   entitled to have final argument.  I'm not so sure you
6   want final argument today, but, um, I'll ask you, and
7   that will take an hour.  Just have that in mind.
8        MR. BUCKLEY:  I understand, your Honor, I
9   appreciate it.  I'll be, um, very brief with this.
10  Q.    Ms. Sullivan, looking at this document that's been
11  premarked as Exhibit OO.  Are you able to discern what
12  the detail rate paid to officers in the normal course
13  would be?
14  A.    Can you repeat that, please?
15  Q.    Sure.  Looking at the document in front of you,
16  are you able to discern, um, what the detail rate paid
17  to an officer on a standard detail would be?
18  A.    Yes.  For a regular day detail, the rate of pay
19  would have been $59.92.
20  Q.    Okay.  And what is the date of this document, if
21  you can see it?
22  A.    January 24th would have been the day that the
23  officer received their paycheck that these details would
24  have been included.
25  Q.    All right.  Thank you.
```

```
 1          MR. BUCKLEY:  Your Honor, I'd like to offer
 2    Exhibits MM, NN, and, um -- your Honor, um, I apologize,
 3    my understanding is these are actually already in the
 4    record with the exhibit numbers attached to them.
 5          THE COURT:  Very well.
 6    Q.    Ms. Sullivan, just a couple more questions for
 7    you.
 8          Ms. Sullivan, are you able to see my screen?
 9    A.    I am.
10    Q.    And do you see the document that's been premarked
11    as Exhibit N?
12    A.    Yes.
13    Q.    And what's the -- and do you -- no, strike that.
14    And do you see that there are 13 pages contained in this
15    document?
16    A.    Yes.
17    Q.    And what do you understand this document to be?
18    A.    "Detail Rules and Procedures."
19    Q.    And what entity -- strike that.  Who or what
20    entity maintains these rules and procedures?
21    A.    I don't know the answer to that question.
22    Q.    Okay.  Ms. Sullivan -- I'm sorry, let's go back to
23    Exhibit -- what's been premarked as Exhibit N, and what
24    I understand is in the record as Exhibit 12.
25          THE COURT:  Mr. Buckley, you've lost me.  I don't
```

1    know what you're doing here.  Do you want these in

2    evidence?

3          MR. BUCKLEY:  Your Honor, I understand that it's

4    actually been admitted as Exhibit 12.

5          THE COURT:  Fine.  So why are we inquiring of here

6    about it?

7          MR. BUCKLEY:  I'm just going to ask Ms. Sullivan

8    where she understands that these rules and procedures

9    come from.

10         MR. PADOLSKY:  Asked and answered, your Honor, she

11   just answered that question.

12         THE COURT:  Yeah, she did, she says she doesn't

13   know.  But the clear inference is that it comes from the

14   police department, not from the Detail Board.

15   Q.    Well, Ms. Sullivan, if I can show you what's been

16   premarked as Exhibit Triple A.  Do you see the -- do you

17   see the document on my screen?

18   A.    I do.

19   Q.    And, Ms. Sullivan, can you see who is copied on

20   this document?

21   A.    I do.

22   Q.    And do you see who the e-mail is from?

23   A.    I do.

24   Q.    And who is copied on the e-mail and who is the

25   e-mail from?

1    A.    Copied to myself.

2    Q.    And who is the e-mail from?  And I'm sorry if you

3    have trouble reading it.

4    A.    Oh, I'm sorry about that.  It says "Brian Tilley"

5    and it's dated February 4th.

6          Do you want me to continue?

7    Q.    Well it's dated February 4th, 2016.  Do we agree

8    on that?

9    A.    Yes, we do.

10   Q.    Okay.  And are you able to see the individuals who

11   are in the "To" line of this document?

12   A.    I do.

13   Q.    And who do you understand these individuals to be?

14   A.    My understanding is that would be the detail that

15   was in effect at that time.

16         THE COURT:  The Detail Board?

17         THE WITNESS:  The Detail Board, yes.

18         THE COURT:  Yes.  All right.

19   Q.    And if we now turn to the body of the document.

20   Could you review just the body of the e-mail.

21   A.    Do you want me to read it or just review it?

22   Q.    You can read it to yourself.

23   A.    (Reads.)  Okay.

24   Q.    Do you understand -- Ms. Sullivan, do you

25   understand -- what's your understanding of Officer

1    Tilley's relationship with the Detail Board at the time

2    of February 4th, 2016?

3         THE COURT:  Mr. Buckley, let me ask you a

4    question.  Now you're seeking to suggest that the Detail

5    Board was making changes to the detail practices and

6    procedures, and that may be so, um, but I guess I don't

7    understand why any of this is material either to the

8    Wage Act claim or to the FLSA claim?  I just don't

9    understand the materiality here.  So explain it to me.

10   What difference does it make?

11        MR. BUCKLEY:  Your Honor, I'm happy to move on

12   from it, but I think it helps to provide a clearer

13   picture as to the operations regarding -- regarding, um,

14   the detail process.

15        THE COURT:  And maybe it does, but how would that

16   change anything that I would do?  That's why I say it's

17   not material.  It may give me a clearer picture, but

18   what difference does it make?  I've got to construe the,

19   um, one, whether these are wages at all, and, two, if

20   they are, what is the rate, um, and the like?  And the

21   calculus is different under the state and the federal

22   laws.  That's what I'm wrestling with here.  I guess I

23   just don't understand.

24        MR. BUCKLEY:  Your Honor, I understand.  I would

25   move to admit Triple A into evidence and --

1          THE COURT:  Any objection, Mr. Padolsky?

2          MR. PADOLSKY:  I do object, your Honor, and I'm --

3          THE COURT:  And sustained.

4          MR. BUCKLEY:  Okay, your Honor.  Thank you.

5          (Pause.)

6     Q.   Ms. Sullivan, that's all the questions I have for

7     you.  Thank you for your time.

8          THE COURT:  Mr. Padolsky, any questions for this

9     witness?

10         MR. PADOLSKY:  Can we take a comfort break, maybe

11    the morning break right now?

12         THE COURT:  You've asked for that frequently.  I

13    want to get through this.  Any questions?

14         MR. PADOLSKY:  Well, your Honor, I've had a lot of

15    coffee and I'm sorry to put that on the record, but it's

16    a very-much needed comfort break.

17         THE COURT:  Very well, we'll recess.  We'll recess

18    for 15 minutes until 20 minutes after 10:00.  We'll

19    recess.

20         MR. PADOLSKY:  Thank you, your Honor.

21         (Recess, 10:05 a.m.)

22         (Resumed, 10:20 a.m.)

23         THE COURT:  Any questions for this witness,

24    Mr. Padolsky?

25         MR. PADOLSKY:  Yes, your Honor.

1          THE COURT:  You may.

2

3     CROSS-EXAMINATION BY MR. PADOLSKY:

4     Q.    The charge that is charged to the City or to the

5     vendor, either one of them, the rate paid to the officer

6     is the same, correct?

7     A.    Yes.

8     Q.    The fee predates you, correct?

9     A.    That is correct.

10    Q.    The categories of rates that you looked at in the

11    spreadsheet, those are based -- the multipliers are

12    based off of the base detail rate, correct?

13         MR. BUCKLEY:  Objection.

14         THE COURT:  Overruled.

15    A.    To the best of my knowledge, yes.

16    Q.    You sent a detailed payroll to Terry Ippelyito and

17    she processes this payroll, correct?

18    A.    I don't know if she actually processes payroll.  I

19    believe it is set somewhere.

20    Q.    But you don't process it, correct?

21    A.    I do not.

22    Q.    Whether the City decides to process payroll is

23    something that you don't control for paid details,

24    correct?

25    A.    That is correct.

1   Q.    For example, if the Controller says, "Don't

2   process this period's paid detail pay," that's out of

3   your control, correct?

4   A.    That is correct.

5   Q.    And that has happened, correct?

6         MR. BUCKLEY:  Objection.

7         THE COURT:  Overruled.

8   Q.    Correct?

9   A.    No, I do not believe so.

10  Q.    Has talk of that happened?

11  A.    Yes.

12        MR. BUCKLEY:  Objection.

13        THE COURT:  "Has talk of this happened?"  I'll let

14  the answer stand for what it's worth.

15  Q.    The City legal department assists you with

16  collections, correct?

17  A.    Yes.

18  Q.    And you're a city employee, correct, with city

19  benefits?

20  A.    Yes.

21  Q.    And I just want to show you a few things here.

22  Look at, um, my screen here for a second.  (On screen.)

23  You went over this e-mail, Exhibit 47, where you sent a

24  detail rate increase, whether it's you or the members of

25  the Detail Board, correct?

```
 1    A.    Correct.
 2    Q.    And this was the letter, Exhibit 46.  Do you see
 3    the language of it specifically?  Yes?
 4    A.    Yes.
 5    Q.    And that language, um, you would agree, mirrors
 6    the same language, if you will, on Exhibit 49?
 7    A.    That's correct.
 8    Q.    "In accordance with labor contracts between the
 9    City of Malden and the police department unions, the
10    following increases for paid details will become
11    effective," correct?
12          MR. BUCKLEY:  Objection to the extent it's asking
13    about other language that Mr. Padolsky just noted.
14          THE COURT:  Overruled.
15    Q.    Correct?
16    A.    I believe so, yes.
17    Q.    It's the same?
18    A.    Yes.
19    Q.    And you don't remember where you got this
20    particular form except for the fact that you got the
21    language, you copied it, you pasted it, correct?
22          MR. BUCKLEY:  Objection.
23          THE COURT:  Overruled.
24    A.    I -- I -- I do not know.
25    Q.    But most recently do you recall receiving this
```

1    e-mail on March 31st, 2021?

2    A.    Yes, I do.

3    Q.    And engaging in this thread with Mr. Ranaghan?

4    A.    Yes.

5    Q.    And that included as an attachment this March

6    18th, 2021 detail rate announcement letter, do you see

7    that?

8    A.    I do.

9    Q.    And that specifically is on the City of Malden

10    letterhead?

11    A.    Yes.

12    Q.    Did Mr. Ranaghan tell you, um, did he edit this

13    particular document?

14    A.    That is -- um, yes, I sent him a document -- I

15    copied and saved the last detail increase letter and I

16    sent it to Mr. Ranaghan, you know, for him to look over.

17    He then in turn sent this back.  He revised it and sent

18    it back to me.

19    Q.    And this time he specifically told you to charge

20    the administrative fee on top of the $66 rate, correct?

21    A.    That's what it says, yes.

22        MR. PADOLSKY:  Your Honor, I move to admit this as

23    the next exhibit.

24        THE COURT:  Any objection?

25        MR. BUCKLEY:  Your Honor, I object.

```
1              THE COURT:  What is it?
2              MR. BUCKLEY:  Um --
3              THE COURT:  What's the ground of the objection?
4              MR. BUCKLEY:  On relevance grounds, your Honor.
5     There's no claim in this case for details for officers
6     worked who were members of the Superior Officers' union,
7     um, at or after the point in which these updated detail
8     rates went into effect.
9              THE COURT:  What do you say to that, Mr. Padolsky?
10             MR. PADOLSKY:  Your Honor, it relates to the
11    entire case to the admin fees for -- specifically to
12    where the admin fee is supposed to be charged to, and it
13    indicates a specific --
14             THE COURT:  I'll admit it.  I'll admit it.
15             MR. PADOLSKY:  And it indicates --
16             THE COURT:  Wait a minute.  Wait a minute.  So it
17    will be Exhibit 53 in evidence.
18             (Exhibit 53, marked.)
19             MR. BUCKLEY:  Your Honor, I'd like to make one
20    additional note, if I may?
21             THE COURT:  Not now.
22             MR. PADOLSKY:  And, your Honor --
23             THE COURT:  Very well.  Now it's your time.  You
24    may examine the witness, Mr. Buckley.
25             What?  Anything further?
```

1          MR. PADOLSKY:  If I may, your Honor?  Before we

2     stop, I did keep specific time, I know that I --

3          THE COURT:  I'm the timekeeper, Mr. Padolsky.

4     You've exhausted your time, but you've got the time for

5     closing.  You may use it as you wish.

6          MR. PADOLSKY:  Thank you, your Honor.

7          THE COURT:  And, Mr. Buckley?

8          MR. BUCKLEY:   Your Honor, nothing further for

9     this witness.

10          THE COURT:  Nothing further.  And thank you,

11     Ms. Sullivan.

12          The defense may call its next witness.

13          MR. MILLER:  Thank you, your Honor.  We call

14     Officer Jack Owens.

15          THE COURT:  He may be called.

16          THE CLERK:  Mr. Owens, could you please raise your

17     right hand.  You're on mute, Mr. Owens.

18          (OFFICER JACK OWENS, sworn.)

19          THE COURT:  And, Mr. Owens, consistent with the

20     procedures we have followed, sir, I'll ask you to state

21     your full name.

22          THE WITNESS:  My full name is Jack Owens.

23          THE COURT:  And, sir, from where we are seeing you

24     on the camera, what documents do you have to hand, um,

25     pertaining to this case that you can use in answering

```
 1   the questions?
 2           THE WITNESS:  None, your Honor.
 3           THE COURT:  Thank you.
 4           Mr. Miller, you may proceed.
 5           MR. MILLER:  Thank you, your Honor.
 6
 7           * * * * * * * * * * * * * * * * * *
 8           OFFICER JACK OWENS
 9           * * * * * * * * * * * * * * * * * *
10
11   DIRECT EXAMINATION BY MR. MILLER:
12   Q.    Good morning, Officer Owens.
13   A.    Good morning, sir.
14   Q.    What do you do for a living, sir?
15   A.    I'm employed with the City of Malden as a police
16   officer.
17   Q.    And are you a member of any union in that
18   capacity?
19   A.    Yes, I am.
20   Q.    Which one?
21   A.    The Malden Police Patrolman's Association.
22   Q.    How long have you been with the "MPPA," as I'll
23   call it?
24   A.    25 years.
25   Q.    Have you ever held an office with the union?
```

1   A.    Yes, I have.

2   Q.    And what was that?

3   A.    I held a position of the Union President.

4   Q.    And when was that?

5   A.    Um, 2018 to 2020.

6   Q.    So including when this case was filed?

7   A.    Yes.

8   Q.    You understand that you're the lead plaintiff in

9   this case?

10  A.    The lead plaintiff?  No.  I know I'm a plaintiff.

11        THE COURT:  I think he means the first-named

12  plaintiff in the caption of the case.

13        THE WITNESS:  Yes, your Honor.

14        THE COURT:  And to that extent you are the lead

15  plaintiff, you're the specifically-named plaintiff.

16  Okay, I understand that.

17        THE WITNESS:  Understood, sir.

18        MR. PADOLSKY:  Tom Brady versus the NFL.

19        Sorry, your Honor.

20  Q.    In that capacity, Mr. Owens, you were one of the

21  first officers to bring this litigation, is that right?

22  A.    Yes.

23  Q.    Okay.  And your fundamental claim in this

24  litigation is that you've been underpaid for details, is

25  that right?

```
1    A.    Yes.
2    Q.    Is this litigation the only complaint you've ever
3    tendered on that subject to anyone?
4    A.    I'm not sure I understand your question.
5    Q.    Did you file any other proceedings regarding your
6    claim that you've been underpaid for details?
7    A.    I -- I -- well can you explain what you mean by a
8    "claim"?
9    Q.    Well I'll try.  Do you understand that you
10   asserted a claim against the City by filing a complaint
11   in Federal Court leading to this litigation?
12   A.    Yes.
13   Q.    And you understand that there are other ways you
14   could render a complaint about the same issues, for
15   example you could file a grievance under the CBA?
16   A.    Yes.
17   Q.    That's what I mean.
18   A.    Okay.
19   Q.    Other than this litigation, have you filed any
20   sort of complaint, grievance, or statement of
21   dissatisfaction anywhere about the subject of this
22   litigation?
23         MR. PADOLSKY:  Objection, relevance.
24         THE COURT:  No, we'll give him some latitude.
25   A.    I don't recall filing a grievance about this case
```

```
 1    through the grievance process and the contract, no.
 2    Q.    Why not?
 3          THE COURT:  Well the "Why not?"  Remember there
 4    was a motion to dismiss that I've ruled on here.
 5          MR. MILLER:  I understand, your Honor.
 6          MR. PADOLSKY:  The same objection.
 7          THE COURT:  And I'll sustain it.
 8          MR. MILLER:  Okay.
 9    Q.    Mr. Owens, did you ever file a complaint with the
10    Attorney General regarding the subject matter of this
11    litigation?
12          MR. PADOLSKY:  Objection, relevance.
13          THE COURT:  Overruled.
14    A.    To my knowledge, um, I have not.  No.
15    Q.    Are you aware of any other plaintiff participating
16    in this litigation who filed a complaint with the
17    Attorney General regarding the subject matter of this
18    litigation?
19    A.    No.
20          MR. MILLER:  No further questions, your Honor.
21          THE COURT:  Nothing for this witness,
22    Mr. Padolsky?
23          MR. PADOLSKY:  No, your Honor.
24          THE COURT:  Thank you.
25          Call your last witness, Mr. Miller.
```

```
 1          MR. MILLER:  Um, we've got nothing further, your
 2    Honor.  We rest.
 3          THE COURT:  Very well.
 4          All right.  So --
 5          And there's no rebuttal evidence, Mr. Padolsky?
 6          MR. PADOLSKY:  None, your Honor.
 7          THE COURT:  All right.
 8          So now I --
 9          MR. PADOLSKY:  But, your Honor, may I clarify
10    subject to the reservation on the 50,000 page --
11          THE COURT:  You're exactly right, we've got to
12    ultimately resolve that.  But I think I'm in a position
13    to entertain final argument.
14          And, um, so I give you various options.  It will
15    be half an hour a side for final argument, the plaintiff
16    will get a chance to argue last.
17          What I propose is any one of these really two
18    options.  We can -- we're going to take a recess for 15
19    minutes now and I'm ready for final argument.  It need
20    not -- since I -- I can do it in a finite period of
21    time, it need not be this morning.  Though I am engaged
22    this afternoon, we can pick a time within the next few
23    days, we can pick a time after you've had a chance to
24    file additional briefs, but I expect it would be a
25    general agreement, that if you don't agree, my instinct
```

1    is to press on.

2         So we'll start with the plaintiff.  What would you

3    like to do, Mr. Padolsky?

4         MR. PADOLSKY:  Maybe we can use the recess to

5    perhaps have a conversation with Mr. Miller and discuss

6    the --

7         THE COURT:  That makes sense and tell me after the

8    recess.

9         MR. PADOLSKY:  Yeah, I think that makes sense,

10   your Honor.

11        THE COURT:  In any event, there will be a recess

12   now to enable you to get ready, if we're going to go

13   forward, or to make a joint proposal if we're not.

14        We'll take a 15-minute recess and we'll start

15   again at 10 minutes to 11:00.  We'll recess.

16        (Recess, 10:30 a.m.)

17        (Resumed, 10:50 a.m.)

18        THE COURT:  And the Clerk will call us to order.

19        THE CLERK:  Now hearing Civil Matter 19-11835,

20   Owens versus the City of Malden.

21        THE COURT:  All right, how do you folks wish to

22   proceed?

23        (Pause.)

24        THE COURT:  Go ahead, Mr. Padolsky.

25        MR. PADOLSKY:  I think we're ready to go on

1   closings, if your Honor is ready to receive them.

2           THE COURT:  I am.

3           And, Mr. Miller, is that so?

4           MR. MILLER:  Yes, we'd be happy to close now, your

5   Honor, and reserve the right to file a post-hearing

6   brief if the Court would find that helpful.

7           THE COURT:  Actually that is the next step.  We'll

8   have the closings and you'll have the benefits of my

9   questions and concerns, and then I will ask you once

10  again what you want to do?  Do you want me to stay my

11  hand for a set period of time?  Do you want my

12  reactions?  What do you want?

13          All right, so we're ready for a final argument not

14  to exceed one half hour.  The plaintiff bears the burden

15  of proof.  I'm sensitive to the fact that we have not

16  resolved all exhibit issues.  And I will hear the

17  defense.

18          MR. MILLER:  Thank you, your Honor.

19

20  CLOSING ARGUMENT BY MR. MILLER:

21          Much of what I have to say, by way of closing, we

22  previewed yesterday, of course, because the merits of

23  the case haven't changed, but I think the benefit of

24  yesterday's conversation and some of the additional

25  evidence that came in today helps us to more clearly

1  reach the same result that I think we were arguing for

2  yesterday.

3       One thing that has changed, um, pertains to the

4  last question after trial.  This issue hadn't been

5  raised throughout the trial, but it was raised in the

6  defendants' answer, the first statement in this case of

7  their defenses, which is that the plaintiffs, in this

8  matter, never exhausted their administrative remedies,

9  they never attempted to do that.  The statute, in the

10  Wage Act, under which they've sued, requires it very

11  plainly that they file an Attorney General complaint.

12  Mr. Owens said he didn't do that.  He's not able to tell

13  me anyone else did that.  And I think that deprives the

14  Court of jurisdiction as to the Wage Act claim.

15       The Supreme Judicial Court has provided some

16  guidance on that subject and the failure to perfect an

17  Attorney General complaint can be excused if cured prior

18  to the close of trial, but that hasn't happened here,

19  and there's no law coming down from the Appellate Courts

20  of Massachusetts that suggests this claim's statutory

21  requirement to file an Attorney General complaint can be

22  excused if the plaintiff allows the case to run its

23  course through the close of trial without making that

24  filing.  So one additional argument we have is that the

25  Court is now deprived of jurisdiction as to the Wage Act

1    claim.  The merits haven't changed a great deal to the
2    extent that the Court finds itself able to reach the
3    Wage Act claim.

4         I still think that there's a binary question that
5    has to start the Court's analysis here and the binary
6    question is whether the contract is ambiguous?  That
7    question is a question of law only, a pure question of
8    law, that does not depend on any extrinsic evidence, in
9    fact all of that evidence about what the parties think
10   the contract means is properly excluded as parol
11   evidence if the contract is unambiguous and clear.  And
12   we'd submit that the only possible unambiguous
13   construction of the contract is the one that we have
14   been proffering since Day 1 of this trial.

15        You have a one-sentence statement in Article 23,
16   Section 3 of the CBA that says "The detail rate shall be
17   the maximum patrolman's rate of pay plus night
18   differential," or "including night differential,"
19   rather.  We think that that is a plain statement that
20   the detail rate is constructed of two elements, the
21   highest salary of any patrol officer working when the
22   detail rate is set, plus the 6 percent night
23   differential, one of several augments that officers
24   receive.  And we further state, as I clarified
25   yesterday, that the expression of the night differential

1   wage augment as part of the detail rate is an exclusive

2   construction of that rate.  There are many augments that

3   officers receive, but age-old maxims of contract

4   construction tell us that when you refer to something

5   and you provide one of a number of things that could be

6   included in the things of which you've referred, what

7   you've done is exclude all of the other things.  That's

8   the "expressio unius" construct.

9        THE COURT:  Yes, I'm familiar with the principle.

10   Let me ask you a related question.

11        Do you therefore concede, um, on the Wage Act

12   claim that these detail payments are in fact -- because

13   this wasn't decided in the Appeals Court decision,

14   they're in fact wages, correct?

15        MR. MILLER:  I don't think they are, your Honor.

16   I think that the entire structure of this pay, um,

17   arrangement for private details, as contemplated in

18   Chapter 44, Section 53(c), the municipal finance law,

19   contemplates that this is all outside employment.  We

20   have established that it's voluntary, it's something

21   that officers sign up for, it's separate from their

22   day-to-day shift work --

23        THE COURT:  But the Appeals Court did hold in

24   these premises that the pay had to be timely consistent

25   with the Wage Act.  Doesn't that suggest that these are

1    in fact wages paid by the City, um, and the like?

2         MR. MILLER:  I think the fact that they are

3    potentially susceptible to the Wage Act and that the

4    City is required to pay them once the process has run

5    its course, once the City has received payment from

6    vendors, doesn't mean that they're a wage for which the

7    municipality is ultimately responsible, and in fact we

8    know they're not because of the structure of the

9    statute.  What the statute says, at Chapter 44, Section

10   53(c), is the fact that the City need not pay for these

11   details until it receives payment from the vendor who

12   procured the detail.

13        Now the City has, in an effort to help these

14   officers, created a little bit of a slush fund to grease

15   the wheels of that and get people paid sooner when that

16   detail money is eventually coming in, but as to the

17   question of "Is the City ultimately responsible for

18   these payments?"  The answer to that, as a matter of

19   law, is "No."  Because if National Grid doesn't pay for

20   that detail, the City has no obligation, pursuant to

21   that statute, to pay the officers with.  But I mean I

22   think that alone defeats the claim as to private

23   details.  But I think there's multiple reasons for that.

24        The first is jurisdictional, as I said.  The

25   Attorney General has not had an opportunity to pursue

1    this case, therefore this Court lacks jurisdiction over

2    it.  The second is it's not wages structurally as a

3    matter of the statute, and I think the Appeals Court

4    decision, read together with the statute and the

5    information that we've heard about the voluntary nature

6    of these details, means that they're not wages, and

7    that's yet another reason that the Wage Act claim fails.

8    But assuming that the Court could reach the merits of

9    it, it fails on those grounds too, because the statutory

10   construction that Mr. Padolsky needs in order to make

11   out his claim for liability simply isn't viable.  And

12   I'm going to walk the Court through just succinctly the

13   reason for that.

14        We're looking at the one sentence in this case

15   that matters, "The base rate for paid details shall be 1

16   1/2 times the maximum patrolman's rate of pay, including

17   night differential."  As I've said, I think that that's

18   clear on its face.  But the Court yesterday posited

19   another possibility, which is that these few words,

20   "maximum patrolman's rate of pay," means the most that

21   any officer makes inclusive of all details, and then

22   make sure that that also includes night differential.

23   But I think that that's foreclosed by the contract.

24        Mr. Padolsky urged a similar construction.  We

25   pointed out that the court time is what negates any

1    possible construction of this contract that would treat

2    these words, "maximum patrolman's rate of pay," with

3    what I'll call the "fully-loaded rate," the rate

4    inclusive of all augments anyone can possibly receive.

5    And the reason that that doesn't work is that we have

6    exactly the same locution for court time, under court

7    time we have exactly the same expression to set a rate,

8    "1 1/2 times the maximum patrol officer's rate of pay

9    including night differential."  And we know something

10   else about court time, which is that this phrase alone

11   does not include the Quinn benefit.  How do we know

12   that?  Because in Article 16, Section 3, we find out

13   that the Quinn benefit is included for those officers

14   who qualify for it, not just any officer, and only if

15   they meet these attendance requirements.  That makes it

16   impossible to conclude that this phrase used to define

17   court time, "maximum patrol officer's rate of pay,"

18   includes the Quinn benefit.  You would not have -- no

19   competent draftsperson would include this sentence in

20   the CBA specifically providing for Quinn bill benefits

21   in certain circumstance if this sentence in the CBA met

22   what Mr. Padolsky urges, i.e. the "fully-loaded" rate,

23   it would not only be redundant, it would be incoherent

24   to structure it that way.

25        Mr. Padolsky's response is "Well that's different,

it's a different rate that appears in a different
section of the contract, so that cannot carry the day."
The Court has to interpret this contract as a whole.  In
determining whether it's ambiguous or not in the first
place, the Court is required to look at not just little
isolated pieces of language, but the document as a
whole, and that is settled in a Mass Appeals Court case
called *Castraconi vs. Michel*, 74 Mass Appeals Court 591,
and at Page 599 of that decision the Court said, "The
judge determines the existence of an ambiguity from an
inspection of the text of the entire contract."  We
cannot find, based on text of this entire contract, that
the phrase that defines the detail rate, "maximum
patrolman's rate plus night differential," is the
fully-loaded rate.  It's simply not susceptible to that
interpretation.

         There's something else that we know too.  We've
figured out that the locution that is used to describe
both the court time rate and the detail rate couldn't
possibly include Quinn benefits.  The separate section
of the overtime article that we looked at about
application of the Quinn bill rate to court time
precludes that, and that's enough.  Because if the Quinn
bill alone was excluded from the detail rate, officers
have been paid more for every detail that they work than

 1    the contract requires, and there's math that leads

 2    directly to that conclusion, because the Quinn bill

 3    incentive, the maximum Quinn bill incentive is 25

 4    percent of the base officer's pay, it has a very

 5    significant inflationary effect on the rate, if

 6    included.

 7        Mr. Padolsky's theory in this case is based on the

 8    administrative fee, which is just 10 percent of the

 9    fully-loaded rate.  And we've done the math on that.

10    And if you extract only the Quinn bill benefit from the

11    detail rate, even if you were to observe -- even if you

12    were to assume a proposition objecting to --

13        (Screen freezes up.)

14        THE COURT REPORTER:  Excuse me, I -- he's frozen

15    up for me right now.  Excuse me, Judge, he froze up

16    right there.

17        THE COURT:  Um, I think the Court Reporter got it

18    up to the point, Mr. Miller, where you said "If you

19    assume the fully-loaded rate without the Quinn

20    benefits," and you can pick up from there.

21        THE COURT REPORTER:  Thank you.

22        MR. MILLER:  Right, your Honor.

23        We've established that Quinn benefits cannot be

24    included in this rate because of the court time

25    provision.  If Quinn is excluded from the detail rate,

1    the Wage Act claim fails because Quinn increases the

2    detail rate by 25 percent of the officer's base pay,

3    it's a material increase.  The admin fee that is the

4    basis for plaintiffs' claim in this matter is only 10

5    percent, it's a much more modest reduction of the rate

6    than the inflationary effect posed by the Quinn bill.

7    So even if the Court could somehow come to a

8    construction that "maximum patrolman's rate plus night

9    differential" means "fully-loaded rate with everything

10   except Quinn," based on this court-time article, the

11   claim would fail.  It's a mathematical matter.  So I

12   think those aspects of the contract lead to a

13   conclusion, as a matter of law, that the Wage Act claim

14   fails.

15        But there is another possibility, that the

16   contract is ambiguous, and I think that the contract can

17   only be found to be ambiguous if the fully-loaded rate

18   is even considered to be a possibility, because if the

19   fully-loaded rate is a coherent construction of the

20   detail rate, there's no way that it's the only coherent

21   construction of the detail rate.  We cannot look at the

22   sentence in Article 3, Section 3, and say "That could

23   mean only one thing, the fully-loaded rate plus

24   gratuitous mention of the night differential is in plain

25   contention with the court time article of the CBA,"

1    that's not a plain and natural reading of the contract.
2    But if it's a possible one, that means that necessarily
3    the contract is ambiguous.
4        So what do we do then?  Then the parol evidence
5    becomes admissible and we look at what people believe
6    this rate to mean over a period of years.  And the
7    evidence that came in plaintiffs' case in chief,
8    together with what Ms. Sullivan told us today,
9    establishes that this practice has been in place and has
10   been consistently enforced pursuant to all the same
11   terms and provisions for decades, at least since
12   Ms. Sullivan took the job.  And you heard Chief Molis
13   and Captain Amirault testify that they've been officers
14   for 40 years and this is the only calculation of the
15   detail rate that they know, the one that exists.  And
16   the one that exists, as a matter of empirical fact, is
17   the fully-loaded rate subject to the application of the
18   administrative fee, 10 percent, the status quo, exactly
19   what's happened for four decades.
20       And so if past practice either displaces the
21   language in the contract, it defines what the detail
22   rate is, or somehow reforms it, because it's ambiguous,
23   then that result is that plaintiffs are entitled to
24   exactly what they received here.  There's no allegation
25   of a change in practice here.  They're not saying, "Hey,

1    wait, you've pulled the rug out from under us, this has

2    been a fully-loaded rate forever," and then shortly

3    before the statute of limitations ran in this case the

4    City started to impose an administrative fee, that's not

5    compatible with the evidence.  In fact the first

6    evidence that Mr. Padolsky put on in this case showed

7    that the administrative fee now in place was put in

8    place more than a decade before this case came out by

9    Mayor Howard at the end of 2007.  So that's the

10   practice.

11        And we now know, as a result of some of the

12   evidence that came in from Mr. Amirault, where the rate

13   came from, specifically as to the 2015 detail memo,

14   because he sent an e-mail to the entire police

15   department reporting it.  He said, "The Detail Board met

16   and voted and this is what we voted the rate was going

17   to be both before and after the application of the

18   administrative fee."  And he didn't check with anybody

19   else on this subject, not the chief, not the Mayor,

20   anybody, that's the Detail Board's rate.  And so it

21   doesn't mean that it was imposed by the City.  If

22   anything it's a common understanding of the parties

23   given light by the unions, i.e. the plaintiffs, and the

24   Detail Board.

25        The only significance of that is that it showed

1    past practice cuts both ways.  There are cases cited in

2    the brief that we filed yesterday, and we'll offer to

3    supplement those in a subsequent brief, that

4    substantiates the common-sense point that if a party,

5    like a union or a plaintiff who's a member of the union,

6    is going to contend that past practice helped us

7    determine what a CBA means, that plaintiff, that union,

8    has to live with all aspects of the past practice they

9    invoke.  They cannot say, "Hey, wait, we're entitled to

10   the fully-loaded detail rate because that's been the

11   practice all along, but not subject to this

12   administrative fee because we don't like it," which is

13   fundamentally plaintiffs' position here.  The

14   administrative fee is not new.  The only way to get to

15   the fully-loaded rate, as I submit it is, is to look at

16   past practice, but then you have to take the

17   administrative fee with it.  And because there's been no

18   change in that past practice, plaintiffs have received

19   everything to which they could possibly be entitled and

20   the Wage Act claim fails.

21        Plaintiffs' only retort to that in the evidence so

22   far is its reference to Chief Molis's testimony, and we

23   heard a lot about that yesterday.  As I said yesterday,

24   it changes nothing.  Chief Molis testified to what we

25   already know, the detail rate empirically calculated has

 1    included lots of augments, and he told us he doesn't --

 2    he didn't do the calculation himself, he doesn't know

 3    exactly how to calculate it, but it's included lots of

 4    augments over time, including Quinn.  That's undisputed.

 5    Nobody contends that to be untrue as a matter of

 6    empirical fact.  There's not a single thing that Captain

 7    Molis said or was asked that suggests that the

 8    administrative fee was not also part of that

 9    understanding.  And so his testimony cannot get

10    plaintiffs to the point that they'd like to get.

11    There's no evidence in the record that would allow for a

12    conclusion that the proper rate of pay in this matter

13    was the fully-loaded rate and not including the

14    administrative fee.  And because plaintiffs can't

15    establish that, then the Wage Act claim fails.

16         If the Court has no questions on the Wage Act

17    claim, then I'm happy to discuss the Fair Labor

18    Standards Act claim.

19         THE COURT:  Go ahead.

20         MR. MILLER:  The Fair Labor Standards Act claim is

21    also a little bit renewed, um, the merits of it are

22    revisited as a result of the objection that we filed

23    this morning, which I don't expect the Court has had a

24    chance to review in any kind of detail.  But we received

25    the exhibits that Mr. Padolsky proffered, the 1006 that

1    he marked as Exhibit AR for identification just a few

2    minutes before trial yesterday, and as I said yesterday,

3    we could tell immediately that there were problems with

4    it, that it wasn't quite accurate.  The objection that

5    we filed this morning demonstrates that it's in fact

6    rife with errors, there's like a dozen errors in the

7    document, and some of them are critical.  Some of them

8    are minor, but some are critical, including overt

9    misstatements of the number of hours that plaintiffs

10   work in a given week.

11          What does that mean?  That means that the 1006

12   documents that Attorney Padolsky has proffered are not

13   reliable, it's not an accurate summary of anything, it

14   can't be used for any purpose, and if it can't, there

15   has been no showing by any plaintiff in this matter of

16   any violation of the Fair Labor Standards Act on any

17   theory.  Mr. Padolsky tried on Day 3 to proffer examples

18   of that, he failed because those were outside the

19   statute of limitations.  He tried again on Friday to

20   proffer examples that were within the statute of

21   limitations, and upon cross-examination, as Ms. Silveira

22   explained to us with Mr. Ranaghan's testimony, those

23   weren't violations either because the officers didn't

24   work more than 40 hours in that week.

25          Now Mr. Padolsky has proffered an exhibit with a

1    handful of additional putative violations, it turns out

2    that about a third of those are outside of the statute

3    of limitations period, and the ones that aren't aren't

4    ripe yet.  Meaning that plaintiffs just haven't met

5    their fundamental burden to show liability in this case.

6    It's just a simple failure of proof, they haven't shown

7    what they needed to show.  The only thing they've shown

8    is that a violation of the Fair Labor Standards Act

9    might have happened to some number of people, we know

10   not who or how many, and to some extent.  But we don't

11   know how many details could potentially be implicated.

12        And the Court has no means to access that other

13   than to wade into this massive trove of documents that

14   Mr. Padolsky proposes to provide to the Court and to do

15   the job before the plaintiffs, which we would submit is

16   improper, and certainly it would be massively

17   burdensome.  We've taken our own efforts at crunching

18   that data and it's an incredible amount of work given

19   the nature of the records compiled.  We just don't think

20   it's the Court's job to do that where plaintiffs have

21   failed to make even a prima facie showing of an actual

22   violation.  And we know from some of the evidence that

23   came in in our case in chief that some of these officers

24   will have no claim.  Ms. Silveira walked Mr. Ranaghan

25   through Officer Tilley's pay stub and this conclusion

```
 1    was reached, I think indisputably, that Officer Tilley's
 2    overtime rate, for purposes of the Fair Labor Standards
 3    Act, is lower than the established detail rate.
 4         THE COURT:  Shouldn't I do this on the Fair Labor
 5    Standards Act claim, shouldn't I say, with some real
 6    care and perhaps consulting you further, here
 7    arithmetically are the Court's findings and rulings as
 8    to each variable of the Fair Labor Standards Act claim?
 9         Now we've got these records and now I turn to the
10    parties and say, "Prepare, um -- that because there's
11    much to your decertification argument, prepare, um, a
12    form of judgment."  For many you say -- though you're
13    not exactly sure, you're saying for certainly most, that
14    will mean judgment for the defendants because under
15    these variables there is no violation.  For a few
16    theoretically, but we know what the variables are, that
17    means some recovery.  Why shouldn't I just do that, to
18    say "This is what I find on this record, these are the
19    requirements, and now give me a form of judgment on each
20    individual plaintiff"?
21         MR. MILLER:  There are two problems with that,
22    your Honor.
23         THE COURT:  Yes, go ahead.
24         MR. MILLER:  One is legal and one is practical.
25    The legal problem with it has two components.
```

1          First of all, I think that what your Honor

2     describes would be an advisory opinion, I don't think

3     that it's sufficiently grounded in actual fact about the

4     parties to satisfy Article III of the Constitution.  I

5     don't think that's appropriate.

6          At a lower level of gravity than the Constitution,

7     the case law around Fair Labor Standards Act collective

8     actions doesn't allow for it either.  There has to be

9     some mechanism demonstrated by the plaintiff to

10    establish, not just the possibility of liability, but

11    actual liability as to a group of people in common.  The

12    procedure that your Honor describes doesn't do that, it

13    still leaves it to an individual person-by-person

14    grinding inquiry which the case law prohibits.  But I

15    think the Constitution --

16         THE COURT:  You're not telling me that an

17    individual can't recover under the Fair Labor Standards

18    Act?

19         MR. MILLER:  Not at all, your Honor, that's in

20    fact what I'm proposing.  I think that these individual

21    plaintiffs, because no general showing of liability has

22    been made in this case, they could still do that as

23    individuals on a decertified basis.

24         THE COURT:  But what I'm saying to you, and maybe

25    you want to reflect on this, is decertification does

1    seem like it is advisable here.  And we'll see what
2    Mr. Padolsky says.  But at the same time proceeding on
3    an aggregate basis now that we've invested all this time
4    and effort would, um, result in finality and, um, the
5    best approach to justice.  Just throwing my hands up and
6    saying "Well, even if I accept this mass of documents"
7    -- which they're your documents, they are the payroll
8    records, um, "we're going to have to look at it at some
9    stage in this proceeding," and then just say "Well,
10   fine, now bring separate actions," that does not commend
11   itself to the Court.
12          You're telling me that's legally inappropriate?
13          MR. MILLER:  Yeah, I do believe it's legally
14   inappropriate for the reasons expressed, your Honor, and
15   I think it's inappropriate at the constitutional level,
16   which is why the case law says what it is.
17          THE COURT:  Right.
18          MR. MILLER:  Those are the legal problems with it.
19   As I mentioned, there's also another set of problems
20   which are practical problems.
21          The transaction costs of doing what the Court just
22   described massively outstrip the amount in controversy
23   here, and the work that we would have to go through to
24   look at every detail worked by people who do not have
25   claims is the reason I think that the courts are

1    prohibited from issuing advisory opinions, to put the

2    parties to massive transactional costs in grinding

3    through this analysis.  And they are massive, as

4    demonstrated by the fact that Mr. Padolsky has been

5    unable to do this comprehensibly or even by example

6    reliably up to this point.  That is no small task at

7    all.  And I don't think it's going to result in anything

8    stipulated either, I think it's likely to result in

9    disputes.  And that, I think, is the reason to allow

10   these plaintiffs to go their separate ways.  And to the

11   extent that they --

12       THE COURT:  If I am sufficiently detailed in my

13   findings and rulings and we're looking at payroll

14   records, I'm not clear what disputes there are?  I mean

15   I'm -- I have to say I'm struck by the commonality of

16   testimony from the various fact witnesses.  This is not

17   a who-do-you-believe case, rather it is a legally and

18   factually complex case, and I praise both attorneys, but

19   the people engaged are, um, generally both credible and

20   in agreement as to what has happened.  Do you see what

21   I'm saying?  I don't -- if I can be sufficiently

22   specific, I don't see why there should be factual

23   disputes.

24       MR. MILLER:  Your Honor has a good point there,

25   but sufficiently specific is very specific and there's a

1  number of dimensions to be covered starting with "What's
2  a city detail?"
3       THE COURT:  Indeed there is and I've been
4  reflecting on that, um, because it's not clear to me --
5  and I'll ask Mr. Padolsky about this, it's not clear to
6  me that, um, all details performed for, um, departments
7  of the City are eligible for the calculation, given
8  really -- and I do, um, my Chief's careful analysis in
9  the *McGraf* case leads me into this 6-factor analysis,
10  and I'm going to have to reflect on the record there and
11  I'll ask him about that.  But if we say third-party
12  details are out, then there's the question of are any --
13  are all city details, that is departments of the city,
14  are they in?  And if not, which ones are and why?  But I
15  have the record that I have.
16       MR. MILLER:  Yeah, you do.
17       THE COURT:  About 5 more minutes.  Go ahead.
18       MR. MILLER:  I agree with those points as your
19  Honor just laid them out.  In the abstract it should be
20  simple, but there's a reason that we're not allowed to
21  make abstract rulings in court, and our objection filed
22  this morning plays this out too.
23       Even as to details that Mr. Padolsky has accounted
24  and claimed as Fair Labor Standards Act violations, you
25  see notations in the record for details for which

1    officers were paid but did not work, they didn't show

2    up, the detail was cancelled, and they still got paid

3    for it.  And so what you have is a giant haystack of

4    potential factual disputes as to happened, how many

5    hours worked by each person each week in which they

6    worked a city detail, and I just don't think that the

7    practical challenges, as a matter of judicial economy,

8    make sense for the Court to address in that fashion.  I

9    think what makes a lot more sense is to say,

10   "Plaintiffs, you've made no common showing, if any one

11   of you can make a individual showing, you're free to do

12   that.  Please do."

13        And the City will respond to that, by the way,

14   your Honor.  We've said from the beginning that the Fair

15   Labor Standards Act is the "Tick on the Tail of the

16   Dog," it's almost inconsequential, that the transaction

17   costs that would go into assessing it massively outweigh

18   the value of the claim for reasons that are also

19   reflected in the exhibits that Mr. Padolsky's proffered.

20   As to any potential claim violation, you're talking

21   about matters of cents, 72 cents in the case.

22        THE COURT:  I hear you.

23        MR. MILLER:  So that is a practical challenge and

24   we do believe that there are legal problems as well.

25        The only other point I would address to your Honor

1    is again the issue of willfulness.  There's been no
2    showing of willfulness in this case and Mr. Padolsky's
3    effort to demonstrate it is only based on his cease-and-
4    desist letters that he sent to the City two days before
5    filing this case.  And his theory is that because the
6    City didn't immediately surrender and change the
7    practices, that it's a willful violation, and set up all
8    kinds of mechanisms to prevent this from happening going
9    forward.  But there's been no adjudication that there's
10   a problem, there's been no showing that there's a
11   violation.
12        And even if the City was negligent and could have
13   acted more promptly to address this in some manner, that
14   might be outmoded by what the Court does in this case
15   anyway.  There's no way that it can be said that conduct
16   that occurred three years prior to the filing of this
17   complaint is rendered willful by a letter that
18   Mr. Padolsky sent 2 or 3 days before he filed the
19   complaint.  It simply doesn't even begin to make sense.
20        And neither does the prior litigation, as
21   discussed yesterday.  The **MPPA vs. The City of Malden**
22   case has nothing at all to do with the detail rate, it
23   put no one on notice of any issue with the detail rate,
24   apparently including plaintiffs.  Because even if
25   plaintiffs were aware of the detail rate being a problem

1    at the time of that litigation, they would have included

2    it in their claims and they didn't.  And so what we know

3    from that is that you can take a very close look at this

4    process and not dig into the nuts and bolts of the

5    detail rate and come to some alarmed conclusion that it

6    might be miscalibrated.

7         The reality here is, if there was any problem with

8    the Fair Labor Standards Act at all, no one noticed it,

9    probably because the amounts at issue are very minor,

10   and given that, there's no showing that the City was

11   even aware of this issue until shortly before the

12   litigation was filed.  And you simply cannot treat

13   something of which a party was unaware as a willful

14   violation.  Even if Mr. Padolsky contends we should have

15   been, that's a showing of negligence only and it just

16   doesn't come close to meeting the standards that the

17   First Circuit has set for a willful violation.

18        THE COURT:  Thank you, Mr. Miller.  Thank you.

19        Mr. Padolsky?

20        MR. PADOLSKY:  Thank you, your Honor.

21

22   CLOSING ARGUMENT BY MR. PADOLSKY:

23        Your Honor, I appreciate the Court's timely

24   hearing of this matter.  I understand that your Honor

25   advised me on Friday not to mention that specifically,

1    but I do appreciate that and would like to state that

2    for the record in part of my time here.  It's been a

3    pleasure to present this case, your Honor,

4    professionally, and it is a complicated case from a

5    factual perspective and a legal perspective.

6         But I'd like to provide some clarity, and I'd like

7    to specifically talk about Mr. Miller's new theory of

8    interpreting the contract and why it's actually

9    illogical and irrational according to the full context

10   of the contract, which I think we, in some respects,

11   agree on the cannons of contract interpretation.

12        First, as a matter, I think, Judge, of just

13   housekeeping, um, is one question to Mr. Owens about

14   administrative remedies I don't think carries the burden

15   that the defendant has to prove its affirmative

16   defenses.  The SJC case that my brother speaks to in his

17   closing, um, ***DiPiante vs. Jan Pro Franchising***

18   ***International,*** it's cited at Page 27 of Docket Number

19   200, it doesn't say what my brother says, it says that,

20   um, it's the defendant's affirmative defense and it may

21   be waived because the rights under the Wage Act, the

22   rights under the FLSA, um, the Federal corollary, are

23   nonwaivable.  And your Honor ruled on that too in the

24   motion to dismiss.

25        Mr. Miller's new theory of the contract is this

1    new, um -- is this, um, theory that involves reading

2    things that actually don't appear in the actual

3    contract, and they really don't say this in their

4    closing necessarily, but we did see this yesterday in

5    the, um, the Docket Number 237, in the motion for a

6    required finding that Mr. Miller filed and that we

7    argued yesterday, which is, and I agree, it was

8    enlightening.

9         You see that the City's position is that the rate

10   consists of two elements -- the detail rate consists of

11   two elements, the maximum patrolman's base pay and a

12   night differential, which they call an "augment."  But,

13   your Honor, Exhibit 5 doesn't actually use the word

14   "augment" at all when referring to these, um, items of

15   pay, it doesn't refer to them as a "supplement" either.

16   So I'd like to show your Honor the full context.

17        So if you recall, they say the rate consists of

18   the maximum patrolman's base pay, and if we actually

19   look to the rate specifically, which is at Page 27 of

20   the contract -- and actually that reminds me, um -- well

21   just getting back to the prior point, that all the

22   arguments that my brother makes about, um, "You know

23   this happened 10 years ago" or "Why didn't they catch

24   this sooner?"  There's actually two no-waiver provisions

25   of the collective bargaining agreement, Article 19,

1    Section 1, and Article 13, Section 1, and doubling down

2    on the fact that, you know, the parties are not waiving

3    rights to this agreement, notwithstanding the fact that

4    neither of these two claims are waivable in the first

5    instance.

6         So we go to the base rate for paid details.  If

7    you recall, the City says that is the maximum

8    patrolman's base pay, but that's not actually what it

9    says, it says "The base rate for paid details shall be

10   the maximum patrolman's rate of pay."  And so if we look

11   to the rate of pay -- if we look to the contract for a

12   definition of "rate of pay," do we find it?  And we

13   really don't find a clean definition in the sense that

14   there's a definition section, but we can look to the

15   phrase "base salary," which does appear specifically in

16   the contract.

17        So if we go to Page 38, that's --

18        THE COURT:  I respect how you're going about this,

19   but at some stage I'd like you to address his argument

20   where he, um -- and I do have to interpret the contract

21   as a whole, where much the same language is used for

22   court time and where he makes an argument that that

23   excludes Quinn pay and so I should exclude it here.

24        MR. PADOLSKY:  Actually it's the opposite and I'm

25   about to show you why.

1          THE COURT:  Go ahead.

2          MR. PADOLSKY:  The contract refers to compensation

3    as the base salary.  As the evidence showed, it's -- the

4    base salary's not paid at an hourly rate, in fact there

5    are five platoons, they all have different set hours,

6    some have a 24-hour platoon, in which case the base

7    salary is still the same.  But if we look to the

8    specific, what the City calls "augments," you can see

9    that the contract doesn't actually call them "augments,"

10   the contract calls them "base salary."

11         So if we look to the night differential, a night

12   differential is computed towards a base salary.  If we

13   look towards -- to the, um, longevity, we can see

14   specifically, at the bottom of Page 39, it says "The

15   longevity benefit payment shall be the additional sum of

16   base salary," and that's consistent for each of the

17   different longevity steps.  The enhanced Quinn -- the

18   Quinn Bill payment, otherwise called "Enhanced Base

19   Salary," is again an additional sum of "base salary."

20   Hazardous duty is the same, your Honor, and that is also

21   calculated at the weekly base salary rate.  And so the

22   contract is not calling these "augments," the contract

23   is not calling these "supplements," the contract is

24   calling these items "base salary."

25         And looking at the context of the, um, of the

```
 1    language of the actual agreement, the full agreement, we
 2    see, if we're going to take the City's position, the
 3    maximum patrolman's base pay, otherwise referred to, on
 4    Page 20 -- sorry, 38, your Honor, um, "base pay" is
 5    "base salary."  So if we're going to take the City's
 6    position here and actually look at the full context of
 7    the contract, we see that these are not augments at all.
 8         In fact if I do a word search -- and certainly
 9    this is, um, not entirely controlling, the language is
10    controlling, but "augment" doesn't appear at all in the
11    CBA.  The City's -- Mr. Miller has used that phrase, but
12    it doesn't appear.  Nor does the word "supplement" as it
13    relates to, um, pay items.  And so these are not --
14    these are not "augments" pursuant to the contract
15    language, they are "base salary."
16         So we look to what your Honor was talking about
17    specifically, the court rate, and Mr. Miller's argument
18    depends upon his interpretation of the court rate.  Look
19    at Page 15 and it does include, under Article 14,
20    similar language, "a minimum of 4 hours compensation
21    calculated at the overtime rate of pay, which overtime
22    rate of pay shall be 1 1/2 times the maximum patrol
23    officer's rate of pay, including night differential."
24    And I just note that court, your Honor, doesn't occur at
25    midnight, it usually doesn't occur after 4:00 either,
```

1    court occurs during the daytime hours, which starts to

2    explain why the phrase "including night differential" is

3    included in this particular salary enhancement.

4         And so we look to the court rate.  And one thing

5    that my brother says is, the Latin phrase that he said

6    yesterday, "expressio unius est exclusio."  Nowhere in

7    this court time article, your Honor, is longevity or

8    hazardous duty specifically mentioned.  Nowhere.  And so

9    my brother says it includes Quinn and it includes night

10   differential, but it doesn't actually include longevity

11   or it doesn't include hazardous duty, according to his

12   interpretation of the agreement.

13        However if we look to -- specifically look to, um,

14   Exhibit 14.10, which is Jack Owens's July 17th, 2020,

15   this rate, which Mr. Ranaghan agreed was calculated by

16   the City on the contract, you can see the number is

17   $67.99 for court overtime and you can see the math --

18   and that doesn't appear in the original exhibit, I put

19   that in there for the sake of efficiency, you can see

20   the math does actually include hazardous duty and it

21   does actually include shift differential, Quinn, and

22   senior longevity.  Neither of those items are expressly

23   mentioned by an exclusion, according to the argument

24   that Mr. Miller has constructed, which we're just now

25   hearing for the first time in this case at trial, your

1   Honor, we haven't heard this at any time before.  And
2   why is that?
3        If we look to the phrase in the contract "maximum
4   Patrol officer's rate of pay," it's very clear that that
5   was used here to include all of these other items which
6   are, according to the contract, part of the base salary.
7   That's why, according to the context of the contract,
8   specifically taking the full language and making sure
9   that we do not delete parts of that language or read in
10  parts of that language such as "The pay detail rate is
11  the maximum patrolman's base rate, base pay," it doesn't
12  say that.  Taking all that in, we can see how the
13  contract leads to the fact that these base-salary items
14  are included in the maximum patrolman's rate of pay.
15  And again, as I said, this explains the fact -- the
16  court thing explains the fact, explains why the phrase
17  "shift differential" is used, because it doesn't happen
18  at night.
19       My brother also points to the OT rate and
20  specifically says, um, my argument on this doesn't make
21  sense.  Your Honor, it's not my argument actually, it's
22  the City's position through the designated witness,
23  first and foremost, and I'll get to that, but he says my
24  argument doesn't make sense because specifically OT does
25  not include Quinn, it uses the same maximum officer's

1   rate of pay including night differential under Section 3

2   overtime.  But let's actually look to the language of

3   what Section 3 overtime is because there's two different

4   overtime articles.  One actually pays for overtime at

5   the Patrol officer's rate of pay and then there's this

6   very specific overtime that is under Section 3 that pays

7   at the maximum officer's rate of pay.

8        And when my sister yesterday showed you Exhibit 33

9   and suggested to the Court, "Well, if we're not correct

10  about our interpretation, how is it that Mr. Tilley is

11  receiving, um, Quinn?"  And they showed you Exhibit 33

12  specifically.  And, um, the suggestion to the question

13  was, "See, look, police overtime with Quinn."  But if we

14  actually look to the rate that he was paid in Exhibit 33

15  and we break it down by the numbers, you can actually

16  see very clearly that it does not include Quinn.

17       And so Exhibit 33 doesn't demonstrate what the

18  City suggests it demonstrates -- what Mr. Miller

19  suggests it demonstrates through their argument, what it

20  demonstrates is that Mr. Tilley received what appeared

21  to be here a Section 2 overtime rate which is based upon

22  his overtime rate of pay.

23       And if you compare that, um, same, um, breakdown

24  or analysis to Exhibit 16.3, which is a paycheck that

25  was about 6 or 7 months earlier, and you break down the

```
 1   City's argument, we look to the same rate here for
 2   Edward Fitzpatrick.  And Edward Fitzpatrick, you can see
 3   his overtime rate does specifically include all of his,
 4   um, different, um, items of regular, um, salary, of base
 5   salary, 61 -- the only way you get to that $61.70 number
 6   is by including all of those specific items.
 7        If we take the City's position, which is that
 8   because the contract only says that OT includes Quinn
 9   and, um, shift differential, you get to a number that
10   doesn't appear in any paychecks at all, you get to a
11   number here that would be $57.67 for this particular
12   court time -- um, overtime.  It doesn't -- it wouldn't
13   include longevity under the City's theory, it doesn't
14   match Brian Tilley's pay stub, it just doesn't make any
15   sense at all according to the contract language.
16        It also treats these two items, um, OT, the
17   maximum patrolman's rate of pay under Section 3 of 16,
18   and the, um, the maximum patrolman's rate of pay for
19   court time, as pay diminutions, your Honor, because as
20   you see here, under 16.3, Edward Fitzpatrick will, um,
21   with all of his different base-salary items, make a rate
22   of $61.70 on January 13th.  And if the City's
23   interpretation was correct, when he was doing these more
24   onerous tasks, such as being recalled to work when he's
25   not working, such as being called into court sometimes
```

1    when he's not working, when he's doing these more

2    stressful, more onerous things, according to the City's

3    interpretive theory which we're just now hearing, Edward

4    Fitzpatrick would get paid less than his actual rate.

5          And so you would think that the contract would

6    express clearly and specifically that this is both an

7    enhancement and a diminution, except it does not do

8    that, it refers to it only as a "salary enhancement."

9    The full context of the language refers to this "maximum

10    officer's rate of pay" as it is and has always been

11    understood, which is the highest possible rate of pay

12    for a patrolman.  That --

13          THE COURT:  Suppose the Court were to adopt that,

14    um, conclusion, it does seem that the Court, in order to

15    adopt that conclusion, would have to, um, find that the

16    contract was ambiguous and that such a conclusion is

17    the, um, most persuasive, um, reading of the contract

18    language.  If that were so, how do you deal with his,

19    um, Mr. Miller's argument that it was clear, it seems

20    quite clear on this record, that the 10 percent

21    administrative fee was taken out of these, um, invoices

22    to third-party vendors and indeed out of the, um,

23    interdepartment transfers after the Former Mayor had

24    instituted that fee?

25          MR. PADOLSKY:  I will directly deal with that,

1    your Honor.  But before I get there, I just want to

2    close this argument briefly.

3         THE COURT:  Go ahead.

4         MR. PADOLSKY:  The, um -- I want to respond to

5    what your Honor just said, um, or first said.

6         First I posited that the contract language itself,

7    because if we look at the contract as a whole,

8    interpreting the intent of the parties, the contract

9    language itself, under Article 23, Section 3, taking

10   into account the fact that all of these different things

11   that the City now challenges as augmented, actually

12   described as "base salary," is actually not ambiguous

13   when you include those items as "base salary."

14        So looking at the four corners, the only

15   reasonable interpretation that you can get is those base

16   salary items are included in the maximum patrolman's

17   rate of pay, which is the actual language.  In order

18   to -- the City's position on interpretation, as I've

19   just demonstrated, doesn't get you cleanly there with

20   the four corners, you have to delete language, you have

21   to read in language, you have to ignore language where

22   these different items are added, are part of the base

23   salary, you have to change the actual language to what

24   the City is trying to do, the maximum patrolman's base

25   pay -- notice it doesn't actually say that in the

1    contract, in order to get to the City's interpretive

2    position.  So from one perspective I posit there is no

3    ambiguity but for the reasons I've stated.

4         The second is, if there is ambiguity, all of the

5    facts point towards the fact that this fee was taken out

6    of the officer's detail rate, not added to the detail

7    rate as is required by General Law Chapter 44, Section

8    53(c).  We heard this from the Chief.  We heard this

9    even from Mr. Ranaghan in the sense of him agreeing

10   that --

11        THE COURT:  But let me say it back.  You're saying

12   that whatever was the custom and whatever was understood

13   and however clear it was made, the municipal finance law

14   governs and says the administrative fee is to be on top

15   of the detail pay, is that your position?

16        MR. PADOLSKY:  Well that's definitely one of my

17   positions and I think probably the leading position, if

18   you will, your Honor, because, as I'll show you in a

19   second, that law is very clear.

20        But the evidence we have is that the rate of pay

21   for -- the base rate of pay for paid details -- and I

22   don't think that anyone has disputed this empirically,

23   if you will, your Honor, is based upon the maximum

24   patrolman's rate of pay including night differential,

25   the highest rate of pay for a police patrolman.  And I

1    think, at the very least, the parties agree, in the

2    operative years, that's Edward Fitzpatrick, Trent

3    Headley, and Jack Owens.

4         And so when you look to the specific rate of pay,

5    the pay rate, the parties agree is the 1 1/2 times --

6    the base pay rate is 1 1/2 times the rate of pay of the

7    highest-paid patrolman.  That is what we all empirically

8    agreed on, um, in this case.  And Exhibits 14.1 through

9    14.10 specifically show exactly what that rate was in

10   the operative time frames.  And it also shows

11   specifically, um, the dates on which the City funded

12   the, um, the increases in pay under the contract.  This

13   is Docket 200, Page 19, it shows you a specific chart

14   with dates and rates.  This chart is sourced in Exhibits

15   14.1 through 14.10 both for the time frames and for the

16   specific rate of pay, your Honor.

17        And so then we look to the contract and we -- in

18   the contract, um -- and I'm not going to go through the

19   whole thing, and I'll suggest, your Honor, um -- as I'm

20   sure the Court has fully reviewed this numerous times by

21   now, that nowhere in this contract does it mention the

22   City taking an administrative fee off of that rate and

23   reducing the rate.  Although they agree that it's

24   happened, nowhere does it say that the unions, the

25   police Patrol Union or the Superior Officers' Union,

```
 1   agreed to that reduction.  In fact we heard from Mayor
 2   Howard, who imposed the rate in the first instance and
 3   Mayor Howard confirmed that he, um, put that rate in
 4   effect unilaterally.  He doesn't say that he has the
 5   authority to do that, but it wasn't specifically
 6   negotiated.
 7        And so we harken back to the contract again.
 8   There's two no-waiver provisions -- not that these
 9   claims could be waived, but there's two no-waiver
10   provisions, Article 19 and Article 13, Section 1 of both
11   articles, and both say that the failure to raise, um, a
12   grievance is not a waiver of that grievance.  Now this
13   is not a grievable thing, this is a wage thing, your
14   Honor, and the case law is clear, you can't waive that
15   anyway, but the City's argument now that "Well they
16   never raised it and so, um, I guess it's okay now," um,
17   it's inconsistent with the no-waiver provisions of the
18   contract and inconsistent with the Wage Act and the
19   FLSA's broad application to protect employee wages.
20        And so when we look at the consistent testimony of
21   the City, through the Chief, which says the maximum
22   patrolman's rate of pay includes all of these items, we
23   look at the contract as a whole, as I've described, and
24   without striking out any language or reading in any
25   language, we see what the rate is.  And so does the City
```

1    for that matter, and that is reflected in the

2    Superior -- in what has happened recently with the

3    Superior Officers' agreement.  As we just saw today, um

4    --

5         MR. MILLER:  Your Honor, that's not in evidence.

6         THE COURT:  Overruled.  He may argue.

7         MR. PADOLSKY:  Mr. Ranaghan is now directing

8    Ms. Sullivan very specifically, despite the fact that

9    the Superior Officers MOA doesn't mention the

10   administrative rate, similar to this, to comply with

11   General Law 44, Section 53(c).  This shows, I think

12   beyond any sort of semblance of doubt, um, not to

13   mention preponderance, your Honor, that, um, there has

14   been a reduction in the rate of pay due under the

15   contract.

16        THE COURT:  5 more minutes.  And you needn't add

17   anything on the FLSA case, but let me just throw out,

18   um, that given the relative magnitude of what's really

19   at stake here, isn't it, as a practical matter,

20   appropriate for the Court to decertify that claim, give

21   you, on the basis of the documents you already have, a

22   fair amount of time, um, having sketched out in the

23   requisite detail the parameters, um, a chance to make a

24   claim under the Fair Labor Standards Act for individual,

25   um, claimants, and put it on you.  Isn't that the best

1    way to do that?

2         MR. PADOLSKY:  I don't think decertifying on

3    liability in terms of determining the merits of the

4    claim is necessarily the best thing -- is necessarily

5    the best thing, but I don't necessarily disagree, your

6    Honor, with the fact that the claim for the damages will

7    be individualized.

8         THE COURT:  Fine.  4 more minutes you have and

9    make your major points.

10        MR. PADOLSKY:  Okay, your Honor.

11        So everything I've just mentioned is all

12   consistent with what has happened in the City of Malden

13   and it's also consistent with Exhibit 42 with actual

14   payroll admin for the Chief, who processes payroll.

15        Wednesday, August 28th, the first Column, is the

16   regular pay, hourly rates.  Well if we look to Trent

17   Headley specifically, his hourly rate is 43.9398,

18   according to this calculation, making his overtime rate

19   65.90.  If we look to his pay stub, we can see that that

20   includes all of these items, all of these items of base

21   salary.  And if we look to Exhibit 26 and see what

22   amount was paid for the details, at the same time we can

23   see it's less than that, it's a number, 59.92, plus the

24   City's administrative fee.  And so they're not getting

25   the rate.  It's beyond, I think, any sort of argument,

1   period.

2        It was imposed unilaterally and, um, since then --

3   and I think the Mayor -- actually Mr. Howard actually

4   admitted this, they never checked to make sure it was

5   being done right, they just announced that it was being

6   put in place and never actually checked that it was

7   being done right.  Your Honor, this goes to the

8   willfulness standard.  And I think your Honor should

9   take into account, and I'm sure you will, the complexity

10  of these factual -- but more to the point these legal

11  issues, um, particularly to lay persons.  The suggestion

12  from my brother that, you know everyone should know

13  immediately exactly how all of these different intricate

14  laws work I think isn't reality.

15       Now I want to address, um, a couple of quick

16  points.  One, this is very clear -- these are very

17  clearly wages, the Appeals Court speaks to this, so that

18  there's no actual -- when there's no conflict between

19  the municipal finance law and the Wage Act, then there's

20  no conflict.  And the fact that the municipal finance

21  law says that the City doesn't have to pay until the

22  monies are collected doesn't mean that once the monies

23  are collected, they're not then wages.  And there's no

24  conflict between the two.  It's in the footnote of that

25  decision, they're payroll controlled by the City,

1    collected by the City, they're -- they're W-2 wages,

2    they're taxed.  These are not independent contractors,

3    they cannot work on their own and do things on their

4    own, they're subject to the control and direction of the

5    department, the supervision of the department, the code

6    of conduct, and the rules and regulations of the

7    department.

8        And there are specifying rules applicable to the

9    way in which officers can get details in the first

10   place.  I can't go work a detail.  I'm professionally

11   licensed as an attorney.  They can't go and work as a

12   police officer for the City of Malden on their own, it's

13   all run through a specific -- through the City of Malden

14   Police Department.

15       And the last point, your Honor.  The FLSA claim,

16   the willfulness finding doesn't require what my brother

17   has been suggesting.  "Willfulness" means specifically

18   that the employer either knew or showed reckless

19   disregard for the matter of whether its conduct was

20   prohibited by the FLSA and --

21       THE COURT:  I'm going to stick to the time,

22   Mr. Padolsky, and in fact I have researched the point,

23   and I thank you.

24       MR. PADOLSKY:  If I may, your Honor?

25       THE COURT:  Nope, I've given you the time.  But

1  now I do turn to you.

2      What do you want me to do now?  Do you want me to

3  stay my hand for any particular time?  Do you want me to

4  address matters this afternoon if I have time?  How do

5  you want to proceed?

6      MR. MILLER:  I'm happy to speak to that first,

7  your Honor.

8      THE COURT:  Yes, go ahead, Mr. Miller.

9      MR. MILLER:  I think in view of the point, that we

10 went back and forth in closings, um, post-trial briefs

11 would be helpful.  We have a number of elements that --

12     THE COURT:  All right, well let's -- I mean to the

13 extent there's agreement, I'm fine.

14     You're okay with that, Mr. Padolsky?

15     MR. PADOLSKY:  Your Honor, I actually do not

16 invite post-trial briefs, your Honor, not unless the

17 Court wishes to see them.

18     THE COURT:  Well when do you want to know what I

19 think?

20     MR. PADOLSKY:  Whenever your Honor could.

21     THE COURT:  Um, all right, I am going to give some

22 time -- I'm not requiring post-trial briefs, I'm not

23 requiring any more effort at all, but I'll hold off for

24 some period of time before, um, acting if in fact, um --

25 well I like to do factual conclusions --

```
 1         Well let me directly ask you, Mr. Miller, how much
 2    time do you want?
 3         MR. MILLER:  I could easily do it in a week, your
 4    Honor, that's sufficient.
 5         THE COURT:  All right, so here's what we'll do.
 6    Nothing will happen for a week.  After that the Clerk
 7    will schedule, and she'll schedule it now, an oral
 8    hearing.  If I have anything to say from the bench that
 9    I'm sufficiently confident of saying, I will say it at
10    that time.  And at that time I will take matters under
11    advisement and -- because I must under Rule 52 and you
12    deserve it, this has been well done and I mean that
13    sincerely.  I'll take it under advisement.  I will
14    proceed in that wise again to give you as much
15    transparency as I can.
16         The Clerk will suggest a time for an oral hearing.
17    It should take no more than -- I'm going to be doing the
18    talking, so it should take no more than a half an hour,
19    Ms. Gaudet, on the week following a week from today.
20         THE CLERK:  A week following a week from today?
21         THE COURT:  Yeah, so that's --
22         THE CLERK:  I would have to go into the week of
23    June 1st.
24         THE COURT:  Yes, because I'm not going to be
25    around.  So the week of June 1st.
```

```
 1            THE CLERK:  Okay.  Tuesday June 1st at -- no, I'm
 2    sorry, Wednesday June 2nd at 2:00 p.m.
 3            THE COURT:  Is that satisfactory, Mr. Padolsky?
 4            MR. PADOLSKY:  Just a moment, your Honor, I closed
 5    my Outlook to make my computer run smoother, so I'm
 6    reopening it now.
 7            THE COURT:  All right.
 8            Mr. Miller, is that satisfactory?
 9            MR. MILLER:  Yes, your Honor.  Thank you.
10            MR. PADOLSKY:  What was the date?
11            THE COURT:  The 2nd of June at 2:00 p.m.
12            MR. PADOLSKY:  And there are no sooner dates?
13            THE COURT:  There really aren't.
14            So that will work?
15            MR. PADOLSKY:  I am available, your Honor.
16            THE COURT:  Fine.  We'll set that down for an oral
17    hearing and I will say whatever I can confidently say in
18    an effort to move the thing along.  I doubt that that
19    will be the entire opinion and I will then take things
20    under advisement.
21            Thank you very much.  I have a 12:00 hearing and
22    I'm going to go to that now.  You're -- and I mean this,
23    this has been well done and the Court is sensible of its
24    responsibility in light of the fine advocacy that I've
25    had.  We'll recess.
```

1          MR. PADOLSKY:  Thank you, your Honor.

2          MR. MILLER:  Thank you, your Honor.

3          (Ends, 11:55 a.m.)

```
1              C E R T I F I C A T E

2

3

4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5    do hereby certify that the foregoing record is a true

6    and accurate transcription of my stenographic notes

7    before Judge William G. Young, on Tuesday, May 11, 2021,

8    to the best of my skill and ability.

9

10

11

12   /s/ Richard H. Romanow 08-23-21
     _____
13   RICHARD H. ROMANOW   Date

14

15

16

17

18

19

20

21

22

23

24

25
```