UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
JACK OWENS, JEFFREY DREES, KATELYN )
MURPHY, PATRICK MANOLIAN, SCOTT    )
MANN, and SEAN HUSSEY, on behalf   )
of themselves and all others       )
similarly situated,                )
                                   )
              Plaintiffs,          )
                                   )
        v.                         )        CIVIL ACTION
                                   )        NO. 19-11835-WGY
CITY OF MALDEN,                    )
                                   )
              Defendant.           )
_____   )
```

YOUNG, D.J.                                    October 4, 2021

**MEMORANDUM OF DECISION**

## I.    INTRODUCTION

Police officers in the City of Malden (collectively, the "Plaintiffs" or "Officers") initiated this putative class action against the City of Malden (the "City") to recover wages for performing paid detail work for both the City and for third parties.  The Plaintiffs allege violations of the Massachusetts Wage Act (the "Wage Act"), Mass. Gen. Laws ch. 149, § 148, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219.

On August 28, 2019, Officers Jack Owens, Jeffrey Drees, Katelyn Murphy, Patrick Manolian, Scott Mann, and Sean Hussey (collectively, the "Named Plaintiffs") filed a class-action complaint in this Court against the City.  See Compl., ECF

No. 1.  On November 27, 2019, the Named Plaintiffs filed an amended complaint.  <u>See</u> Am. Compl., ECF No. 8.

The amended complaint alleges a violation of the FLSA in count I, <u>see id.</u> ¶¶ 45, 46, (the "FLSA claim") and the Wage Act in count II, <u>see id.</u> ¶¶ 47, 48, (the "Wage Act claim"). Specifically, the Plaintiffs claim that the City violated their rights by unlawfully deducting an administrative fee of ten percent from their respective wages for the provision of police detail work.  <u>See id.</u> ¶¶ 46, 48.

The docket in this matter contains 110 formal notices, <u>see</u> Formal Notices Filing Consent Sue, ECF Nos. 34-143, filed on August 21, 2020, and a further three formal notices, Formal Notices Filing Consent Sue, ECF Nos. 187-189, filed on April 15, 2021 (collectively, the "Notices").  The Notices are filed on behalf of "current or former employee[s] of the Malden Police Department, represented for collective bargaining purposes by either the Malden Police Patrolmen's Association or the Malden Police Superior's association" (collectively, the "Opt-In Plaintiffs").  <u>See, e.g.,</u> John A. Delaney's Consent Opt In Plaintiff ("Opt-In Sample Delaney"), ECF No. 143.[1]  The Notices

---

[1] Officer Delaney's notice is referenced here as a sample notice.  All filed Notices are identical, save for a section that includes space for an Officer's manuscript signature, the date of execution of the document, and a space for an Officer's printed name.  <u>See</u> Opt-In Sample Delaney 1.

reference the Plaintiffs' Wage Act and FSLA claims.  See, e.g., id.

At a hearing on the parties' cross-motions for summary judgment on February 22, 2021, the Court certified a class in relation to the Plaintiffs' Wage Act and FLSA claims.  See Tr. Zoom Hr'g Summ. J. & Final Pretrial ("Tr. Summ. J.") 6:17, ECF No. 198.

A five-day jury-waived trial was held remotely on the Court's Zoom platform between May 5, 2021 and May 11, 2021 (the "trial"), during which the parties presented their arguments and examined several witnesses.  See Electronic Clerk's Notes, ECF Nos. 229-235, 243-44.  The Court heard evidence from Richard Howard, former mayor of the City of Malden, on May 5, 2021 ("day one" of the trial), see id., ECF No. 230; Gary Christensen, the current mayor of the City of Malden, on day one and on May 6, 2021 ("day two" of the trial), see id., ECF Nos. 230, 231; Charles Ranaghan ("Ranaghan"), the City's controller, on day two and on May 7, 2021 ("day three" of the trial), see id., ECF Nos. 231, 232; the City of Malden Police Chief Kevin Molis ("Chief Molis") on day three and on May 10, 2021 ("day four" of the trial), see id., ECF Nos. 232, 243; City of Malden Police Captain John Amirault on day four of the trial, see id., ECF No. 243; Margaret Sullivan, the City's detail clerk, on day four and on May 11, 2021 ("day five" of the trial), see id., ECF Nos.

243, 244; and from Named Plaintiff City of Malden Police Officer Jack Owens ("Owens") on day five of the trial, see id., ECF No. 244.

Both parties filed pre-trial briefing.  See Def.'s Trial Br. ("City's Pre-Trial Br."), ECF No. 197; Pls.' Trial Br. ("Pls.' Pre-Trial Br."), ECF No. 200.

The City's motion for judgment on partial findings, Def.'s Mot. J. Partial Findings ("Mot. J. Partial Findings"), ECF No. 237, filed during the ongoing trial on May 10, 2021, was allowed in part and denied in part, see Electronic Clerk's Notes, ECF No. 243.  The Court allowed the City's motion with respect to Opt-In Plaintiff Heidi Mccormick and ruled that a workweek runs from Saturday of one calendar week until Saturday of the following calendar week.  See Tr. Zoom Bench Trial ("Bench Trial Tr. Day Four") 75:15-24, ECF No. 261.[2]  The motion was otherwise denied.  Id.

The City also filed a motion to decertify the Plaintiffs' FLSA claim on May 10, 2021.  See Def.'s Mot. Decertify, ECF No. 236.  The Court did not rule on the motion.

After the conclusion of the trial, the Court invited the parties to file post-trial briefs, which the City did on May 18,

---

[2] Consequently, 112 Opt-In Plaintiffs currently remain in this action.  See generally Notices; Bench Trial Tr. Day Four 75:15-24.

2021.  See Def.'s Post-Trial Br. ("City's Post-Trial Br."), ECF No. 239.  The Plaintiffs filed a post-trial brief on May 28, 2021.  Pls.' Post-Trial Br., ECF No. 240.

At a hearing on June 2, 2021, the Court made its post-trial rulings.  See Electronic Clerk's Notes, ECF No. 245; Tr. Zoom Hr'g Rulings ("Tr. Rulings"), ECF No. 247.  An order pertaining to the timing of actions required of the parties and to other future events yet to occur in this matter was entered on June 10, 2021.  See Order ("Timing Order"), ECF No. 246.  The Court's full written opinion is set out below.

In accordance with the Court's post-trial rulings and the Timing Order, judgment is yet to enter regarding the individual Plaintiffs' entitlement to any compensation with respect to the Wage Act claim or the FLSA claim.

## II.  FINDINGS OF FACT

### A.  General Facts

The City is a municipality located in Middlesex County, Massachusetts.  The parties agree that the City employs the Officers who work for the City of Malden Police Department.  See City's Pre-Trial Br. ¶ 2; Pls.' Pre-Trial Br. ¶¶ 2, 3, 5, 6. The City of Malden Police Department distinguishes between Officers on the basis of rank.  See Trial Ex. 8, Police Manual Police Department City Malden ("Police Manual") § I.B, II (discussing the various roles of each rank in Section I.B.

"Rules and Regulations: Definitions" and Section II "Duties by Rank and Assignment). Officers of Rank are Sergeants, Lieutenants, Captains, and the Chief of Police. See Police Manual § II (outlining duties of ranking officer in Section II "Duties by Rank and Assignment"). According to Chief Molis's testimony, all City of Malden Police Officers are sworn in and eligible to perform detail work. See Tr. Zoom Bench Trial ("Bench Trial Tr. Day Three") 107:13-21, ECF No. 260.

The Named Plaintiffs Jack Owens, Katelyn Murphy, Patrick Manolian, Scott Mann, and Sean Hussey are Patrolmen. See Pls.' Pre-Trial Br. ¶¶ 5, 6 (providing a "complete list of plaintiffs," including individual rank designations). Named Plaintiff Jeffrey Drees is an Officer of Rank, a Sergeant. Id. The Opt-In Plaintiffs in this action include Patrolmen and Officers of Rank. Id.

Patrolmen are members of the Malden Police Patrolmen's Association, Inc. (the "Patrolmen's Union"), and Superior Officers are members of "MassCOP Local 479" (the "Superior Officers' Union") (collectively, the "Unions"). See id. ¶¶ 212, 216.

Agreements between the Unions and the City govern general aspects of the relationship between the parties. See generally Trial Ex. 5, Contract Between City Malden & Malden Police Patrolmen's Association, Inc. July 1, 2018 through June 30, 2021

("Agreement") (collective bargaining agreement between the City and the Patrolmen's Union); Trial Ex. 13, Mem. Agreement ("Memorandum") (agreement between the Superior Officers' Union and the City executed on March 2, 2021).

**B.   Work Schedules, Overtime, and Detail Work**

Generally, some Officers work an administrative schedule, Monday through Friday, eight hours per day.  See City's Pre-Trial Br. ¶ 13.  Others work platoon shifts, two or three sixteen-hour shifts per calendar week, totaling thirty-two or forty-eight hours, with off-duty days in between.  Id. ¶ 11. Officers are paid a salary that is not necessarily tied to the number of hours worked.  See Tr. Zoom Bench Trial ("Bench Trial Tr. Day Two") 60:14-16, ECF No. 259 (Ranaghan's Testimony).

In addition to their routine work schedules, the Plaintiffs in this action also regularly provide police details ("detail work").  See Bench Trial Tr. Day Three 108-109 (Molis's Testimony).  Detail work refers to services provided by Officers during their off-duty hours in response to a request made by a City Department (a "city detail" or "city detail work") or by a private third party (a "private detail" or "private detail work").  See id.  According to Chief Molis, the broad purpose of detail work is to provide a public service and public safety. See id. 105:22-24.  Detail work can be planned, as for road construction projects or scheduled strike actions, or unplanned,

such as when a water main breaks unexpectedly.  See id. 108,
119-20.  The overwhelming majority of detail work is private
detail work.  See Bench Trial Tr. Day Four 12:23-25, 13:1-3
(Molis's Testimony).  Private detail work is provided on the
basis of an agreement between the City and the private person or
entity requesting the detail.  See id. 12-13.  A list of City of
Malden Departments (the "City Departments") was provided by the
City during the trial.  See Trial Ex. 45, City of Malden
Departments.  According to Ranaghan, the list identifies the
City Departments that would be capable of making a request for a
city detail.  See Bench Trial Tr. Day Four 81:9-16 (Ranaghan's
Testimony).

    Chief Molis testified that all Officers are eligible to
perform detail work.  See Bench Trial Tr. Day Three 107:17-19
(Molis's Testimony).  All detail work is performed on a
voluntary basis during an Officer's off-duty hours.  See id.
109:3-9.  Once Officers have signed up for a detail work
assignment, they are required to attend.  See id. 110:8-10.

    Officers wear their uniforms, including their duty belt,
while performing detail work.  See id. 112:3-5.  The party
requesting a police detail generally cannot deviate from this
requirement by asking Officers to wear different clothing or
equipment.  See id. 113.  According to Chief Molis, while
performing detail work, Officers are bound by the rules and

regulations applicable to police details, the traffic rules, the code of conduct, and common sense.  See id. 111:19-25, 112:12-21; see also Trial Ex. 12, Malden Police Department Detail Rules & Procedures (the "Detail Rules and Procedures") ¶¶ II.9, II.12, II.22 (outlining the code of conduct for details under "Detail Rules").  The scope of work for a specific detail assignment is determined by the person or entity who requested the detail.  See Bench Trial Tr. Day Three 110:16-25, 111:8-18.  That person or entity has some control over how an Officer acts during his or her detail work.  Id.  Officers, however, are required not to perform illegal, improper, or unsafe detail work.  See id. 112.

Ranaghan testified that Officers receive compensation for overtime work on an hourly basis.  See Bench Trial Tr. Day Two 130:20-25.  Prior to the execution of the Memorandum on March 2, 2021, the City did not differentiate between city detail work and private detail work when paying Officers for detail work.  Id. 131:15-19 (Ranaghan's Testimony).  Since the execution of the Memorandum on March 2, 2021, the City has not kept track of overtime hours for Officers unless they are Superior Officers.  See id. 78:8-20, 87:21-25, 88:1.

### C.  Detail Work Organization and Fee Administration

The organization of the detail process is under the exclusive direction and control of the detail board, which comprises representatives and members of the Unions.  See

Agreement Art. 23, § 5 (describing how the detail board is
selected and composed and endowing the detail board with the
power to "establish rules and procedures pertaining to
details . . . hear complaints pertaining to details[,] and
rectify them in accordance with the rules they establish"); id.
Art. 23, § 8 ("The detail board shall have control over all
matters having to do with details.").

The City employs and pays a detail clerk, Margaret Sullivan
("Sullivan"), who is not a member of a Union, see Bench Trial
Tr. Day Three 7:6-13 (Ranaghan's Testimony), and who organizes
and performs tasks related to detail work administration for the
Police Department, see Bench Trial Tr. Day Four 95:7-11
(Sullivan's Testimony); see also Agreement Art. 23, § 9.
Sullivan was hired by the detail board on January 29, 2010.  See
Trial Ex. 22, Offer Letter Detail Clerk Margaret Sullivan.

According to Sullivan, the names of Officers interested and
willing to perform detail work are entered on a spreadsheet, see
Trial Ex. 23-28, Detail Work Spreadsheets 2016-2021 (the
"Spreadsheet"), which the detail clerk maintains, see Tr. Zoom
Bench Trial ("Bench Trial Tr. Day Five") 8:2-7, ECF No. 262.
The Spreadsheet has existed since at least 2016.  See Bench
Trial Tr. Day Two 45:16-25 (Ranaghan's Testimony).  Private
persons or entities who wish to obtain a police detail typically
contact the detail clerk on a designated telephone line and

[10]

provide preliminary information regarding the detail work
location, date and start time, and name and contact information
of the party seeking the detail.  See Bench Trial Tr. Day Four
96:8-13 (Sullivan's Testimony).  The detail work is then offered
to Officers listed on the Spreadsheet, and they may accept or
reject it.  See id. 97:10-25.  After completing the detail work,
Officers return a slip to the detail clerk, containing basic
detail work information, including the name of the person or
entity for whom the detail work was completed, the Officer's
name, the location of the detail, and the hours worked.  See id.
98:11-25, 99:1-2.

The Spreadsheet is maintained annually and further grouped
by Officer and pay date.  See generally Spreadsheet.  The
Spreadsheet also includes information related to the date,
duration of specific detail work (in hours), the party
requesting it, and the corresponding monetary value, with a
total figure for the relevant pay period.  Id.  Since August
2020, the Spreadsheet has been sent to Ranaghan on a bi-weekly
basis.  See Bench Trial Tr. Day Two 46:4-9.

The detail clerk prepares invoices for private detail work
and sends them to the private third parties.  See Bench Trial
Tr. Day Four 99:11-17.  The detail clerk also processes and
deposits checks and payments received from private third parties
for private detail work into the City's bank account.  Id.

101:4-8.  Payments for city detail work are received via money transfer between the City Departments.  Id. 102:14-18.

The Agreement and the Memorandum govern the rate of compensation for paid details (the "detail rate").  See Memorandum ¶ 6; Agreement Art. 23, § 3.  The Agreement does not stipulate an hourly monetary value for the detail rate.  See Agreement Art. 23, § 3 ("The base rate for paid details shall be one and one half times the maximum patrolman's rate of pay including night differential.").  The Memorandum stipulates detail rate values applicable during certain time periods since its execution on March 2, 2021.  See Memorandum ¶ 6.

The Court heard evidence from Chief Molis and Ranaghan that the phrase "maximum patrolman's rate of pay" in Article 23, section 3 of the Agreement refers to the rate of pay of the Patrolman who, in addition to his base pay, has accumulated the maximum amount of additional benefits, such as Quinn Bill pay, hazardous duty pay, longevity pay, and shift differential.  See Bench Trial Tr. Day Three 132:17-25, 133-1-4, 134:19-21 (Molis's Testimony) (listing Quinn Bill pay, hazardous duty pay, longevity pay, and shift differential among the "variety of things" that alter Officers' rates of pay); id. 64:1-25 (Ranaghan's Testimony) (stating the same).  A new detail rate is announced whenever pay raises or promotions have occurred.  See Bench Trial Tr. Day Five at 15:15-17.  Private persons or

entities requesting a private detail are informed of detail rate
increases in memoranda that the detail clerk sends on behalf of
the detail board.  <u>See, e.g.</u>, Trial Ex. 46, Detail Board Detail
Rates Letter May 15, 2012; Trial Ex. 48, Detail Board Detail
Rates Letter Dec. 12, 2007; Trial Ex. 49, Detail Board Detail
Rates Letter Dec. 15, 2005; Trial Ex. 51, Detail Board Detail
Rates Apr. 27, 2017.

According to Chief Molis, under certain circumstances,
other rates are applied that are in excess of the detail rate,
such as for strike pay, detail work after midnight, supervisor
detail pay, holiday detail pay, and detail work in excess of
eight hours in duration (the "Multipliers").  <u>See</u> Bench Trial
Tr. Day Three 127:5-25, 128:1-25 (Molis's Testimony).  The pay
rate for strike detail, for instance, is two times the detail
rate.  <u>See</u> <u>id.</u> 128:9-12.

Chief Molis testified that the detail system has been in
existence since the 1980s and that the rates have evolved over
the years to include new criteria and incremental rate
increases.  <u>See</u> <u>id.</u> 129:10-14.

### D.  **Officers' Salaries and Detail Work Compensation**

According to Ranaghan, payroll is prepared by each City
Department individually.  <u>See</u> Bench Trial Tr. Day Two 28:3-7
(Ranaghan's Testimony).  The information is entered into a

computer program, a third-party payroll system called Harper's
Payroll, for payroll processing.  See id. 31:16-25, 32:1-7.

The City issues annual W-2 forms for each Officer which
include statements related to taxes, wages, and detail wages
earned, and list the City as employer.  See id. 44:1-25.

Compensation for detail work is paid out to Officers by the
City's payroll and is included as a line-item on individual
Officers' weekly or bi-weekly paystubs.  See generally Trial Ex.
37, Officers' Direct Deposit Records City Malden (collectively
the "Paystubs").  At a line item entitled "Regular," the
Paystubs list an individual Officer's basic weekly (or bi-
weekly) salary for a number of stipulated weekly work hours
(forty or eighty), along with the respective annually
accumulated monetary value.  See generally id.  The Paystubs
also include line items that increase an individual Officer's
basic salary, such as "Quinn (25%)," "POLS Sr. Longevity," "POLP
Hazardous Duty," and "Shift Differential Police" (collectively,
the "salary augments").  See generally id.

The parties agree that the highest paid officers over the
operative timeframes were Edward Fitzpatrick, Trent Headley, and
Jack Owens.  See Pls.' Pre-Trial Br. ¶ 155.

Officers' on-duty work times are tracked on annual timecard
spreadsheets that are grouped by calendar week (from Mondays to
Sundays), listing Officers' names, hours worked, as well as off-

duty times (and the reasons, where relevant).  See Trial Ex. 39,
Officer Timecards (collectively, the "Timecards").  The
information included in the Timecards is collected by a member
of the Police Department.  See Bench Trial Tr. Day Three 12:1-3
(Ranaghan's Testimony) (identifying Terry Ippelyito, the Chief
of Police's Administrative Assistant, as the individual who
processes payroll for the Officers).

According to Ranaghan, the City has deducted an
administrative fee of ten percent from Officers' compensation
for detail work from February 1, 2008 to March 2, 2021.  See id.
29:1-13 (Ranaghan's Testimony) (affirming that the ten percent
fee has been taken out of Officers' compensation at all times
prior the Agreement's execution); see also Trial Ex. 6, Letter
Mayor Howard (Dec. 11, 2007) (establishing the ten percent
detail fee).  The purpose of the administrative fee is to
compensate the City for running the detail program.  See Bench
Trial Tr. Day Three 22:21-23 (Ranaghan's Testimony).  Then-Mayor
of the City Richard Howard instituted the administrative fee in
the detail work process effective February 1, 2008.  See Trial
Ex. 6, Letter Mayor Howard (Dec. 11, 2007).  Neither the
Agreement nor the Memorandum mentions the administrative fee.
See Agreement Art. 23; Memorandum ¶ 6.  The City began charging
the administrative fee for private detail work performed by
Superior Officers directly to private contractors when the

Memorandum was executed on March 2, 2021.  See Bench Trial Tr. Day Three 29:10-13 (Ranaghan's Testimony); see generally Memorandum.  The City has never charged private contractors directly for the administrative fee for private detail work performed by Patrolmen.  See Bench Trial Tr. Day Three 29:14-19 (Ranaghan's Testimony).  The City has deposited all administrative fees in the City's ledger account.  See id. 38:7-10.

### E.   The Audit

Ranaghan testified that to his knowledge, the first time an audit was performed to determine whether the payments made to Officers for detail work conformed with the Agreement was in connection with the present lawsuit, upon the Patrolmen's Union request.  See Bench Trial Tr. Day Two 85-87 (Ranaghan's Testimony).  Previous audits were limited to reconciling individual officers' salary accounts with the City's account.  See id. 34:10-16.

Owens testified that, as of May 11, 2021, the Plaintiffs had not filed a complaint with the Massachusetts Attorney General.  See Bench Trial Tr. Day Five 51:9-11.

## III. RULINGS OF LAW

### A.   Violation of the Wage Act For Private Detail Work

In count II of the amended complaint, the Plaintiffs claim that the City violated Massachusetts General Laws chapter 149,

section 148 by deducting a ten percent administrative fee from the Plaintiffs' wages earned for private detail work.  See Am. Compl. ¶¶ 34, 47-48.

In pertinent part, Massachusetts General Laws chapter 149, section 148 provides:

> Every person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week, or to within seven days of the termination of the pay period during which the wages were earned if such employee is employed seven days in a calendar week . . . .

Mass. Gen. Laws ch. 149, § 148.

### 1. Exhaustion of Administrative Remedies Under Massachusetts General Laws Chapter 149, Section 150

The City contends that this Court lacks jurisdiction over the Plaintiffs' Wage Act claim because the Plaintiffs did not exhaust administrative remedies, viz., they failed to file a complaint with the Massachusetts Attorney General (the "Attorney General") before initiating the present action in accordance with Massachusetts General Laws chapter 149, section 150.  See City's Post-Trial Br. 3-7.  The Plaintiffs' attorney argued during the trial that the City waived this defense.  See Bench Trial Tr. Day Five at 28:12-24; see also Pls.' Post-Trial Br. 14-15.

Massachusetts General Laws chapter 149, section 150
provides in pertinent part:

> An employee claiming to be aggrieved by a violation of
> section[] . . . 148 . . . may, 90 days after the
> filing of a complaint with the attorney general, or
> sooner if the attorney general assents in writing, and
> within 3 years after the violation, institute and
> prosecute in his own name and on his own behalf, or
> for himself and for others similarly situated, a civil
> action for injunctive relief, for any damages
> incurred, and for any lost wages and other
> benefits . . . .

Mass. Gen. Laws ch. 149, § 150.

Named Plaintiff Owens stated on day five of the trial that neither he nor any of the other Plaintiffs ever initiated a grievance procedure in compliance with Massachusetts General Laws chapter 149, section 150.[3]  <u>See</u> Bench Trial Tr. Day Five 51:9-11.  In their post-trial brief, the Plaintiffs do not allege that they notified the Attorney General in the meantime (or, up to that point, ever).  <u>See</u> Pls.' Post-Trial Br. 14-15.

---

[3] In <u>Malden Police Patrolman's Association</u> v. <u>City of Malden</u>, the plaintiff "union had filed a nonpayment of wage complaint with the Attorney General's office" in accordance with Massachusetts General Laws chapter 149, section 150.  92 Mass. App. Ct. 53, 54 n.2 (2017).  "By letter dated January 9, 2015, the Attorney General's fair labor division authorized the union to pursue a private civil action."  <u>Id.</u>  The Plaintiffs in the present action are not identical with those in the <u>Malden Police Patrolman's Association</u> case.  In addition, the claim in that case concerned overdue payments for detail work rather than unlawful withholding of a ten percent administrative fee.  <u>Id.</u> at 54.

The Plaintiffs direct the Court's attention to the decision
of the Massachusetts Supreme Judicial Court in <u>Depianti</u> v. <u>Jan-</u>
<u>Pro Franchising International, Inc.</u>, 465 Mass. 607 (2013), which
answered a certified question from another Session of this
Court, <u>see</u> <u>Depianti</u> v. <u>Jan-Pro Franchising Int'l, Inc.</u>, C.A. No.
08-10663-MLW, 2012 WL 3835090 (D. Mass. Aug. 31, 2012) (Wolf,
J.).  The certified question was:

> Whether a plaintiff's failure to exhaust
> administrative remedies pursuant to Mass. Gen. Laws
> ch. 149, § 150 by filing a complaint with the Attorney
> General deprives a court of jurisdiction to consider
> the plaintiff's claims under Mass. Gen. Laws ch. 149,
> §§ 148, 148B, and 150, and under Mass. Gen. Laws ch.
> 151, §§ 1 and 1A.

<u>Depianti</u>, 2012 WL 3835090, at *3.  The Massachusetts
Supreme Judicial Court answered the question as follows:

> To this question, we answer, "No." . . . .  In
> determining whether a procedural defect deprives a
> court of jurisdiction to hear a claim, we consider (1)
> to what extent the defect interferes with the
> "accomplishment of the purposes implicit in the
> statutory scheme," and (2) to what extent the opposing
> party can "justifiably claim prejudice."

<u>Depianti</u>, 465 Mass. at 611 (quoting <u>Schulte</u> v. <u>Dir. of the Div.</u>
<u>of Emp. Sec.</u>, 369 Mass. 74, 79-80 (1975)).

Because the federal courts are bound by the rulings of the
state's highest court on substantive issues when considering
that state's laws, this Court is bound by the decision of the
Massachusetts Supreme Judicial Court in <u>Depianti</u>.  <u>See</u> <u>Phoung</u>
<u>Luc</u> v. <u>Wyndham Mgmt. Corp.</u>, 496 F.3d 85, 88 (1st Cir. 2007).

To file a complaint with the Massachusetts Attorney General is a legal requirement under Massachusetts General Laws chapter 149, section 150 that cannot simply be ignored.  The Court realizes, of course, that a trial in this case has already taken place.  A judgment on the Plaintiffs' claims under the Wage Act or the FLSA, however, has yet to enter in this case.

In accordance with the decision of the Massachusetts Supreme Judicial Court in Depianti, this Court ruled at the June 2, 2021 hearing that it has subject-matter jurisdiction provided that the Massachusetts Attorney General is notified of the pending suit in accordance with Massachusetts General Laws chapter 149, section 150 before judgment in this matter enters. See Tr. Rulings 5:5-14; see also Depianti, 465 Mass. at 611.

Accordingly, the Court advised the Plaintiffs in its Timing Order, among other things, to file a complaint within thirty days with the Attorney General pursuant to Massachusetts General Laws chapter 149, section 150, and invited the parties to brief the Court as to the legal effect of any such filing, including whether and to what extent the City may have been prejudiced by any delay in such filing.  See Timing Order ¶¶ I.A., I.C.

After being advised by the Court to do so, see Timing Order at I.A., the Plaintiffs' attorney sent a notification letter to

the Attorney General's Office on June 9, 2021.[4]  See Officers'
Second Post-Trial Br., Ex. A, Pl.'s Letter Attorney General
(June 9, 2021) ("Officers' Letter"), ECF No. 251-1.  The
Attorney General's office responded to the Officers' Letter via
a letter dated June 16, 2021.  See id. Ex. B, Attorney General's
Letter Officers (June 16, 2021), ECF No. 251-1.

The Plaintiffs' attorney now appears to suggest in an
affidavit that he notified the Attorney General's office of the
Plaintiffs' Wage Act claim in a telephone call in July 2020 by
speaking with "AAG Robert Quinan" and "a colleague of his" about
"the allegations of the Complaint and . . . the claims of this
case."  See Officers' Second Post-Trial Br., Ex. 1, Aff. Supp.
Pls.' Post-Trial Br. ¶ 6, ECF No. 251-1.  No other corroboration
of that claim is offered.  Id.

### 2.  **Wage Act Claim Requirements**

"It is well established that municipalities are subject to
the Wage Act."  Malden Police Patrolman's Ass'n v. City of
Malden, 92 Mass. App. Ct. 53, 62 (2017).  To recover on a Wage
Act claim, "a plaintiff must show that: (1) he was an employee
under the Wage Act; (2) the compensation constitutes wages
pursuant to the Wage Act; (3) the Wage Act was violated; and (4)

---

[4] The notification was apparently first attempted on the
Attorney General's website on June 8, 2021 and later
supplemented by letter dated June 9, 2021.  See Officers' Letter
at 1.

any individual defendants were corporate officers as defined by the statute."[5]  Ellicott v. Am. Capital Energy, Inc., 906 F.3d 164, 169 (1st Cir. 2018); see Stanton v. Lighthouse Fin. Serv., Inc., 621 F. Supp. 2d 5, 10 (D. Mass. 2009) (Gertner, J.).

The parties diverge as to whether the first, second, and third requirements limned in Ellicott are met.  See City's Post-Trial Br. 16-21; Pls.' Post-Trial Br. 15-16.

### a.  Compensation for Work for Private Details Constitutes Wages Under the Wage Act.

The City argues that the Plaintiffs did not provide "services" to the City when performing private detail work and that, therefore, they are not entitled to "wages" under Massachusetts General Laws chapter 149, section 148.  See City's Pre-Trial Br. ¶ 17, at 10; City's Post-Trial Br. 17-21.  The Plaintiffs disagree, contending that the Massachusetts Superior Court sitting in and for the county of Middlesex has already ruled that compensation for private detail work constitutes "wages" under the Wage Act.  See Pls.' Post-Trial Br. 15-16.

This Court agrees with the Plaintiffs.  In Malden Patrolman's Association v. City of Malden, the Massachusetts Superior Court ruled that "compensation due to officers for

---

[5] Although a Wage Act claim requires proof of wages owed, "the Act itself provides no substantive standard for determining what wages are owed."  Rueli v. Baystate Health, Inc., 835 F.3d 53, 60 (1st Cir. 2016).

detail services provided to private entities . . . does constitute 'wages' as that term is defined in the Wage Act." No. 15CV223, 2016 WL 8232832, at *1 (Mass. Super. Ct. Feb. 09, 2016) (Henry, J.).

On appeal, the Massachusetts Appeals Court recited the Superior Court's ruling "that compensation earned by police officers for the performance of detail work for third parties constituted 'wages' under G.L.c. 149, § 148." See Malden Police Patrolmen's Ass'n, 92 Mass. App. Ct. at 62.  Importantly, the Appeals Court did not disturb this ruling.  See id.  Instead, the Appeals Court explained that because "neither party addressed the three-part test set forth in G.L.c. 149, § 148B, to determine whether the union members, when performing police details, are 'employees' of the city for purposes of the Wage Act," it was "unable to conclude that such compensation, even if 'wages,' is paid to 'employees' of the city."  Id.

In substantive legal issues involving state laws, this Court is bound by the rulings of the state's highest court.  See Phoung Luc, 496 F.3d at 88.

> If the state's highest court, here the Supreme
> Judicial Court ("SJC"), has not definitively addressed
> a question, [federal courts] may consult other sources
> as [they] "make an informed prophecy" about what rule
> the state courts would likely follow.  That said,
> however, we generally make such prophecies only on
> interstitial questions.  As a federal court, we will
> not create new rules or significantly expand existing
> rules.  We leave those tasks to the state courts.

Id. (citing North Am. Specialty Ins. Co. v. Lapalme, 258 F.3d 35, 37-38 (1st Cir. 2001)).  Because the Massachusetts Appeals Court did not disturb the Massachusetts Superior Court's ruling that compensation for private detail work constitutes "wages" under Massachusetts General Laws chapter 149, section 148, this Court considers the question settled.

This Court therefore rules that compensation received by the Plaintiffs for private detail work constitutes "wages" for the purposes of the Plaintiffs' Wage Act claim.

### b.   Officers Performing Private Detail Work are Employees Under the Wage Act.

For the Wage Act to apply to private detail work, the Officers must qualify as "employees" under the Wage Act.[6]  See Malden Police Patrolmen's Ass'n, 92 Mass. App. Ct. at 63.  The City argues that Officers were not "employees" under the Wage Act when performing private detail work.  See City's Post-Trial Br. 16-21.  The Plaintiffs assert the opposite.  See Pls.' Post-Trial Br. 16-18.

Section 148B of the Wage Act prescribes a three-prong test for determining whether an individual is considered an employee

---

[6] In Malden Police Patrolmen's Association, the Massachusetts Appeals Court stated, "In circumstances where G.L.c. 44, § 53C, is applicable, there may be provisions of the Wage Act that do not conflict with § 53C such that the two statutes should be construed and applied harmoniously."  92 Mass. App. Ct. at 62 n.13.

for purposes of the Wage Act.  <u>See</u> Mass. Gen. Laws ch. 149,

§ 148B.  Individuals are considered employees unless:

> (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
>
> (2) the service is performed outside the usual course of the business of the employer; and,
>
> (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

<u>Id.</u>  It is undisputed that all Plaintiffs are employees of the

City when on duty as police officers.  <u>See</u> City's Pre-Trial Br.

¶ 2; Pls.' Pre-Trial Br. ¶¶ 2, 3, 5, 6.  The Superior Court in

<u>Malden Patrolman's Association</u> did not address whether police

officers working private details are considered "employees" for

purposes of the Wage Act.  <u>See</u> 2016 WL 8232832, at *1; <u>see also</u>

<u>Malden Police Patrolmen's Ass'n</u>, 92 Mass. App. Ct. at 62-63

(remanding for this reason).

In its post-trial brief, the City relies heavily on the

decision of the Massachusetts Appeals Court in <u>Gallagher</u> v.

<u>Cerebral Palsy of Massachusetts, Inc.</u>, 92 Mass. App. Ct. 207

(2017).  <u>See</u> City's Post-Trial Br. 16-21.  In essence, the City

argues that, by performing private detail work, an individual

Officer was not providing services to the City.  <u>Id.</u> at 19.

Rather, the City was merely operating as a kind of

"intermediary" between the Officer and a third-party contractor who hired that Officer.  Id.

The City's reliance on Gallagher is misplaced.  In Gallagher, a personal care assistant had sued a fiscal intermediary company, alleging that the company was her employer and therefore owed her overtime pay under the Wage Act.[7]  See 92 Mass. App. Ct. at 209.  Here, there can be no doubt that the Plaintiffs were employed as police officers by the City.  See City's Pre-Trial Br. ¶ 2, at 1; Pls.' Pre-Trial Br. ¶¶ 2, 3, 5, 6.  The issue at hand is simply whether the Officers acted in some other capacity than as police officers when conducting private detail work.

No directly applicable Massachusetts caselaw exists.  The purpose of Massachusetts General Laws chapter 149, section 148B appears to be to distinguish "employees" from "independent contractors."  See Hogan v. InStore Grp., LLC, CIVIL ACTION NO. 17-10027-DPW, 2021 WL 91386, at *12 (D. Mass. Jan. 11, 2021) (Woodlock, J.).  Massachusetts caselaw does address, however, the general nature of the work performed by police officers during private details.

---

[7] The plaintiff in Gallagher had also executed documents stating that the plaintiff's employer was a third-party consumer.  92 Mass. App. Ct. 209.  Several tax documents contained similar statements.  Id.

In <u>Davis</u> v. <u>DelRosso</u>, the Massachusetts Supreme Judicial Court decided that the question whether police officers on a paid detail are to be considered independent contractors or employees of a third-party contractor depends on "the principal's 'right to control' the policemen's activities." 371 Mass. 768, 771 (1977); <u>see also</u> <u>Davis</u> v. <u>Allard</u>, 37 Mass. App. Ct. 508, 513-14 (1994) (holding that racetrack owner did not "control" police detail hired to oversee traffic during an event because he "did not exercise any oversight of the control of traffic" and police officers "were under the direction of a lieutenant or other senior officer"; the officers hired to perform the private details were "in uniform, carried on traffic duties as they had learned them in police academy and by daily experience on the streets"; and "[t]hey could make arrests and in other ways behaved as they did in the streets"), <u>rev'd on other grounds</u> <u>Davis</u> v. <u>Westwood Grp.</u>, 420 Mass. 739 (1995); <u>Yates</u> v. <u>City of Salem</u>, 342 Mass. 460, 461-62 (1961) (holding that a police officer who was paid by a contractor to perform traffic control on his day off was "performing the work of a police officer" and "not acting in the capacity of employee of the contractor"); <u>Kidder</u> v. <u>Whitney</u>, 336 Mass. 307, 308-09 (1957) (finding that a police officer paid to direct traffic by defendant-operators of an open air theater was not defendants' servant because they did not give the officer "instruction or

directions"); <u>Champa</u> v. <u>Town of Billerica</u>, No. 992861, 2001 WL
920000, at *1-4 (Mass. Super. Ct. June 27, 2001) (Volterra, J.)
(holding that a police officer performing private detail work
involving security and supervision at a high school dance event
was not liable for personal injuries sustained by guests, when
he was performing the work "in his patrolman's uniform," having
been "paid by the Town . . . with funds supplied by [the third-
party contractor]," in "the same functions . . . as he did at
any other time when he was working for the . . . Police
Department . . . motivated wholly by his public duty," and
because the event organizer "exercised no control over the
exercise of [the officer's] authority").

Here, Chief Molis testified on day three of the trial that
the broad purpose of detail work is to provide a public service
and public safety.  <u>See</u> Bench Trial Tr. Day Three 105-22:24
(Molis's Testimony).  He also stated that Officers wear their
uniforms, including their duty belt, while performing detail
work.  <u>See</u> <u>id.</u> 112:3-5.  Furthermore, according to Chief Molis,
while performing such work, Officers are bound by the rules and
regulations applicable to police details, the traffic rules, the
code of conduct, and common sense.  <u>See</u> <u>id.</u> 111:19-25, 112:12-
21; <u>see also generally</u> Detail Rules and Procedures.  Although
the initial scope of work for a specific detail assignment is
determined by the person or entity who requested the detail, <u>see</u>

Bench Trial Tr. Day Three 110:16-25, 111:8-18 (Molis's
Testimony), compensation for detail work is paid out to Officers
by the City's payroll, as was confirmed by Ranaghan during his
testimony on day two of the trial, see Bench Trial Tr. Day Two
44:1-25 (Ranaghan's Testimony).  Ranaghan also stated that the
City issues annual W-2 forms to Officers which include
information on detail wages earned and list the City as the
employer.  Id.  According to Sullivan's testimony, the detail
clerk organizes various aspects of detail work administration,
including invoicing and check deposits.  See Bench Trial Tr. Day
Four 95:7-11, 98:11-25, 99:1-2 (Sullivan's Testimony).  Lastly,
Chief Molis confirmed that private detail work is provided on
the basis of an agreement between the private person or entity
requesting the detail and the City.  See id. 12:23-25, 13:1-3
(Molis's Testimony).

The evidence adduced at trial therefore demonstrates that
Officers continued to act in their capacity as police officers
when conducting detail work, including private detail work.  The
evidence also unequivocally shows that the City does not act as
a mere "intermediary" between individual Officers and third-
party contractors with respect to private detail work, but that
the City contracts with third parties directly and pays its
Officers for detail work as part of its regular payroll process.
Accordingly, the Court rules that the Plaintiffs are to be

considered employees under the Wage Act while performing private detail work.

### c.  Violation of the Wage Act by not Paying Wages

In count II of the amended complaint, the Plaintiffs claim that the City violated Massachusetts General Laws chapter 149, section 148 by deducting a ten percent administrative fee from the Plaintiffs' wages earned for private detail work.  See Am. Compl. ¶¶ 34, 47-48.

The City argues that the Officers were paid either "exactly what they were owed," see City's Post-Trial Br. 14-16, or that they were "overpaid" on the basis of the purported correct application of the relevant provisions of the Agreement, id. 8-9.

The City is authorized to collect an administrative fee for private detail work pursuant to Massachusetts General Laws chapter 44, section 53C (the "Municipal Finance Law").  Mass. Gen. Laws ch. 44, § 53C.  In relevant part, the statute reads:

> A city, town or district may establish a fee not to exceed ten per cent of the cost of services authorized under this section, which shall, except in the case of a city, town, district or the commonwealth, be paid by the persons requesting such private detail.  Any such fee received shall be credited as general funds of the city, town or district and shall not be used again without further appropriation.

Id.

[30]

The Massachusetts Appeals Court's decision in <u>Malden Police</u> <u>Patrolmen's Association</u> instructs that "where the detail work is performed for third parties, the plain language of G.L.c. 44, § 53C, governs with respect to detail pay."  92 Mass. App. Ct. at 62.

> **i.**       **Massachusetts General Laws Chapter 44, Section 53C Requires that the Ten Percent Administrative Fee Be Paid by the Person Requesting a Private Detail.**

Massachusetts General Laws chapter 44, section 53C plainly states that "a fee not to exceed ten per cent . . . shall . . . be paid by the persons requesting such private detail."  Mass. Gen. Laws ch. 44, § 53C.

"We 'must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.'"  <u>United States</u> v. <u>Lewis</u>, 554 F.3d 208, 214 (1st Cir. 2009) (quoting <u>Connecticut</u> <u>Nat'l Bank</u> v. <u>Germain</u>, 503 U.S. 249, 253-54 (1992)).  "Where its terms are unambiguous, a statute must be held to mean what it plainly expresses."  <u>L.W.K.</u> v. <u>E.R.C.</u>, 432 Mass. 438, 445-46 (2000).

Here, Massachusetts General Laws chapter 44, section 53C plainly and unambiguously states that the person requesting a private detail must[8] pay the ten percent administrative fee.

The City argues that Massachusetts General Laws chapter 44, section 53C does not confer a private right of action on the Plaintiffs.  See City's Post-Trial Br. 23-24.  That question is not at issue here, however, because the Plaintiffs' claim in count II of the amended complaint is clearly brought for violation of the Wage Act.  See Am. Compl. ¶¶ 34, 47-48.

The Court therefore rules that, in accordance with the clear and unambiguous wording of Massachusetts General Laws chapter 44, section 53C, the person requesting a private detail must pay the ten percent administrative fee.

The City thus violated Massachusetts General Laws chapter 44, section 53C if and to the extent that it deducted a ten percent administrative fee from Officers' wages for private detail work, instead of charging the third party that had requested the private detail.

### ii.   Interpretation of Article 23, Section 3 of the Agreement

The City argues that the Plaintiffs were in fact overpaid when performing detail work, rendering any reduction in pay by

---

[8] The use of the word "shall" in Massachusetts General Laws chapter 44, section 53C indicates that this is a requirement.

subtracting the ten percent administrative fee immaterial.  <u>See</u>
City's Post-Trial Br. 8-9.

To establish whether the reduction of the Plaintiffs' wages
was material, it is necessary first to determine what wages the
Plaintiffs were owed.  It is therefore imperative to establish
the applicable rate of pay owed to the Officers for detail work
performed, which, in turn, requires a review of Article 23,
section 3 of the Agreement.

> **1)   The Term "Maximum Patrolman's Rate
> of Pay" in Article 23, Section 3
> of the Agreement is Ambiguous.**

Article 23, section 3 of the Agreement provides:

> The base rate for paid details shall be one and one
> half times the maximum patrolman's rate of pay
> including night differential.

Agreement Art. 23, § 3.  In essence, Article 23, section 3 is an
equation:

> Base rate for paid details = (maximum patrolman's rate of
> pay including night
> differential) × (1.5)

<u>See</u> <u>id.</u>

"Collective bargaining agreements are contracts governed by
federal common law.  Generally speaking, contract interpretation
is a legal question for the court, unless the contract is
ambiguous, in which case the interpretation may become a fact
question for the jury."  <u>Local 369 Utility Workers</u> v. <u>NSTAR</u>
<u>Elec. & Gas Corp.</u>, 317 F. Supp. 2d 69, 73 (D. Mass. 2004)

(Harrington, J.).  "In construing the terms of contracts that
are governed by federal common law, we are guided by 'common-
sense canons of contract interpretation.'"  Smart v. Gillette
Co. Long-Term Disability Plan, 70 F.3d 173, 178 (1st Cir. 1995)
(quoting Burnham v. Guardian Life Ins. Co., 873 F.2d 486, 489
(1st Cir. 1989)).

The parties agree that Article 23, section 3 is
unambiguous.  See City's Post-Trial Br. 9-12; Pls.' Post-Trial
Br. 12-14.  They just differ markedly as to what the word
"unambiguous" means.  Id.

The parties also differ as to what the expression "maximum
patrolman's rate of pay" means.  The City contends that whatever
"maximum patrolman's rate of pay" refers to, it cannot include
any salary augments besides "night differential."  See City's
Post-Trial Br. 9-12.  Effectively, this means that, according to
the City, the maximum patrolman's rate of pay "consists of two
elements: (1) the maximum patrolman's base pay, and (2) a 'night
differential' (also referred to as a 'shift differential') wage
augment of 6%."  See Mot. J. Partial Findings 1.  The Plaintiffs
contend that the proper calculation of the detail rate under
Article 23, section 3 is not so limited, and that it includes
other salary augments in addition to "night differential."  See
Pls.' Post-Trial Br. 9-13.  The Plaintiffs do not explain,

[34]

however, how the wording of the Agreement supports their
position.  Id.

"Maximum patrolman's rate of pay" is not defined in the
Agreement.  See generally Agreement.  The Agreement identifies
the elements of "Compensation" in Article 30, comprising a "Base
Salary," Agreement Art. 30, § 1, and additional elements,
applicable under certain circumstances: "Shift Differential,"
id. § 2, "Hazardous Duty," id. § 5, and "Longevity and
Education," id. § 7.  Article 30, section 8(A) makes clear that
"[a]n officer cannot receive both longevity and education pay."
Id. § 8(a).

The salary augments can be grouped into elements that
attach to an individual Officer's personal qualifications (such
as "Quinn (25%)" or "POLP Sr. Longevity"; collectively,
"personal salary augments") and those that confer additional
benefits on the basis of an Officer's particular working
conditions during the relevant salaried time period (such as
"POLP Hazardous Duty" and "Shift Differential Police";
collectively, "conditional salary augments").  See generally
Agreement.

The City's argument that the maximum patrolman's rate of
pay consists of "(1) the maximum patrolman's base pay, and (2) a
'night differential,'" see Mot. J. Partial Findings 1, is not
supported by the terms of the Agreement, see Agreement Art. 23,

[35]

§ 3.  Article 23, section 3 clearly states that the detail rate
is 1.5 times "the maximum patrolman's <u>rate of pay</u> including
night differential."  Agreement Art. 23, § 3 (emphasis added).
It does not say the maximum patrolman's <u>base pay</u> including night
differential.  <u>Id.</u>  Article 16, section 4 makes clear that the
Agreement does not apply the terms "base pay" and "rate of pay"
synonymously.  <u>See id.</u> Art. 16, § 4.  There, for the calculation
of overtime, Article 16, section 4 states that "base pay" is an
element included in "rate of pay":

> The overtime <u>rate of pay</u> shall be 1/40th of the
> officer's weekly pay to include <u>base pay</u>, hazardous
> duty pay, night differential, longevity and
> educational incentive monies to which the officer is
> entitled, multiplied by one and one-half for number of
> hours worked.

<u>Id.</u> (emphasis added).

The City's other argument is also unconvincing.  The City
argues that, because overtime calculation under Article 16,
section 4 mentions a plethora of salary augments, whereas
Article 23, section 3 only refers to "night differential," the
Agreement contemplates that the night differential is the only
salary augment relevant for the detail rate calculation.  <u>See</u>
City's Post-Trial Br. 11.  Article 16, section 4 deals with the
calculation of overtime, which is Officer-specific, as evidenced
by the phrase "monies to which the officer is entitled,"
Agreement, <u>see</u> Agreement Art. 16, § 4, whereas the detail rate

[36]

calculation is broadly applicable, _i.e._, it applies uniformly to any Officer seeking remuneration for detail work, referring to the somewhat mysterious "maximum patrolman," _see_ _id._ Art. 23, § 3.  It appears sensible in Article 16, section 4, in the context of overtime calculation, to include a list of any and all salary augments to which an individual Officer may or may not be entitled.  It is true that, as the City contends, the phrase "one and one half times the maximum patrolman's rate of pay including night differential" appears in other contexts in the Agreement.  _See, e.g._, _id._ Art. 14, § 1.  This does nothing, however, to assist in establishing what is meant by the phrase "maximum patrolman's rate of pay" in Article 23, section 3.

"A contract is ambiguous if 'an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken.'" _NSTAR Elec. & Gas Corp._, 317 F. Supp. 2d at 73 (quoting _Lohnes_ v. _Level 3 Commc'ns, Inc._, 272 F.3d 49, 53 (1st Cir. 2001)).

As illustrated above, the parties' views differ as to what elements the phrase "maximum patrolman's rate of pay" reasonably includes.  A reading of the entire Agreement does not provide any reference points as to the phrase's reasonable meaning in the context of the case at hand.  On this basis, the Court rules

that Article 23, section 3 of the Agreement -- specifically the
phrase "maximum patrolman's rate of pay" -- is ambiguous.

> If an inquiring court concludes that an ambiguity
> exists in a contract, the ultimate resolution of it
> typically will turn on the parties' intent.  Exploring
> the intent of contracting parties often (but not
> always) involves marshalling facts extrinsic to the
> language of the contract documents.  When this need
> arises, these facts, together with the reasonable
> inferences extractable therefrom, are together
> superimposed on the ambiguous words to reveal the
> parties' discerned intent.  This construct ordinarily
> requires the judge in a non-jury case to resolve
> questions of fact rather than questions of law.

Smart, 70 F.3d at 178 (citing In re Newport Plaza Assocs., 985
F.2d 640, 645 (1st Cir. 1993)).

The Court conducted a bench trial in this matter.  On day
three of the trial, the Court heard evidence from two witnesses
-- Ranaghan, the City's current Controller, and Police Chief
Kevin Molis -- about their understanding of the phrase "maximum
patrolman's rate of pay" in Article 23, section 3.  See
generally Bench Trial Tr. Day Three.  Both stated that the
phrase refers to the rate of pay of the patrolman who, in
addition to his "base pay," had accumulated the maximum amount
of additional benefits during a certain time period, embodied in
salary augments, namely Quinn Bill pay, hazardous duty pay,
longevity pay, and shift differential.  Id. 132:17-25, 133-1-4,
134:19-21 (Molis's Testimony) (listing Quinn Bill pay, hazardous
duty pay, longevity pay, and shift differential among the

"variety of things" that alter Officers' rates of pay); id. 64:1-25 (Ranaghan's Testimony) (listing the same). Chief Molis further explained that this system had been in place since sometime in the 1980s, and that a new detail rate would be announced if an Officer received a raise or a promotion. See id. 129:10-14.

The construction of the phrase "maximum patrolman's rate of pay," as articulated by the witnesses, makes the most sense because it explains the reference to "maximum patrolman." It also conforms with the use of the terms "rate of pay" and "base pay," as applied in the Agreement. See Agreement Art. 16, § 4. The fact that "night differential" is expressly included in the formula at Article 23, section 3 does not contradict the witnesses' testimony. "Night differential" is a conditional salary augment, i.e., an enhancement that is tied to a condition under which specific work is performed, see id. Art. 30, § 2, whereas Quinn Bill pay and longevity pay are tied to an Officer's unique qualities, see id. § 7.[9] Because a Patrolman who would be considered the "maximum patrolman" would not automatically fulfill the requirements for a "night differential," it makes sense to include a reference to "night

_____

[9] Hazardous duty pay is a conditional salary augment as well, but it appears to be distributed indiscriminately on an annual basis and paid out weekly to every Officer. See Agreement Art. 30, § 5.

differential," but no other salary augment, in Article 23, section 3.

Accordingly, the Court rules that the phrase "maximum patrolman's rate of pay" in Article 23, section 3 of the Agreement refers to the rate of pay of the Patrolman who, in addition to his "base pay," has accumulated the maximum amount of additional benefits during a certain time period, embodied in salary augments, namely Quinn Bill pay, hazardous duty pay, longevity pay and night differential.

### 2) The Term "Base Rate" and the Multipliers

At trial, the Court heard evidence regarding a second issue that is related to the interpretation of Article 23, section 3 of the Agreement.  According to Chief Molis, under certain circumstances, Officers performing detail work were paid detail rates in excess of the detail rate determined by applying the process described above.  See Bench Trial Tr. Day Three 140:13-15 (Molis's Testimony); see also Spreadsheet.  The situations in which higher rates would typically be paid include detail work during strike action, after midnight, detail work by supervisors, detail work performed on holidays, and detail work in excess of eight hours.  See Bench Trial Tr. Day Three 127-128 (Molis's Testimony).  There are several enhancements to detail pay according to the Detail Rules and Procedures (collectively,

the "Multipliers").  "The rate of a supervisor's pay is 1 ½ (one

and one half) times the patrolman's rate for the detail."

Detail Rules ¶ I.17.  Detail work on certain national holidays

warrants payment of "1 ½ (one and one half) times the detail

rate."  Id. ¶ I.21.  Finally, the "[s]trike rate is 2 times the

prevailing detail rate."  Id. ¶ IV.3.  There is no direct

reference to these Multipliers in the Agreement.  See generally

Agreement.  But see Memorandum ¶ 5 (stipulating, under the

heading "Details and Poll Duty," a monetary "detail rate" and

multiplier values for Superior Officers' detail pay under

certain circumstances).  The Agreement does, however state the

following:

> No new categories for which now pay in excess of 1.5
> times the maximum patrolmen's rate of pay will be
> approved or voted by members of this unit without
> approval of the Mayor.

Agreement Art. 23, § 12.

The Agreement also references the Detail Rules and

Procedures, stating that "[t]he detail board shall establish

rules and procedures pertaining to details."  Id. Art. 23, § 5.

The Agreement further includes a provision which reads:

> No amendment, alteration or variation of the terms or
> provisions of this Agreement shall bind the parties
> hereto unless made and executed in writing by said
> parties.  There shall be no alterations, deviations,
> amendments or abridgements of this Agreement unless
> mutually agreed upon by the parties and set down in
> writing and signed by the authorized representatives of
> both the Association and the City.

<u>Id.</u> Art. 4, § 2.

Lastly, the Agreement provides that "[t]he provisions of this Agreement supersede any conflicting or inconsistent rule, regulation or order as promulgated by the Police Commissioner o[r] Chief of Police." <u>Id.</u> Art. 31, § 5.

The City argues broadly that excess detail rates resulted in overpayments for detail work, which in turn invalidates the Plaintiffs' Wage Act claim. <u>See</u> City's Post-Trial Br. 14-16.

This would be an apposite argument if the Multipliers were not contemplated by the Agreement.

> "A fully integrated agreement is a statement which the parties have adopted as a complete and exclusive expression of their agreement." Such an agreement will typically contain an "integration clause" stating that it constitutes the parties' sole agreement and that there are no oral or written representations outside of the agreement.

<u>Cabot</u> v. <u>Cabot</u>, 55 Mass. App. Ct. 756, 763 (2002) (citations omitted). "[E]ven apparently straightforward contractual language asserting integration will not always compel a conclusion that a writing reflects a complete and integrated agreement," however. <u>Chambers</u> v. <u>Gold Medal Bakery, Inc.</u>, 83 Mass. App. Ct. 234, 242-43 (2013) (quoting <u>Green</u> v. <u>Harvard Vanguard Med. Assocs., Inc.</u>, 79 Mass. App. Ct. 1, 9 (2011)).

Here, Article 4, section 2 of the Agreement merely states that "no alterations, deviations, amendments or abridgements"

are to be made to the Agreement, "unless mutually agreed
upon . . . and set down in writing . . . ."  Agreement Art. 4,
§ 2.  Article 31, section 5, states that the Agreement only
"supersede[s] any conflicting or inconsistent rule, regulation
or order."  Id. Art. 31, § 5.  Moreover, Article 23, section 12
clearly references the existence of "categories for which now
pay in excess of 1.5 times the maximum patrolmen's rate of pay,"
but which are not otherwise explained in the Agreement, as well
as the requirement in Article 23, section 5 that "[t]he detail
board shall establish rules and procedures pertaining to
details."  Id. Art. 23, §§ 5, 12.

On this basis, the Court rules that the Agreement is a
partially integrated document.

"Evidence of a consistent additional term is admissible to
supplement an integrated agreement unless the court finds that
the agreement was completely integrated."  Aretakis v. Gen.
Signal, Inc., Civil Action No. 05-10257-DPW, 2006 WL 1581781, at
*5 (D. Mass. June 7, 2006) (Woodlock, J.) (quoting Restatement
(Second) of Contracts § 216(1)); In re Inofin Inc., 512 B.R. 19,
74 (Bankr. D. Mass. 2014) ("[A] partially integrated document
can be supplemented with evidence of consistent additional
terms.").

Here, the witness testimony of Chief Molis and the Detail
Rules and Procedures reference Multipliers for detail work

performed under certain conditions.  See Bench Trial Tr. Day
Three 127-128 (Molis's Testimony); Detail Rules and Procedures
¶¶ I.17, I.21, IV.3.  The existence of Multipliers also does not
contradict the wording of Article 23, section 3, which expressly
refers to "[t]he base rate for paid details," indicating that
the "base rate" may be subject to further enhancement.  See
Agreement Art. 23, § 3 (emphasis added).

The Court therefore rules that the existence of Multipliers
is contemplated in the Agreement and that Multipliers must be
taken into account when calculating an applicable detail rate.

Lastly, the City argues that, even if the detail rate
included all salary augments and further enhancements, the
Plaintiffs received exactly they bargained for and therefore
cannot request more from the City.  See City's Post-Trial Br.
14-16.

This argument is unavailing.  Irrespective of how high a
detail rate may have been under individual circumstances, the
City violated Massachusetts General Laws chapter 44, section 53C
when it deducted a ten percent administrative fee from the
Officers' wages for private detail work, instead of charging the
third party that had requested the private detail.  Under these
circumstances, the Officers might have been paid a high detail
rate in some situations, but they still were not paid what they

were owed in accordance with Massachusetts General Laws chapter 149, section 148.

**B.    Violation of the FLSA for City Detail Work**

The Plaintiffs' FLSA claim is expressly limited to "all paid detail work performed for or on behalf of the City of Malden as the employer."  See Am. Compl. ¶¶ 45-46 (count I). The Plaintiffs claim that the City violated the FLSA, reducing Officers' FLSA overtime payments for detail work, by subtracting the ten percent administrative fee from their compensation.  Id. ¶ 46; Pls.' Post-Trial Br. 2-4.

**1.    The Cause of Action: 29 U.S.C. § 07(a)(1)**

As a threshold issue, the Plaintiffs must prove that they are entitled to overtime pay.  See McGrath v. City of Somerville, 419 F. Supp. 3d 233, 246 (D. Mass. 2019) (Saylor, J.) (citing Manning v. Bos. Med. Ctr. Corp., 725 F.3d 34, 43-44 (1st Cir. 2013)).  The statutory guarantee provides:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).

"A claim for unpaid overtime wages must demonstrate that the plaintiffs were employed 'for a workweek longer than forty hours' and that any hours worked in excess of forty per week were compensated 'at a rate . . . less than one and one-half times the regular rate.'"  Manning, 725 F.3d at 43 (quoting 29 U.S.C. § 207(a)(1)).

"[A]s a threshold matter, to recover FLSA overtime wages, each opt-in plaintiff must be able to prove that he or she worked more than 40 hours in one or more workweeks."  Banks v. Birmingham Bd. of Educ., Case No.: 12-cv-01682-MHH, 2017 WL 3218046, at *1 (N.D. Ala. July 28, 2017).

Detail work can be taken into account when determining whether a plaintiff in an FLSA action worked for more than forty hours.  See O'Brien v. Town of Agawam, 350 F.3d 279, 289 (1st Cir. 2003) ("For purposes of the FLSA, all hours worked under the statutory maximum are non-overtime labor.").

On day four of the trial, the Court ruled that, for the purposes of the present action, a "workweek" as referred to in 29 U.S.C. § 207(a)(1) runs from Saturday of one week until Saturday of the following week.  See Bench Trial Tr. Day Four 76:15-24.

### 2.   The "Regular Rate": 29 U.S.C. § 207(e)

As used in this section the "regular rate" at which an employee is employed shall be deemed to include all

> remuneration for employment paid to, or on behalf of,
> the employee . . . .

29 U.S.C. § 207(e).

> Calculation of the correct "regular rate" is the
> linchpin of the FLSA overtime requirement.  The term
> is significant because under 29 U.S.C. § 207(a)(1), an
> employee who works overtime is entitled to be paid "at
> a rate not less than one and one-half times the
> <u>regular rate</u> at which he is employed."  The statute
> defines the term "regular rate" in § 207(e).  Under
> that provision and the relevant case law and
> interpretive regulations, the regular rate cannot be
> stipulated by the parties; instead, the rate must be
> discerned from what actually happens under the
> governing employment contract.

<u>O'Brien</u>, 350 F.3d at 294 (citing 29 C.F.R. § 778.108).

### a.   General Rules

"[T]he regular rate refers to the hourly rate actually paid

the employee for the normal, non-overtime workweek for which he

is employed."  <u>Walling</u> v. <u>Youngerman-Reynolds Hardwood Co.</u>, 325

U.S. 419, 424 (1945) (citing <u>Walling</u> v. <u>Helmerich & Payne</u>, 323

U.S. 40 (1944)).

> The regular rate by its very nature must reflect all
> payments which the parties have agreed shall be
> received regularly during the workweek, exclusive of
> overtime payments.  It is not an arbitrary label
> chosen by the parties; it is an actual fact.  Once the
> parties have decided upon the amount of wages and the
> mode of payment the determination of the regular rate
> becomes a matter of mathematical computation, the
> result of which is unaffected by any designation of a
> contrary 'regular rate' in the wage contracts.

<u>Id.</u> at 424-25.

**b.  The "Regular Rate" Includes Individual**
**Salary Augments.**

The "regular rate" includes individual salary augments, such as shift-differential pay, longevity pay, and career-incentive ("Quinn Bill") pay.  See O'Brien, 350 F.3d at 294-95; see also 29 C.F.R. § 778.200(c) ("[A]ll remuneration for employment paid to employees which does not fall within one of these seven exclusionary clauses [in 29 U.S.C. § 207(e)] must be added into the total compensation received by the employee before his regular hourly rate of pay is determined.").

**c.  Calculation Involving Fixed Salaries**

If an employee receives a fixed salary, instead of being compensated on an hourly basis, additional considerations apply for the calculation of the employee's "regular rate" of pay under 29 U.S.C. § 07(e).

> The Act does not require employers to compensate employees on an hourly rate basis; their earnings may be determined on a . . . salary . . . basis, but in such case the overtime compensation due to employees must be computed on the basis of the hourly rate derived therefrom and, therefore, it is necessary to compute the regular hourly rate of such employees during each workweek.

29 C.F.R. § 778.109.

A "'fixed weekly salary' method" of calculation "governs employees who receive a fixed salary that is intended to compensate a specific number of hours of labor (e.g., $400 for 40 hours)."  O'Brien, 350 F.3d at 287.

[48]

> For employees who are paid on a weekly salary basis,
> the regular rate is "computed by dividing the salary
> by the number of hours which the salary is intended to
> compensate."  29 C.F.R. § 778.113(a).  "Where a salary
> covers a period longer than a workweek, such as a
> month, it must be reduced to its workweek equivalent."
> 29 C.F.R. § 778.114(b).  Thus, for example, a "monthly
> salary is subject to translation to its equivalent
> weekly wage by multiplying by 12 (the number of
> months) and dividing by 52 (the number of weeks).

O'Brien v. Town of Agawam, 440 F. Supp. 2d 3, 10 (D. Mass.

2006) (Ponsor, J.).

In the case at hand, the Plaintiffs were mostly paid on a

weekly basis to cover a time period of forty hours.  See

generally Paystubs.  The regular hourly rate to be calculated

for each individual Plaintiff is therefore the sum of the

"Current Amt" listed as "Regular" and the value of any

individually applicable augments, as listed on individual

Paystubs, divided by 40.  The same calculation applies for

payments made to individual Plaintiffs on a bi-weekly basis,

applying a divisor of 80.

### 3.   Exclusions: 29 U.S.C. § 207(p)(1)

The FLSA contains express exclusions of hours worked for

specific purposes from the calculation of overtime, most notably

in the context of the present action, 29 U.S.C. § 207(p)(1),

which:

> makes special provision for fire protection and law
> enforcement employees of public agencies who, at their
> own option, perform special duty work in fire
> protection, law enforcement or related activities for

[49]

a separate and independent employer (<u>public or private</u>) during their off-duty hours. The hours of work for the separate and independent employer are not combined with the hours worked for the primary public agency employer for purposes of overtime compensation.

29 C.F.R. § 553.227(b) (emphasis added).

Section § 207(p)(1) provides:

If an individual who is employed by a State, political subdivision of a State, or an interstate governmental agency in fire protection or law enforcement activities (including activities of security personnel in correctional institutions) and who, solely at such individual's option, agrees to be employed on a special detail by a separate or independent employer in fire protection, law enforcement, or related activities, the hours such individual was employed by such separate and independent employer shall be excluded by the public agency employing such individual in the calculation of the hours for which the employee is entitled to overtime compensation under this section if the public agency—

(A) requires that its employees engaged in fire protection, law enforcement, or security activities be hired by a separate and independent employer to perform the special detail,

(B) facilitates the employment of such employees by a separate and independent employer, or

(C) otherwise affects the condition of employment of such employees by a separate and independent employer.

29 U.S.C. § 207(p)(1).

Count I of the amended complaint is limited to city detail work.  <u>See</u> Am. Compl. ¶¶ 45-46.  At trial, the City provided a list of departments for the City of Malden.  <u>See</u> Trial Ex. 45, City Malden Departments.  According to Ranaghan's testimony, the list purported to show the City

Departments that would be capable of making a request for a
city detail.  See Bench Trial Tr. Day Four 81:9-17.  The
list therefore represents the City Departments for which,
in principle, individual Plaintiffs could have performed
city detail work.[10]  Id.

"Section 7(p)(1) applies to such outside employment
provided (1) The special detail work is performed solely at
the employee's option, and (2) the two employers are in fact
separate and independent."  29 C.F.R. § 553.227(b); see also
McGrath, 419 F. Supp. 3d at 247 (quoting 29 C.F.R. § 553.227 in
determining when 29 U.S.C. § 207(p)(1) applies to outside
employment).  Chief Molis testified that any detail work by
Officers -- whether private detail work or city detail work --
was performed on a voluntary basis and during off-duty hours.
See Bench Trial Tr. Day Three 109:3-9 (Molis's Testimony).

"Neither the statute nor the regulation explicitly defines
'separate and independent.'"  McGrath, 419 F. Supp. 3d at 247
(quoting Clark v. City of Fort Worth, 800 F. Supp. 2d 781, 787
(N.D. Tex. 2011), aff'd sub nom. Clark v. City of Fort Worth,
464 F. App'x 325 (5th Cir. 2012)).

> However, courts addressing the issue have considered
> the following factors: "(1) whether the agencies
> maintained separate payrolls; (2) whether the entities
> had arms-length dealings regarding employment; (3)

---

[10] The Plaintiffs did not dispute or rebut the evidence in
trial exhibit 45.

whether the agencies had separate budgets; (4) whether
the employees of the entities participate in separate
retirement programs; (5) whether they are independent
entities under state statute; and (6) whether they can
both sue and be sued."

Murphy v. Town of Natick, 516 F. Supp. 2d 153, 157-58 (D. Mass.

2007) (Stearns, J.) (quoting Barajas v. Unified Gov't of

Wyandotte Cnty./Kansas City, 87 F. Supp. 2d 1201, 1207 (D. Kan.

2000)).  "The degree to which one employer exerts budgetary

control over another is typically given special weight."

McGrath, 419 F. Supp. 3d at 248 (quotations omitted) (quoting

Nolan v. City of Chi., 125 F. Supp. 2d 324, 337 (N.D. Ill.

2000)).

     The fact that the departments that are listed in trial

exhibit 45 are "City of Malden Departments" is not dispositive

as to whether or not they are "separate and independent" from

the City for the purposes of 29 U.S.C. § 207(p)(1), however.

For instance, the special detail exception would apply to "the

police officer who accepts extra employment from a school board

to direct traffic at a football game."  Baltimore Cty. FOP Lodge

4 v. Baltimore Cty., 565 F. Supp. 2d 672, 678 (D. Md. 2008)

(quotations omitted)).  A municipal board was described as a

"separate and independent" public agency from a city by the Wage

and Hour Division of the United States Department of Labor in an

opinion letter dated October 5, 2006.  See U.S. Dep't Labor,

Wage & Hour Division, Opinion Letter Fair Labor Standards Act

(FLSA) (Oct. 5, 2006), 2006 WL 4512963.  It has also been held that 29 U.S.C. § 207(p)(1) applied to city police officers who provided detail work for a city's transit and housing authorities.  See Nolan, 125 F. Supp. 2d at 337.  Cf. Cox v. Town of Poughkeepsie, 209 F. Supp. 2d 319, 326 (S.D.N.Y. 2002) (holding that police officers' time worked off-duty as town court security details was not excluded under 29 U.S.C. § 207(p)(1) because police officers were paid for detail work and their regular police work on the same paycheck by the Town, rather than by separate subdivisions).

Because 29 U.S.C. § 207(p)(1) is an exclusionary provision, the City bears the burden of showing that it applies in the case at hand.  See Specht v. City of Sioux Falls, 639 F.3d 814, 819-20 (8th Cir. 2011) (citing Benshoff v. City of Va. Beach, 180 F.3d 136, 140 (4th Cir. 1999))) ("[T]he employer bears the burden of proving entitlement to any exemptions or exceptions to the Act's compensation requirements.").  The City did not attempt to make any such showing at trial.  It was established at trial through Ranaghan's and Sullivan's testimonies, however, that city detail work was compensated by internal money transfer rather than by means of a check or other external payment method.  See Bench Trial Tr. Day Four 102:14-18.

Consequently, the Court ruled at the June 2, 2021 hearing that, in the event and to the extent that the Plaintiffs are

able to make the required showing under 29 U.S.C. § 207(a)(1)
for any individual Plaintiff in this case, the City may
demonstrate that individual City Departments are to be
considered "separate and independent employer[s]" under 29
U.S.C. § 207(p)(1) on the basis of evidence proffered at trial
and facts of which the Court can take judicial notice.  See Tr.
Rulings 11:19-12:10, Timing Order ¶ II.E.  Any hours of city
detail work performed by an individual Plaintiff for which the
City is able to make such a showing are then to be disregarded
for the purpose of calculating overtime in accordance with 29
U.S.C. § 207(a)(1) for that particular plaintiff.  Id.

### 4.   Statute of Limitations: 29 U.S.C. § 255(a)

The FLSA provides for a time-limit within which
actions can be brought:

> Any action commenced on or after May 14, 1947, to
> enforce any cause of action for unpaid minimum wages,
> unpaid overtime compensation, or liquidated damages,
> under the Fair Labor Standards Act of 1938, as amended
> [29 U.S.C. 201 et seq.], the Walsh-Healey Act, or the
> Bacon-Davis Act --
>
> (a) if the cause of action accrues on or after May 14,
> 1947 -- may be commenced within two years after the
> cause of action accrued, and every such action shall
> be forever barred unless commenced within two years
> after the cause of action accrued, except that a cause
> of action arising out of a willful violation may be
> commenced within three years after the cause of action
> accrued . . . .

29 U.S.C. § 255(a).  Accordingly, "[u]nder the Fair Labor Act,
an action for unpaid compensation must commence within two years

after a cause of action accrues and three years if the cause of action arises out of a willful violation." Trezvant v. Fid. Emp. Servs. Corp., 434 F. Supp. 2d 40, 51 (D. Mass. 2006).

### a.   Applicable Time Period: Willfulness

The Plaintiffs argue that the City acted willfully in failing to administer the ten percent administrative fee because the City "intentionally ignore[d] police detail payroll."  See Pls.' Post-Trial Br. 6.  The City argues that any failure to investigate the detail rate administration and payment to Officers for compliance with the FLSA was not willful, but rather negligent.  See City's Post-Trial Br. 31-33.

### i.   The Legal Standard

An employer's behavior is willful under the FLSA if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988); see also Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 128 (1985) (applying the standard later adopted in McLaughlin).  The Plaintiffs bear the burden of proof that the City's conduct was willful.  See McLaughlin, 486 U.S. at 135.

"[T]he First Circuit has rejected the notion that a failure to investigate compliance with the FLSA can, without more, constitute willfulness."  McGrath, 419 F. Supp. 3d at 259

(citing <u>Baystate Alt. Staffing, Inc.</u> v. <u>Herman</u>, 163 F.3d 668, 681 (1st Cir. 1998)).

> Recklessness involves more than mere awareness of the existence of a governing federal law, or negligence in complying with it, yet less than "voluntary," "deliberate," or "intentional" conduct.  "Deliberate indifference" to the requirements of the law, requirements that the employer "should have known" about, may be willful, while "good faith but incorrect conduct" is not.

<u>LeGoff</u> v. <u>Trs. of Bos. Univ.</u>, 23 F. Supp. 2d 120, 125 (D. Mass. 1998) (Gertner, J.) (citations omitted).

There is no binding or persuasive caselaw that requires that an employer's willful conduct must occur during the third year prior to commencement of any action by Plaintiffs, as the City asserts.  <u>See</u> City's Post-Trial Br. 31-32.

### ii.   Application to the Facts

The Plaintiffs argue that the City had been aware of its violation of the FLSA since the Massachusetts Appeals Court rendered its decision in <u>Malden Police Patrolman's Association</u> on August 11, 2017.  <u>See</u> Pls.' Trial Br. ¶¶ 212-213.  That decision, however, does not refer to a violation of the FLSA. <u>See</u> <u>Malden Police Patrolman's Ass'n</u>, 92 Mass. App. Ct. at 62 n.11 (deeming any possible FLSA issue waived).  On this basis, the City cannot have been deliberately indifferent to the requirements of the FLSA.  <u>See</u> <u>LeGoff</u>, 23 F. Supp. 2d at 125.

The City's Controller, Charles Ranaghan, testified on day two of the trial that he conducted an audit of payments made to Officers for detail work as to whether those payments corresponded with the provisions of the Agreement following a meeting with the Plaintiffs' counsel and certain individual Plaintiffs in relation to the present lawsuit.  See Bench Trial Tr. Day Two 37:21-25, 38:1-6 (Ranaghan's Testimony).  Ranaghan further testified at trial that he had never checked the accuracy of any detail rate paid out to Officers prior to the audit.  Id.  He further testified that he was provided with copies of the detail rate Spreadsheet only since August 2020 and that he had not seen the Spreadsheet for prior years.  Id. 45:6-9.

The conduct described in Ranaghan's testimony was not a "voluntary," "deliberate," or "intentional" violation of the FLSA, and it does not it demonstrate "[d]eliberate indifference" to the requirements of the law.  See LeGoff, 23 F. Supp. 2d at 125 (quotations omitted) (quoting Andover Newton Theological School, Inc. v. Cont'l Cas. Co., 930 F.2d 89, 91 (1st Cir. 1991)).  It is therefore not willful as required under 29 U.S.C. § 255(a).  At most, any failure to investigate discrepancies between detail pay and the provisions of the Agreement absent awareness of any potential wrongdoing under the FLSA constitutes negligence, which is not a sufficient basis for willfulness

under 29 U.S.C. § 255(a).  See McGrath, 419 F. Supp. 3d at 259;
Herman, 163 F.3d at 681.

### iii.      Conclusion

The Plaintiffs failed to demonstrate that the City
willfully violated the FLSA.  Accordingly, the limitation period
applicable in this case is two years, calculated "backward" from
August 28, 2019, the date on which the present lawsuit was
initiated by the Named Plaintiffs, see generally Compl., August
21, 2020, the date on which the majority of the Opt-In
Plaintiffs filed their opt-in Notices in the current action, see
generally Notices, ECF Nos. 34-142, and April 15, 2021 (when the
Opt-In Plaintiffs Kenneth Watkins, Amanda Yanovitch, and
Lieutenant Richard Correale filed their Notices), see Notice
Filing Consent Sue Kenneth Watkins, ECF No. 187; Notice Filing
Consent to Sue Amanda Yanovitch, ECF No. 188; Notice Filing
Consent to Sue Richard Correale, ECF No. 189.

### b.   Statute of Limitations Application

### i.      Accrual of the Cause of Action

With respect to 29 U.S.C. § 255, a cause of action
"accrues when the allegedly illegal employment practice occurs,
and no later than the termination of such practice or the
termination of the plaintiff's employment." Pineda v. Skinner
Servs., Inc., Civil Action No. 16-12217-FDS, 2020 WL 5775160, at
*7 (D. Mass. Sept. 28, 2020) (Saylor, C.J.);  see also Hughes v.

Region VII Area Agency on Aging, 542 F.3d 169, 187 (6th Cir.
2008) ("Under the FLSA . . . '[a] cause of action is deemed to
accrue . . . at each regular payday immediately following the
work period during which the services were rendered for which
the wage or overtime compensation is claimed.'").

Here, accrual of a cause of action for the purposes of 29
U.S.C. § 255 occurred at different points in time for each
Plaintiff in this matter, depending on whether and when each
Plaintiff can demonstrate an FLSA violation within the
limitations period.  The alleged violations are described as
being of a continuous nature.  See Pls.' Pre-Trial Br. ¶¶ 110,
115 n.3, 129; Pls.' Post-Trial Br. 8.

### ii.     Commencement of the Action

With respect to the question as to when an action
commences, 29 U.S.C. § 256 distinguishes between named
plaintiffs and opt-in plaintiffs in class action lawsuits:

> In determining when an action is commenced for the
> purposes of section 255 of this title, an action
> commenced on or after May 14, 1947 under the Fair
> Labor Standards Act of 1938, as amended, the Walsh-
> Healey Act, or the Bacon-Davis Act, shall be
> considered to be commenced on the date when the
> complaint is filed; except that in the case of a
> collective or class action instituted under the Fair
> Labor Standards Act of 1938, as amended, or the Bacon-
> Davis Act, it shall be considered to be commenced in
> the case of any individual claimant --
>
> (a)    on the date when the complaint is filed, if he is
>        specifically named as a party plaintiff in the
>        complaint and his written consent to become a

[59]

>     party plaintiff is filed on such date in the
>     court in which the action is brought; or
>
> (b)  if such written consent was not so filed or if
>      his name did not so appear -- on the subsequent
>      date on which such written consent is filed in
>      the court in which the action was commenced.

29 U.S.C. § 256.  In accordance with 29 U.S.C. § 256, therefore,

the present action has "commenced" at different times for each

individual Plaintiff, depending on which group of Plaintiffs

that individual Plaintiff belongs: on August 28, 2019 for the

Named Plaintiffs, see 29 U.S.C. § 256(a), and on August 21, 2020

or April 15, 2021 for the Opt-In Plaintiffs, see 29 U.S.C.

§ 256(b).

### c.  Conclusion

The point of time at which a cause of action under the FLSA

accrues for the purposes of the application of 29 U.S.C.

§ 255(a) is different for each individual Plaintiff.

Accordingly, a two-year limitation period applies, ending

on August 28, 2019 (for the Named Plaintiffs), the opt-in date

of August 21, 2020 (for the majority of the Opt-In Plaintiffs)

and April 15, 2021 (for the Opt-In Plaintiffs Kenneth Watkins,

Amanda Yanovitch, and Lieutenant Richard Correale), with respect

to individual Plaintiffs' FLSA claims if and to the extent that

the requirements of 29 U.S.C. § 207(a)(1) can be shown to have

been met.

###### 5.   Summary of Rulings of Law: The FLSA Claim

At the June 2, 2021 hearing, the Court made the following rulings relating to the calculation of individual Plaintiffs' FLSA claims:[11]

Each individual Plaintiff in this matter is required to demonstrate the following to satisfy the requirements of 29 U.S.C. § 207(a)(1) in the present action --

Within a time period of two years between August 28, 2017 and August 28, 2019 (for the Named Plaintiffs), August 21, 2018 and August 21, 2020 (for the Opt-In Plaintiffs) and April 15, 2019 and April 15, 2021 (for the Opt-In Plaintiffs Kenneth Watkins, Amanda Yanovitch, and Lieutenant Richard Correale):

- An individual Plaintiff worked more than forty hours in one or more workweeks;

- A workweek runs from Saturday of one calendar week until Saturday of the following calendar week;

- An individual Plaintiff performed city detail work during any such workweek;

- The hourly detail rate for city detail paid to an individual Plaintiff was less than one and one half times an individual Plaintiff's regular rate of pay;

---

[11] See Tr. Rulings 8:16-10:15, 11:19-12:10.

- An individual Plaintiff's regular rate of pay is a workweekly rate that includes individually applicable augments, such as, but not limited to, shift-differential pay, longevity pay, and career-incentive ("Quinn Bill") pay;

- The regular hourly rate to be calculated for each individual Plaintiff per workweek is the sum of the "Current Amt" listed as "Regular" on an individual Plaintiff's Paystub and the value of any salary augment(s) relevant during that workweek applicable to an individual Plaintiff, divided by forty;

- For payments made to individual Plaintiffs on a bi-weekly basis, the same calculation applies, using a divisor of eighty;

- The City may demonstrate that individual City Departments are to be considered "separate and independent employer[s]" under 29 U.S.C. § 207(p)(1) on the basis of evidence proffered at trial and facts of which the Court can take judicial notice;

- Any hours of city detail work performed by an individual Plaintiff for which the City is able to make such showing are to be disregarded for the purpose of calculating overtime in accordance with 29 U.S.C. § 07(a)(1) for that particular Plaintiff.

### C.    Decertification

The City has moved the Court to decertify the Plaintiffs'
FLSA claim.  See generally Mot. Decertify; see also City's Post-
Trial Br. 24-31.

### 1.    Legal Standard

The docket in this case contains 113 Notices filed on
behalf of the Opt-In Plaintiffs.  See generally Notices.  The
Notices reference the Plaintiff's Wage Act and FSLA claims.  Id.
The Court certified a class for the Plaintiffs' Wage Act and
FLSA claims during the hearing on February 22, 2021 on the
parties' cross-motions for summary judgment.  See Tr. Summ. J at
6:17.

> At the close of discovery and following the arrival of
> opt-in plaintiffs, the defendant employer may initiate
> the second stage by moving to "decertify" the
> collective action.  With the benefit of more
> substantial evidence, the court makes a comparatively
> searching "factual determination as to whether there
> are similarly-situated employees who have opted in."

Rossello v. Avon Prod., Inc., Civil No. 14-1815 (JAG/BJM), 2015
WL 3890403, at *3 (D.P.R. June 24, 2015) (citations omitted)
(quoting Sandoz v. Cingular Wireless LLC, 553 F.3d 913, 916 n.2
(5th Cir. 2008), R&R adopted, (D.P.R. Sept. 28, 2015).

The Court is therefore tasked with determining whether the
Named Plaintiffs and the Opt-In Plaintiffs are "similarly
situated" under 29 U.S.C. § 216(b).  See O'Donnell v. Robert

Half Int'l, Inc., 429 F. Supp. 2d 246, 248-49 (D. Mass. 2006)

(Gorton, J.).  At the decertification stage,

> courts consider factors such as: 1) the disparate
> factual and employment settings -- e.g. whether
> plaintiffs were employed in the same corporate
> department, division, and location; 2) the various
> defenses available to defendant which appear to be
> individual to each plaintiff; and 3) fairness and
> procedural considerations.

Trezvant, 434 F. Supp. 2d at 45 (quoting Reeves v. Alliant

Techsystems, Inc., 77 F. Supp. 2d 242, 247 (D.R.I. 1999)).

The issue to be decided here is whether the Plaintiffs are

challenging a "single policy" imposed on them by the City, which

would involve an "inquiry that 'does . . . generate common

answers and [can] be answered 'yes' or 'no' on a classwide

basis,'" or bringing forward an "inquiry that [goes] beyond the

mere existence of a single policy and need[s] to be analyzed on

a case-by-case basis."  See Botero v. Commonwealth Limousine

Serv. Inc., Civil Action No. 12-10428-NMG, 2014 WL 1248158, at

*6 (D. Mass. Mar. 25, 2014) (Gorton, J.) (citing Raposo v.

Garelick Farms, LLC, 293 F.R.D. 52, 57 (D. Mass. 2013) (Gorton,

J.)).

### 2.  Application

The Court applies the factors listed in Trezvant, 434 F.

Supp. 2d at 45, to the facts of the present action below.

### a.   Disparate Factual and Employment Settings

In the case at hand, the likelihood of success for an individual Plaintiff's FLSA claim depends on the consideration of highly disparate factual circumstances.  To determine whether a City policy illegally deprived an individual Plaintiff of ten percent of his or her compensation for city detail work, the Court is required first to determine whether each such plaintiff has an overtime claim under the FLSA.  As discussed above, a detailed and highly complex plaintiff-specific analysis is necessary to determine, on a workweekly basis, whether each plaintiff was eligible for overtime pay under the FLSA for city detail work within the individually applicable two-year statute of limitations time period.[12]

While it may be "plausible that each would-be class member, were he or she to file a separate complaint, could provide sufficient proof to survive summary judgment . . . that fact alone would not be sufficient to render such class members 'similarly situated' so as to warrant conditional class certification here."  Botero, 2014 WL 1248158, at *6.

---

[12] But see Scovil v. FedEx Ground Package Sys., Inc., 886 F. Supp. 2d 45, 58 (D. Me. 2012) (denying an "individualized statute of limitations defense" in response to a motion to decertify an FLSA collective action, stating that "the statute of limitations does not make a collective action inappropriate").

The facts of the matter at hand call for a case-by-case analysis, and do not point to a common answer that applies on a class-wide basis.

### b. Defenses Individual to Each Plaintiff

Here, the limitation period operates as an individualized defense.  The limitation period attaches at different points in time for each plaintiff (depending on when the cause of action under the FLSA accrued) and ends depending on whether each plaintiff is a Named Plaintiff (at the time the action was commenced on August 28, 2019, see Compl.) or an Opt-In Plaintiff (when an individual Notice was filed on August 21, 2020 or April 15, 2021, see Notices).  Only once this has been established can the Court consider whether any deduction of a ten percent administrative fee has deprived individual Plaintiffs of overtime compensation to which they were legally entitled under the FLSA.

### c. Fairness and Procedural Considerations

The City's motion to decertify was filed during the ongoing trial in the present matter.  See generally Mot. Decertify.

The main reason for certifying a class in an FLSA action is to promote judicial economy.  See Cunha v. Avis Budget Car Rental, LLC, 221 F. Supp. 3d 178 (D. Mass. 2016) (Saylor, J.) (citing Iriarte v. Café 71, Inc., No. 15 Civ. 3217 (CM), 2015 WL 8900875, at *2 (S.D.N.Y. Dec. 11, 2015) ("FLSA '[c]ollective

actions were created to promote the efficient adjudication of similar claims, so similarly situated employees, whose claims are often small and not likely to be brought on an individual basis, may join together and pool their resources to prosecute claims.'")).  In the case at hand, it is not at all certain, even after completion of the trial, whether any individual Plaintiffs -- Named or not -- have a viable claim under the applicable provisions of the FLSA.  The trial has demonstrated what extraordinary effort is required to make such a showing, considering how much time was spent by the Plaintiffs' attorney to attempt to do so at trial for only a small number of (strategically) selected Plaintiffs.  No judgment rendered on the Plaintiffs' FLSA claim with respect to the Named Plaintiffs in this case will be applicable to the Opt-In Plaintiffs if it has not first been established whether an individual Opt-In Plaintiff has a viable FLSA claim.  Here, no such comprehensive showing has yet been made.

Moreover, the viability of an individual Plaintiff's FLSA claim turns on the determination of a "regular rate" under 29 U.S.C. § 207(a)(1).  See O'Brien, 350 F.3d at 294.  Because the "regular rate" includes salary augments that are individual to each Plaintiff, "regular rate[s]" naturally differ between individual Plaintiffs.  Moreover, "the actual denominator [for the calculation of an officer's 'regular rate' under 29 U.S.C.

§ 207(a)(1)] will depend on the actual overtime and detail hours worked by each officer.  That number is necessarily an individualized calculation, not a fixed number applicable to all officers."  McGrath, 419 F. Supp. 3d at 252.

Individual considerations overwhelmingly dominate any common questions of fact and law in this case.  The Court therefore rules that the Plaintiffs in this action are not "similarly situated" with respect to their FLSA claim.

### 3.   Legal Effect of Decertification

The City argues that the Court ought dismiss without prejudice the Opt-In Plaintiffs' FLSA claims.  See City's Post-Trial Br. 30-31.

The legal effect of the decertification of a class of plaintiffs in an FLSA collective action has not yet been addressed by the First Circuit Court of Appeals or the district courts within this Circuit.  Other circuit and district courts, however, have done so.  "If the plaintiffs are similarly situated, the collective action proceeds to trial; but if they are not, 'the class is decertified, the claims of the opt-in plaintiffs are dismissed without prejudice, and the class representative may proceed on his or her own claims.'"  Zivali v. AT&T Mobility, LLC, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011) (quoting Lee v. ABC Carpet & Home, 236 F.R.D. 193, 197 (S.D.N.Y. 2006)).  "'[W]hen a collective action is decertified, it reverts

to one or more individual actions on behalf of the named
plaintiffs,' -- which is just what happens when a Rule 23 class
is decertified: the unnamed class members go poof and the named
plaintiffs' claims revert to being individual claims."
Espenscheid v. DirectSat USA, LLC, 688 F.3d 872, 877 (7th Cir.
2012) (quoting Alvarez v. City of Chi., 605 F.3d 445, 450 (7th
Cir. 2010)); see also Roberson v. Rest. Delivery Devs., LLC, 320
F. Supp. 3d 1309, 1322 (M.D. Fla. 2018) (dismissing all of the
opt-in plaintiffs' claims without prejudice and proceeding with
named plaintiff's individual claims).

In the case at hand, the Court certified a class for the
Plaintiffs' FLSA claims that was co-extensive with the Wage Act
claim class.  See Tr. Rulings 10:13-15; Tr. Summ. J. 6:17.  To
dismiss without prejudice the Opt-In Plaintiffs' FLSA claims
while maintaining the Plaintiffs' Wage Act class certification,
thereby forcing the Opt-In Plaintiffs to re-file any viable
individual FLSA claim(s) appears to be unnecessarily burdensome
and not in the interest of judicial economy.

Accordingly, the Court provisionally decertifies the class
for the purposes of the Plaintiffs' FLSA claim, meaning that it
does not currently put the decertification into effect.  The
above appears best to accord with the present procedural posture
of the case as a whole, as well as with considerations of
judicial economy and fairness.

## IV.  CONCLUSION

**A.**  With respect to the Plaintiffs' Wage Act claim, the Court rules that:

**1.**  The Plaintiffs have not yet exhausted their administrative remedies in accordance with Massachusetts General Laws chapter 149, section 150, but the Court nevertheless has jurisdiction to consider and make rulings concerning the Wage Act claim.

**2.**  Compensation received by the Plaintiffs for private detail work constitutes "wages," and the Plaintiffs are "employees" under Massachusetts General Laws chapter 149, sections 148 and 148B.

**3.**  Massachusetts General Laws chapter 44, section 53C requires that the person requesting a private detail must pay the ten percent administrative fee, and the City violated Massachusetts General Laws chapter 44, section 53C if and to the extent that it deducted a ten percent administrative fee from the Officers' wages for private detail work instead of charging the third party that had requested the private detail.

**4.**  Article 23, section 3 of the Agreement -- specifically the phrase "maximum patrolman's rate of pay" -- is ambiguous, and the phrase "maximum patrolman's rate of pay" in Article 23, section 3 of the Agreement refers to the rate of pay of the Patrolman who, in addition to his "base pay," had

accumulated the maximum amount of additional benefits during a certain time period, embodied in salary augments, namely Quinn Bill pay, hazardous duty pay, longevity pay, and night differential.

**5.**   Multipliers must be taken into account when calculating an applicable detail rate because the Agreement is a partially integrated document.

**B.**   With respect to the Plaintiffs' FLSA claim, the Court rules that:

**1.**   The Court provisionally decertifies the class for the purposes of the Plaintiffs' FLSA claim.

**2.**   The Plaintiffs failed to demonstrate that the City willfully violated the FLSA.  In accordance with 29 U.S.C. § 255(a), the limitation period applicable in this case therefore is two years.

**3.**   Pursuant to 29 U.S.C § 256, the two-year limitation period ends on August 28, 2019 (for the Named Plaintiffs), the opt-in date of August 21, 2020 (for the majority of the Opt-In Plaintiffs), and April 15, 2021 (for the Opt-In Plaintiffs Kenneth Watkins, Amanda Yanovitch, and Lieutenant Richard Correale).

**4.**   The point in time at which a cause of action under the FLSA accrues for the purposes of the application of 29 U.S.C. § 255(a) is different for each individual Plaintiff,

depending on whether and to what extent the requirements of 29

U.S.C. § 207(a)(1) can be shown to have been met.

     5.   Each individual Plaintiff in this matter is

required to demonstrate the following to satisfy the

requirements of 29 U.S.C. § 207(a)(1) in the present action --

Within a time period of two years between August 28, 2017

and August 28, 2019 (for the Named Plaintiffs), August 21, 2018

and August 21, 2020 (for the Opt-In Plaintiffs), and April 15,

2019 and April 15, 2021 (for the Opt-In Plaintiffs Kenneth

Watkins, Amanda Yanovitch, and Lieutenant Richard Correale):

- An individual Plaintiff worked more than forty hours in one
  or more workweeks;

- A workweek runs from Saturday of one calendar week until
  Saturday of the following calendar week;

- An individual Plaintiff performed city detail work during
  any such workweek;

- The hourly detail rate for city detail paid to an
  individual Plaintiff was less than one and one half times
  the individual Plaintiff's regular rate of pay;

- An individual Plaintiff's regular rate of pay is a
  workweekly rate that includes individually applicable
  augments, such as, but not limited to, shift-differential
  pay, longevity pay, and career-incentive ("Quinn Bill")
  pay;

- The regular hourly rate to be calculated for each
  individual Plaintiff per workweek is the sum of the
  "Current Amt" listed as "Regular" on an individual
  Plaintiff's Paystub and the value of any salary augment(s)
  relevant during that workweek applicable to an individual
  Plaintiff, divided by forty;

- For payments made to individual Plaintiffs on a bi-weekly
  basis, the same calculation applies, using a divisor of
  eighty;

- The City may demonstrate that individual City Departments
  are to be considered "separate and independent employer[s]"
  under 29 U.S.C. § 207(p)(1) on the basis of evidence
  proffered at trial and facts of which the Court can take
  judicial notice;

- Any hours of city detail work performed by an individual
  Plaintiff for which the City is able to make such a showing
  are to be disregarded for the purpose of calculating
  overtime in accordance with 29 U.S.C. § 207(a)(1) for that
  particular Plaintiff.

**C.**   The calculation of individual claims in this matter --
whether brought in the form of a Wage Act or FLSA claim -- is to
be performed in accordance with the requirements further set out
in the Timing Order, and the Court does not express an opinion,

nor does it enter judgment, with respect to any individual

Plaintiff's claims in this matter at this time.

    **SO ORDERED.**

<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[13]

---

[13] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 43 years.